CV 13-4165

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MAUSKOPF, J.

POHORELSKY, M.J.

| | |
|---|---|
| THE UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Civil Action No. _____ |
| ) | |
| STATE OF NEW YORK, ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

The United States of America, by its undersigned attorneys, for its complaint, states the following:

1. The United States brings this complaint against the State of New York ("the State") for failing to serve individuals with mental illness in the "most integrated setting" as required by title II of the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12131-12134, and Section 504 of the Rehabilitation Act ("Rehabilitation Act"), 29 U.S.C. § 794, and their implementing regulations (as interpreted in Olmstead v. L.C., 527 U.S. 581 (1999)). This suit seeks to vindicate the rights of people with mental illness in "impacted"[1] adult homes with 120 or more beds in New York City (hereinafter, "Adult Homes"), and those at risk of entry into Adult Homes, to receive services in the most integrated setting appropriate to their needs.

2. Title II of the ADA prohibits the unjustified isolation of persons with disabilities, *see* 42 U.S.C. § 12132; Olmstead, 527 U.S. 581 (1999), and requires states and other public entities to

---

[1] Impacted adult homes are homes in which at least 25% of the residents or 25 residents (whichever is fewer) have mental disabilities. See N.Y. Mental Hyg. Law §§ 45.09(a), 45.10(a) (referring to adult homes in which "at least twenty-five percent or twenty-five residents, whichever is less, have at any time received or are receiving services from a mental hygiene provider which is licensed, operated or funded by the office of mental health, or the office for people with development disabilities").

"administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The Rehabilitation Act similarly prohibits recipients of federal financial assistance from discriminating against individuals with disabilities, and requires that they provide services and supports in the most integrated setting appropriate to the needs of individuals with disabilities. 29 U.S.C. § 794, 45 C.F.R. § 84.4.

3.  As set forth herein, thousands of individuals with mental illness in New York City are segregated in large, for-profit institutional residential care facilities known as "impacted" adult homes that are part of the State's system for providing services to people with mental illness, even though they could be more appropriately served in more integrated settings.

4.  More integrated and appropriate alternatives for persons with mental illness exist within New York's mental health service system. These alternatives include supported housing—integrated, community-based housing that provides tenants with all the rights of tenancy—combined with an array of mental health services to support people with mental illness living in the community. Accord Disability Advocates, Inc. v. Paterson, 653 F. Supp. 2d 184, 218-223 (E.D.N.Y. 2009).

## JURISDICTION and VENUE

5.  This Court has jurisdiction over this action under title II of the ADA, 42 U.S.C. § 12133, Section 504 of the Rehabilitation Act, 29 U.S.C. § 794a, and 28 U.S.C. §§ 1331 and 1345.

6.  The Court may grant the relief sought in this action pursuant to 28 U.S.C. §§ 2201-2202.

7.  Venue is proper in this district pursuant to 28 U.S.C. § 1391, because a substantial part of the acts and omissions giving rise to this action occurred in the Eastern District of New York. 28 U.S.C. § 1391(b).

## PARTIES

8. Plaintiff is the United States of America. The United States Department of Justice is the federal agency responsible for administering and enforcing title II of the ADA, 42 U.S.C. § 12131 et seq.

9. Defendant New York State is a "public entity" within the meaning of the ADA, 42 U.S.C. § 12131(1), 28 C.F.R. § 35.104, and is therefore subject to title II of the ADA, 42 U.S.C. § 12131 et seq., and its implementing regulations, 28 C.F.R. Part 35.

10. At all times relevant to this action, the State of New York has been a recipient of Federal financial assistance, including Medicaid funds, and is therefore subject to the Rehabilitation Act, 29 U.S.C. § 794, and its implementing regulations, 45 C.F.R. Part 84.

## STATUTORY AND REGULATORY BACKGROUND

11. Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities[.]" 42 U.S.C. § 12101(b)(1). It found that "historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]" 42 U.S.C. § 12101(a)(2).

12. The ADA provides that "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

13. Congress directed the Attorney General to issue regulations implementing title II of the ADA. 42 U.S.C. § 12134. The title II regulations require public entities to "administer services,

programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The preamble discussion of the "integration regulation" explains that "the most integrated setting" is one that "enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible[.]" 28 C.F.R. pt 35, App. B, section 35.130(d) (2011).

14. Regulations implementing title II of the ADA further prohibit public entities, "directly or through contractual or other arrangements" from utilizing "criteria or methods of administration" that (1) "have the effect of subjecting qualified individuals with disabilities to discrimination" and (2) "have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the public entity's program with respect to individuals with disabilities[.]" 28 C.F.R. § 35.130(b)(3). Accord 45 C.F.R. § 84.4(b)(4) (Rehabilitation Act).

15. In Olmstead v. L.C., 527 U.S. 581, 597 (1999), the Supreme Court held that title II of the ADA prohibits the unjustified segregation of individuals with disabilities. The Court explained that its holding "reflects two evident judgments." Id. at 600. "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." Id. "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." Id. at 601.

16. Under Olmstead, public entities are required to provide community-based services when (1) such services are appropriate, (2) the affected persons do not oppose community-based treatment, and (3) community-based services can be reasonably accommodated, taking into

account the resources available to the entity and the needs of other persons with disabilities. Id. at 607.

17. Discrimination on the basis of disability is also prohibited by Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a):

> No otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance[.]

18. The Rehabilitation Act's implementing regulations provide that recipients of federal funds "shall administer programs and activities in the most integrated setting appropriate to the needs of qualified handicapped persons." 28 C.F.R. § 41.51(d); see also 45 C.F.R. § 84.4.

## FACTS

### A. New York's Mental Health Scheme

19. Pursuant to New York State law, "New York and its local governments have a responsibility for the prevention and early detection of mental illness and for the comprehensively planned care, treatment and rehabilitation of their mentally ill citizens." N.Y. Mental Hyg. Law § 7.01; see also id. §§ 5.07, 7.07. In this regard, "[s]uch a system should include, whenever possible, the provision of necessary treatment to people in their home communities; it should assure the adequacy and appropriateness of residential arrangements for people in need of services; and it should rely upon improved programs of institutional care only when necessary and appropriate." N.Y. Mental Hyg. Law § 7.01.

20. Defendant New York State operates its mental health system through two state agencies, the New York State Office of Mental Health ("OMH") and the Department of Health ("DOH"). OMH and DOH administer the State's mental health service system, plan the settings in which mental health services are provided (by both public and private entities) and allocate resources

within the mental health service system. See, e.g., N.Y. Mental Hyg. Law §§ 5.07, 7.07, 41.03, 41.42, 41.39; N.Y. Comp. Codes R. & Regs. tit. 18, §§ 485-87.

21. Specifically, DOH is responsible for, among other things, promoting the "development of sufficient and appropriate residential care programs for dependent adults." N.Y. Comp. Codes R. & Regs. tit. 18, §§ 485.3(a)(1), 487.1(b). DOH issues operating certificates to establish and operate adult homes. N.Y. Soc. Servs. Law §§ 460-b, 461-b; N.Y. Comp. Codes R. & Regs. tit. 18, §§ 485.3, 485.5. DOH also licenses and monitors adult homes and enforces the applicable statutes and regulations through unannounced inspections of each adult home every twelve or eighteen months, depending on the facility's record. N.Y. Soc. Servs. Law §§ 461-a, 461-b. OMH is also involved in the inspection process. See id. § 485.3(b)(1). OMH is required by law to plan how and where New York's mental health services will be delivered. N.Y. Mental Hyg. Law § 7.07. In particular, OMH is responsible for developing an "effective, integrated, comprehensive system for delivery of all services to the mentally ill and to create financing procedures and mechanisms to support such a system of services to ensure that mentally ill persons in need of services receive appropriate care, treatment and rehabilitation close to their families and communities," and it relies on both public and private providers of those services. Id. § 7.01. OMH also serves an advisory role to "assist the governor in developing policies designed to meet the needs of the mentally ill and to encourage their full participation in society." Id. at § 7.07(b).

22. OMH licenses, funds, and oversees an array of mental health housing and support service programs statewide, including community support, residential, and family care programs. N.Y. Mental Hyg. Law §§ 41.03, 41.42, 41.39. Housing programs include Supported Housing, which is a scattered site setting in which individuals live in their own apartment and receive services to

support their success as tenants and their integration into the community. In carrying out these roles and responsibilities, the State determines what mental health services to provide, who will provide them, in what settings to provide them, and how to allocate funds among various services and settings. By virtue of the manner in which New York has designed, administered, and funded its service system, adult homes are a significant part of the State's mental health service system. Accord DAI, 653 F. Supp. 2d at 192-94; Disability Advocates, Inc. v. Paterson, 598 F. Supp. 2d 289, 317-19 (E.D.N.Y. 2009).

B. Adult Homes Are Not the Most Integrated Setting Appropriate for Persons with Mental Illness

23. Adult homes are a type of adult care facility licensed by the State of New York and authorized to provide long-term residential care, room, board, housekeeping, personal care, and supervision to five or more adults unrelated to the operator.

24. There are approximately 380 adult homes in New York State; approximately 44 of these are in New York City.

25. Certain adult homes are known as "impacted" homes. These are adult homes in which at least 25% of the residents, or twenty-five residents, whichever is fewer, have mental illnesses. In Adult Homes, defined herein as impacted facilities with 120 or more total residents in New York City, the proportion of residents with mental illness far exceeds 25%.

26. There are approximately 23 Adult Homes in New York City; the vast majority of residents in these homes have mental illness.

27. For the most part, Adult Homes have the characteristics of an institution. Accord DAI, 653 F. Supp. 2d at 198-215, 282-88. Residents live with other persons with disabilities, and have limited opportunity to interact with individuals who do not have disabilities. They are assigned

7

to small rooms that they share with at least one other resident. Bathrooms are also shared with at least one other person.

28. Residents of Adult Homes have very little autonomy over their daily lives, including over with whom they live and eat meals, and what they eat and when, and are afforded virtually no privacy. Most Adult Home residents are denied the right to administer their own medication, and instead, are required to line up at a medication station at specific times of day. Some Adult Homes require residents to notify staff each time they leave the facility or if they are going to be away from the facility overnight, such as visiting relatives. Some facilities have evening curfews.

29. Adult Homes generally control and manage residents' "personal needs allowance" – $187 – from their Social Security Supplemental Security Income (SSI) benefits each month. The remainder of the resident's SSI benefits is paid to the Adult Home.

30. Adult Homes do not afford people with mental illness opportunities to achieve greater independence and community integration. For example, the Adult Homes do not permit residents to cook for themselves or do their own laundry at the facility. Consequently, the facilities foster learned helplessness. Accord id. at 214-15.

31. The State itself has characterized residents with mental illness as "stuck" in "institutional settings," including adult homes. OMH Guiding Principles for the Redesign of the OMH Housing and Community Support Policies (2007), at 1; OMH Statewide Comprehensive Plan, 2006-2010 (2008 Update); 2009-2010 Mental Health Update & Executive Budget Testimony of OMH Commissioner M. Hogan (Jan. 29, 2009).

32. OMH recently recognized that impacted adult homes are not clinically appropriate settings for the significant number of persons with serious mental illnesses who reside in such

8

settings, and are not conducive to the rehabilitation or recovery of persons with serious mental illness. Clinical Advisory from Lloyd I. Sederer, M.D. to OMH Facility, Clinical, and Nursing Directors, Directors of OMH Licensed Inpatient Programs (August 8, 2012), available at www.omh.ny.gov/omhweb/advisories/Clinical_Advisory_Adult.pdf. OMH has further acknowledged that impacted adult homes "do not foster independent living, with the use of congregate meals, ritualized medication administration and programming that may not be tailored to the individual needs of the residents." Office of Mental Health, Notice of Adoption, Operation of Psychiatric Inpatient Units of General Hospitals and Operation of Hospitals for Person with Mental Illness, I.D. No. OMH-32-12-00019-A, NYS Register at 13 (Jan. 16, 2013), available at http://docs.dos.ny.gov/info/register/2013/jan16/pdf/rulemaking.pdf.

33. Similarly, the Department of Health has recognized that impacted adult homes "do not foster independent living due to institutional practices such as of congregate meals or ritualized medication administration; and do not provide specifically designed rehabilitation programs linked to community work settings." Department of Health, Notice of Adoption, Adult Homes, I.D. No. HLT-32-12-00020-A, NYS Register, at 6 (Jan. 16, 2013), available at http://docs.dos.ny.gov/info/register/2013/jan16/pdf/rulemaking.pdf.

    D.    People with Mental Illness in Adult Homes Are Persons with Disabilities Who Are Qualified to Receive Services in More Integrated Settings and Do Not Oppose It

34. Persons with mental illness residing in, and persons with mental illness at risk of entry into, Adult Homes are individuals with mental illnesses, such as schizophrenia, bipolar disorder, depression, and others, that substantially limit one or more major life activities, including personal care, working, concentrating, thinking, and sleeping. They are therefore persons with disabilities for purposes of the ADA and the Rehabilitation Act.

35. Virtually all of the individuals with mental illness in Adult Homes and those at risk of entry into Adult Homes can be served in more integrated settings, specifically, supported housing. Accord DAI, 653 F. Supp. 2d at 218-23, 229.

36. The placement of persons with mental illness in Adult Homes is not based on a determination that such placement is clinically necessary. Instead, people with mental illness tend to end up in Adult Homes following a hospitalization or homelessness because there are no available residential placements in integrated community settings, such as supported housing. Accord id. at 245-46, 260-61.

37. OMH currently funds and develops supported housing for individuals with mental illness, including a limited supply of units for adult home residents. Supported housing is an initiative to provide permanent housing, mostly in apartments scattered throughout the community, to individuals with mental illness, with individualized support services to assist them in succeeding in their housing.

38. One of the key principles of the State's supported housing program is to separate housing from support services by assisting the resident to remain in the housing of his choice while the services vary to meet the changing needs of the individual.

39. Supported housing is a successful, cost-effective program that gives residents the same privacy rights as any other tenant in a landlord-tenant relationship. In supported housing, people with mental illness live much like their nondisabled peers. It is the individual's home. Residents of supported housing sometimes live alone and sometimes share their apartment with a roommate, whom they choose. They can control their own schedules and daily lives. They can come and go when they like, eat what and when they like, decide when to go to sleep and when to wake up, and invite guests over at whatever times they choose. Accord id. at 218-23.

40. Compared to residents of Adult Homes, residents of supported housing have far greater opportunities to interact with non-disabled persons and be integrated into the larger community. Accord id. at 218-24, 227.

41. People with mental illness in Adult Homes are not materially different from people with mental illness who receive services in more integrated settings, including supported housing. People with mental illness in Adult Homes have similar diagnoses and symptoms of people who live successfully in more independent settings, including supported housing, with the supports and services that exist in the State's community mental health system. Accord id. at 245-47.

42. In supported housing, community mental health providers offer a variety of support services, depending on the needs of the individual. Such services include case management such as Assertive Community Treatment ("ACT") or "intensive" or "blended" case management which, among other things, can assist individuals with daily activities such as personal care and safety, grocery shopping and cooking, purchasing and caring for clothing, household chores, using transportation and other community resources, and managing finances.

43. Most individuals with mental illness in Adult Homes would not oppose moving to integrated settings such as supported housing, if they had a fully-informed choice and a realistic opportunity to do so. Accord id. at 259-67. Numerous Adult Home residents have expressed their desire to leave the Adult Home and become members of their communities once again.

    E.     <u>Serving Individuals with Mental Illness in an Integrated Setting Can Be Reasonably Accommodated</u>

44. Providing services in community settings to individuals with mental illness residing in, or at risk of entry into, Adult Homes can be accomplished with reasonable modifications to the Defendant's programs and services. Accord DAI, 653 F. Supp. 2d at 300-11.

45. The types of programs and services needed to support individuals with mental illness in community-based settings, including supported housing, ACT teams, case management, and peer support services, already exist in New York's mental health service system.

46. However, very few Adult Home residents have accessed the State's community housing programs due to the insufficient supply of supported housing units for the approximately 4,000 residents with mental illness in Adult Homes and the many more individuals with mental illness who are at risk of entry into Adult Homes.

47. Serving individuals with mental illness residing in, or at risk of entry into, Adult Homes in supported housing rather than Adult Homes would not adversely impact the State's ability to serve other individuals with disabilities. Id. at 298-99, 305-08. To the contrary, serving those individuals in supported housing will likely save money, thus freeing State funds to use for other individuals with disabilities. According to DOH, "it is expected that when adult home residents with behavioral health needs transition to appropriate community housing, coupled with appropriate supportive services, their overall utilization of Medicaid-funded services will decrease and significant savings will result." Department of Health, Notice of Adoption, Adult Homes, I.D. No. HLT-32-12-00020-A, NYS Register at 6 (Jan. 16, 2013), available at http://docs.dos.ny.gov/info/register/2013/jan16/pdf/rulemaking.pdf.

    F.      Resolution of the United States' Claims

48. On November 23, 2009, the court granted the United States' intervention as plaintiff-intervenor in Disability Advocates, Inc. v. Paterson, No. 03-CV-3209 (E.D.N.Y.). The United States participated in implementation of the district court's remedial order and in the State's appeal of the court's order to the Second Circuit. On April 6, 2012, the Second Circuit vacated the district court's remedial order and judgment and dismissed the action for lack of jurisdiction.

49. In lieu of re-filing a complaint, United States officials met with State officials over the past year and exchanged written proposals in an attempt to reach a resolution to the violations identified by the United States in the United States' Complaint in <u>Disability Advocates, Inc. v. Paterson</u>, No. 03-CV-3209 (E.D.N.Y.) and in its on-going investigation. The parties ultimately reached a settlement agreement.

50. Accordingly, all conditions precedent to the filing of this Complaint have occurred or been performed.

## COUNT I

## VIOLATION OF TITLE II OF THE AMERICANS WITH DISABILITIES ACT

51. The allegations of Paragraphs 1 through 50 of the Complaint are hereby realleged and incorporated by reference.

52. Defendant is a public entity subject to title II of the ADA. 42 U.S.C. § 12131(1).

53. Defendant violates the ADA by administering its mental health service system in a manner that denies persons with mental illness residing in, and at risk of entry into, Adult Homes the opportunity to receive services in the most integrated setting appropriate to their needs.

54. The persons with mental illness residing in, and at risk of entry into, Adult Homes are persons with disabilities covered by title II of the ADA, and they are qualified to receive services in a more integrated setting. 42 U.S.C. §§ 12102, 12131(2).

55. Providing services in more integrated settings to persons with mental illness residing in, and at risk of entry into, Adult Homes can be accomplished with reasonable modifications to the Defendant's programs and services.

56. Defendant's actions constitute discrimination in violation of title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations, 28 C.F.R. Part 35.

57.     All conditions precedent to the filing of this claim have occurred or have been performed.

## COUNT II

## VIOLATION OF SECTION 504 OF THE REHABILITATION ACT

58.     The allegations of Paragraphs 1 through 50 of the Complaint are hereby realleged and incorporated by reference.

59.     The State of New York, which is a recipient of federal financial assistance, discriminates against "qualified individual[s] with a disability" within the meaning of the Rehabilitation Act by administering programs and services for individuals with mental illness in a manner that denies individuals the opportunity to receive services in the most integrated setting appropriate to their needs. 29 U.S.C. § 794; 45 C.F.R. § 84.4.

60.     The persons with mental illness residing in, and at risk of entry into, Adult Homes are persons with disabilities covered by Section 504 of the Rehabilitation Act, and they are qualified to receive services in a more integrated setting.

61.     Providing services in more integrated settings to persons with mental illness residing in, and at risk of entry into, Adult Homes can be accomplished with reasonable modifications to the Defendant's programs and services.

62.     All conditions precedent to the filing of this claim have occurred or have been performed.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States of America prays that the Court:

A. Grant judgment in favor of the United States on its Complaint and declare that Defendant has violated title II of the ADA, 42 U.S.C. § 12131 et seq., and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794;

B. Enjoin Defendant from:

 1. failing to provide appropriate, integrated community services and supports to persons with mental illness residing in, and at risk of entry into, Adult Homes;

 2. discriminating against persons with mental illness residing in, and at risk of entry into, Adult Homes by failing to provide services and supports in the most integrated setting appropriate to their needs;

C. Issue a declaratory judgment declaring that:

 1. Defendant has violated title II of the ADA and Section 504 of the Rehabilitation Act by failing to make reasonable modifications to services, programs, and supports for persons with mental illness residing in, and at risk of entry into, Adult Homes to enable them to receive services in the most integrated setting appropriate to their needs; and

D. Order such other appropriate relief as the interests of justice may require.

Dated: July 23, 2013

Respectfully submitted,

*[signature]*

JOCELYN SAMUELS
Acting Assistant Attorney General
Civil Rights Division

EVE L. HILL
Deputy Assistant Attorney General
Civil Rights Division

ALISON BARKOFF, Special Counsel for
*Olmstead* Enforcement
Civil Rights Division

*[signature]*

REBECCA B. BOND, Section Chief
SHEILA M. FORAN, Special Legal Counsel
AMANDA MAISELS, Trial Attorney
NICHOLAS C. LEE, Trial Attorney
Disability Rights Section
Civil Rights Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W. - NYA
Washington, D.C. 20530
Telephone: (202) 305-8454
Facsimile: (202) 307-1197
Amanda.Maisels@usdoj.gov
Nicholas.Lee2@usdoj.gov
*Counsel for Plaintiff*
*United States of America*

16

                LORETTA E. LYNCH
                United States Attorney

BY:    MICHAEL J. GOLDBERGER
        Assistant U.S. Attorney
        United States Attorney's Office
        Eastern District of New York
        271 Cadman Plaza East
        Brooklyn, New York 11201
        (718) 254-6052
        michael.goldberger@usdoj.gov
        *Counsel for Plaintiff*
        *United States of America*