UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JUL 23 2013 ★

BROOKLYN OFFICE

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>STATE OF NEW YORK,<br><br>Defendant. | Civil Action No. CV-13-4165<br>(Mauskopf, J.)<br>(Pohorelsky, M.J.) |
| RAYMOND O'TOOLE, ILONA SPIEGEL, and STEVEN FARRELL, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>ANDREW M. CUOMO, in his official capacity as Governor of the State of New York, NIRAV R. SHAH, in his official capacity as Commissioner of the New York State Department of Health, KRISTIN M. WOODLOCK, in her official capacity as Acting Commissioner of the New York State Office of Mental Health, THE NEW YORK STATE DEPARTMENT OF HEALTH, and THE NEW YORK STATE OFFICE OF MENTAL HEALTH,<br><br>Defendants. | Civil Action No. CV-13-4166<br>(Irizarry, J.)<br>(Bloome, M.J.) |

## STIPULATION AND ORDER OF SETTLEMENT

**WHEREAS**, the United States of America asserts as against the State of New York, and the Plaintiff Class asserts as against certain State agencies and officials, that they are prepared to commence litigation seeking declaratory and injunctive relief, alleging violations of Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12131 *et seq.*, and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, with respect to individuals with serious mental illness who reside in, or who may in the future reside in, NYC Impacted Adult Homes, meaning Adult Homes in New York City with certified capacities of 120 or more in which 25 percent or more of the residents or 25 residents, whichever is less, have serious mental illness; and

**WHEREAS**, the United States of America and the Plaintiff Class (collectively, the "Plaintiffs") allege that the State of New York and certain State agencies and officials (collectively, the "State") violate the ADA and the Rehabilitation Act by designing, funding, and administering the State's mental health service system in a manner that discriminates against Persons with Serious Mental Illness who reside in NYC Impacted Adult Homes; that there are more than 4,000 individuals with serious mental illness who currently reside in NYC Impacted Adult Homes; and that NYC Impacted Adult Homes are segregated facilities that are not the most integrated setting appropriate for individuals with serious mental illness, virtually all of whom can be served in more integrated settings, specifically, supported housing; and

**WHEREAS**, the State of New York and State agencies and officials, namely the Commissioner of the New York State Office of Mental Health, the Commissioner of the New York State Department of Health, and the Governor of the State of New York, all in their official capacities, and the New York State Office of Mental Health ("OMH") and the New York State Department of Health ("DOH") (collectively "the Defendants" or "the State"), deny that they have violated the ADA or the Rehabilitation Act; and

**WHEREAS**, OMH has issued a Clinical Advisory stating that Adult Homes with a significant proportion of residents with serious mental illness are not conducive to the recovery and rehabilitation of these individuals and thus are not clinically appropriate settings for such individuals; and

**WHEREAS**, on January 16, 2013, DOH adopted regulations providing that no operator of an Adult Home located anywhere in New York State with a certified capacity of 80 or more shall admit any person with serious mental illness whose admission will cause such Adult Home to become or remain a "Transitional Adult Home" – meaning that the mental health census of such particular adult home is 25 percent or more of the resident population – and that the operator of any Transitional Adult Home must submit a compliance plan to DOH demonstrating how it will reduce such mental health census below 25 percent; and

**WHEREAS**, on January 16, 2013, OMH adopted regulations prohibiting OMH-licensed psychiatric inpatient units of general hospitals and private psychiatric hospitals from discharging individuals with Serious Mental Illness to Transitional Adult Homes, and has issued similar guidance to its state-operated psychiatric centers through amendments to its Official Policy Manual; and

**WHEREAS**, the Medicaid Redesign Team ("MRT"), established by the Governor in Executive Order No. 5 on January 5, 2011, recommended a series of reforms

2

in the Medicaid Program, most of which were incorporated into the budget for State Fiscal Years 2011-12 and 2012-13, including the creation of Health Homes and the institution of an accelerated shift to Managed Long Term Care Plans ("MLTCPs") for eligible Medicaid recipients; and

**WHEREAS,** as part of the implementation of the aforementioned MRT initiatives, Persons with Serious Mental Illness who reside in Transitional Adult Homes throughout the State will be enrolled in either Health Homes or MLTCPs, which will perform comprehensive assessments of the residents' physical and behavioral health needs and arrange for needed services; and

**WHEREAS,** the State will require that Health Homes and MLTCPs, as part of the comprehensive assessment of a Person with Serious Mental Illness residing in a Transitional Adult Home, affirmatively work with the individual and his or her family as appropriate to recommend housing and coordinate other social, medical and behavioral health services that would be necessary to support such individual and facilitate his or her ability to live in the community; and

**WHEREAS,** pursuant to a Request for Proposals issued on August 10, 2012, OMH entered into contracts to fund the development of 1,050 Supported Housing units in Kings and Queens Counties over a three year period for the purpose of helping Persons with Serious Mental Illness residing in Transitional Adult Homes in such counties transition to the community as appropriate and will enter into additional similar arrangements as necessary; and

**WHEREAS,** the State has developed a Community Transition Unit within DOH, which includes several Community Transition Coordinators who will help facilitate efforts to transition individuals with Serious Mental Illness residing in Transitional Adult Homes to the community; and

**WHEREAS,** by Executive Order No. 84 issued on November 30, 2012, the Governor established a body of State officials to provide guidance in the creation of a formal Olmstead Plan; and

**WHEREAS,** in addition to these efforts, the State and Plaintiffs intend that the measures required pursuant to this Agreement will provide residents of Impacted Adult Homes in New York City who have serious mental illness with the opportunity to live in the most integrated setting and will ensure that they are provided with the information necessary to allow them to make informed choices about those opportunities;

**IT IS HEREBY STIPULATED AND AGREED** by and among the undersigned that Plaintiffs' claims are settled on the following terms and conditions:

## A. INTRODUCTION

The Parties agree that it is in their mutual interest to avoid the time, expense, and

3

risk of litigation and hereby resolve the allegations by entering into this Agreement.

**B.**  **JURISDICTION**

The Parties acknowledge that the Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 42 U.S.C. §§ 12131-12132 and authority to enter this Agreement and to enforce its terms as set forth herein.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

**C.**  **DEFINITIONS**

1.  "Adult Home" means an adult care facility licensed as an adult home by the Department of Health pursuant to Social Services Law Article 7.

2.  "Transitional Adult Home" means an Adult Home with a certified capacity of 80 or more beds and a Mental Health Census of 25 percent or more of the resident population.  Transitional Adult Homes include NYC Impacted Adult Homes.

3.  "NYC Impacted Adult Home" means an Adult Home located in New York City with a certified capacity of 120 or more beds and a Mental Health Census of 25 percent or more of the resident population or 25 persons, whichever is less, consisting of the facilities listed in Appendix A.

4.  "NYC Adult Home Resident" means a Person with Serious Mental Illness residing in a NYC Impacted Adult Home.

5.  A "Person with Serious Mental Illness" means an individual who meets criteria established by the Commissioner of Mental Health, which shall be persons who have a designated diagnosis of mental illness under the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders (but not a primary diagnosis of alcohol or drug disorders, organic brain syndromes, developmental disabilities or social conditions) and whose severity and duration of mental illness results in substantial functional disability.

An individual is presumed to have a substantial functional disability as a result of mental illness if the individual:

a.  received treatment from a mental health services provider operated, licensed or funded by OMH within the 24 months preceding the date on which this Agreement is "so ordered" by the Court, unless the Health Home or MLTCP determines, based on information which the Health Home or MLTCP shall document,

4

that the individual's mental illness has not resulted in a substantial functional disability; or

    b.    is under the age of 65 and receives Supplemental Security Income ("SSI") or Social Security Disability Insurance ("SSDI") due to mental illness (but not a primary diagnosis of alcohol or drug disorders, organic brain syndromes, developmental disabilities or social conditions):

        i.    according to reliable information received from the Social Security Administration, pursuant to a reasonable agreement to share data, that the individual's receipt of SSI or SSDI is due to mental illness, unless the Health Home or MLTCP determines, based on information which the Health Home or MLTCP shall document, that the individual's mental illness has not resulted in a substantial functional disability; provided, however, that: (1) this subparagraph (b)(i) shall not apply to individuals who receive in-reach or are assessed by Health Homes or MLTCPs prior to the date on which such agreement to share data is in place; and (2) this subparagraph (b)(i) shall not apply if the State determines that it cannot reach a reasonable agreement to share data with the Social Security Administration within four months of the date on which this Agreement is "so ordered" by the Court; or

        ii.    according to a written final administrative determination from the Social Security Administration specifying that the individual was awarded SSI or SSDI due to mental illness, unless the Health Home or MLTCP determines, based on information which the Health Home or MLTCP shall document, that the individual's mental illness has not resulted in a substantial functional disability.

6.    "Mental Health Census" means the number of residents in an Adult Home who are Persons with Serious Mental Illness.

7.    "Supported Housing" means scattered-site apartments for which OMH funding provides rental assistance and a minimum level of housing-related support services from the housing provider for individuals with Serious Mental Illness. These housing-related support services include assisting the resident in managing tenant/landlord relations and with transitioning to the new housing unit. In situations where a resident needs ongoing additional support to manage his or her symptoms, or assistance with living skills such as shopping, maintaining his or her living environment, medication management, and/or personal care services, the supported housing provider may assist in linking the resident with the entities that

5

directly provide these additional services in coordination with the resident's care manager (Health Home or MLTCP). These additional support services may include the Community Services listed in paragraph 8 below.

8.  "Community Services" means services and supports provided in New York State that assist persons with Serious Mental Illness to live in the community. Such services and supports include, but are not limited to, Assertive Community Treatment ("ACT"), care coordination, employment services, outpatient services, Intensive Psychiatric Rehabilitation Treatment, medical services, Personalized Recovery Oriented Services ("PROS"), crisis services, assistance with taking medication (including through prompting), Medicaid benefits for which the Adult Home Resident is eligible, including but not limited to home and community based services ("HCBS") waivers, clinic services, certified home health care, personal care assistance, nursing and rehabilitative services.

9.  "Community Transition List" means one or more lists maintained for the purpose of facilitating efforts to transition NYC Adult Home Residents into the community.

10. "Health Home" means a State-approved entity that provides or arranges for care management from care management partner agencies that provide health home services including comprehensive assessment, comprehensive care management, health promotion, transitional care including appropriate follow-up from inpatient to other settings, patient and family support, referral to community and social support services, and use of health information technology to link services.

11. "Managed Long Term Care Plan" or "MLTCP" means an entity that provides or arranges for the provision of health and long-term care services to adults with chronic illness or disabilities. MLTCP services include – but are not limited to – nursing, physical therapy, occupational therapy, speech pathology, medical equipment and supplies, podiatry, dentistry, optometry, respiration therapy, transportation and social day care. These services are provided under contract with the State and Federal governments.

**D.   SUPPORTED HOUSING**

1.  The State shall fund Supported Housing units in a quantity sufficient such that every NYC Adult Home Resident for whom Supported Housing is appropriate in accordance with sections F and G of this Agreement is afforded the opportunity to transition to a unit during the time when this Agreement is in effect. The State shall have the discretion to allocate Supported Housing units within New York City as necessary for the

implementation and oversight of the Transitional Adult Home compliance plans approved pursuant to regulations adopted by DOH; provided however, that the State shall make all reasonable efforts to coordinate the performance of assessments by Health Homes and MLTCPs with the development of Supported Housing units so that the assessments take into account Supported Housing units that are actually available or will soon become available.

2.   The State shall dedicate a minimum of 2,000 Supported Housing units to help transition NYC Adult Home Residents for whom Supported Housing is appropriate out of NYC Impacted Adult Homes.  The Supported Housing units referenced under this paragraph shall include:

a.   The 1,050 units that are being funded and operated in Kings and Queens Counties pursuant to the RFP issued by OMH on August 10, 2012;

b.   Additional units that the State will fund for development and operation of Supported Housing units in Staten Island and the Bronx pursuant to one or more RFPs that will be issued by OMH within two years of the execution of this Agreement; and

c.   Additional units that the State will fund for development and operation in New York City pursuant to one or more additional RFPs to be issued by OMH, as necessary pursuant to Section D(1).

3.   The use of Supported Housing units for other populations shall not reduce the State's obligation under Section D(1) during the time when this Agreement is in effect.

## E.   IN-REACH

1.   The State shall arrange for the entities that provide Supported Housing, as set forth in Section D, pursuant to contracts with OMH ("Housing Contractors"), to conduct in-reach in the NYC Impacted Adult Homes. In-reach shall not be provided by operators of NYC Impacted Adult Homes.  For any housing contracts procured after the date of this agreement, OMH shall consider whether prospective bidders have provided onsite case management to any of the NYC Impacted Adult Homes listed in Appendix A and whether that experience, in addition to other relevant experience, would impact their ability to conduct effective in-reach.

2.   The goal of in-reach is to actively support NYC Adult Home Residents in considering and making an informed choice about moving to Supported

Housing or other housing that is the most integrated setting appropriate to the individual.

    a.    The State shall require Housing Contractors, in providing in-reach, to provide information about the benefits of Supported Housing and discuss any concerns that a NYC Adult Home Resident may have about moving to Supported Housing.

    b.    The State shall use best efforts to locate persons who live in Supported Housing and are willing to speak with NYC Adult Home Residents, so that Housing Contractors can offer NYC Adult Home Residents opportunities to speak with such persons.

    c.    The State shall require Housing Contractors, in providing in-reach, to provide information such as photographs and/or virtual tours of sample Supported Housing apartments that will help residents visualize Supported Housing settings.

    d.    The State shall require Housing Contractors to facilitate visits for those NYC Adult Home Residents who have been identified by the Health Home or MLTCP as Residents who appear to be appropriate candidates for Supported Housing pursuant to Section F but are undecided about their desire to move to Supported Housing and could benefit from such visit.

3.    Housing Contractors shall provide in-reach to their designated NYC Adult Home Residents on a regular and continuing basis during the time period of their contracts with OMH.

4.    The State shall advise NYC Impacted Adult Homes that they may not interfere with the reasonable access of Housing Contractors to the NYC Impacted Adult Homes and may not discourage NYC Adult Home residents from meeting with Housing Contractors. The State shall require Housing Contractors to report to the State any instances of such interference or discouragement. The State shall take appropriate corrective action to address interference or discouragement, which may include action available under Social Services Law §§ 460-d, 461 and 461-a and 18 NYCRR Parts 485 and 487 to the extent deemed appropriate by DOH.

F.    **ASSESSMENT**

1.    The State shall arrange for Health Homes and MLTCPs that have completed the State's training, as defined in Section H, to conduct a comprehensive assessment of each NYC Adult Home Resident. If a NYC Adult Home Resident is not enrolled in a Health Home or MLTCP, then

the State shall provide the person with a care coordinator who shall carry out the functions in this Agreement that would otherwise be assigned to a Health Home and MLTCP.

2.    The assessment shall determine the housing and service needs and preferences of the NYC Adult Home Resident for purposes of transitioning from the NYC Impacted Adult Home. Each assessment shall identify the housing that is the most integrated setting appropriate for the individual and the Community Services needed to support the individual in such housing, based on the individual's needs and personal preferences.

3.    Community integration and self-determination shall be key considerations in the assessment process.

4.    Health Homes and MLTCPs shall have the linguistic and cultural competence in the aggregate to serve competently all NYC Adult Home Residents.

5.    Assessments shall begin with the presumption that NYC Adult Home Residents can live in Supported Housing. A resident will be considered appropriate for Supported Housing if desired by the resident, unless the assessment discloses that the resident:

    a.    Has significant dementia;

    b.    Would be a danger to self or others in Supported Housing even if receiving the services referenced in subparagraph d below;

    c.    Needs skilled nursing care that cannot be provided outside of a nursing home or hospital; or

    d.    Needs a type and/or frequency and duration of service on an ongoing and sustained basis in order to live in Supported Housing that is not available under the New York State Medicaid program, unless another public (e.g., Medicare) or private (e.g., Meals on Wheels) program will pay for or provide the needed service, the individual is eligible for such program, and such program is available to such individual.

        Services available through the New York State Medicaid program include, but are not limited to, Medicaid-billable Community Services, such as assertive community treatment ("ACT"), care coordination, crisis services, home health services, assistance with taking medication (including through prompting), personal care services, licensed mental health clinic services and successor programs that serve the same functions as these services; provided,

however, that (i) Medicaid services shall be available to NYC Adult Home Residents pursuant to the same criteria applicable to other similarly situated individuals enrolled in the Medicaid program; and (ii) nothing in this Agreement shall prevent the State from discontinuing or revising these or any other services offered in the Medicaid program, subject to Section J(2) below.

6. A NYC Adult Home Resident shall not be determined to be inappropriate for Supported Housing solely based on lack of desire unless he or she has been provided with the opportunity to receive In-Reach, pursuant to Section E above.

7. If a NYC Adult Home Resident is assessed as not appropriate for Supported Housing:

   a. the assessment must identify the specific reasons why such Supported Housing is not appropriate; and

   b. the Resident will be afforded the opportunity to live in the most integrated setting desired by the Resident that is appropriate to the Resident's needs.

## G. PERSON-CENTERED CARE PLANNING

1. The State shall require that for each NYC Adult Home Resident assessed pursuant to Section F, the Health Home or MLTCP shall develop the individual's person-centered care plan. The person-centered care planning shall include consideration of the current and unique psychosocial and medical needs and history of the individual as well as the functional level and support systems developed by the Health Home or MLTCP care manager.

2. The State shall require that each NYC Adult Home Resident be provided with a primary role in developing the plan and with information reasonably sufficient to assist him or her in making informed choices about housing and services.

3. The State shall require that each person-centered plan identify the housing that is the most integrated setting appropriate for the individual and the Community Services needed to support the individual in such housing, based on the individual's needs and personal preferences and subject to the provisions of Section F(5). In cases where OMH Supported Housing is part of the person-centered plan developed by the Health Home or MLTCP, the assigned Health Home or MLTCP care manager will make a referral to the appropriate Housing Contractor.

**H.   TRAINING**

    1.    Within 180 days of the execution of this Agreement or within 30 days of the commencement of operations of a Health Home or MLTCP, whichever is later, the State shall provide guidance and training to the Health Homes and MLTCPs pertaining to the assessment of NYC Adult Home Residents and the development of person-centered care plans.  Such guidance and training shall include the requirement that each assessment identify the housing that is the most integrated setting appropriate for the individual and the Community Services needed to support the individual in such housing, based on the individual's needs and personal preferences and subject to the provisions of Section F (5), and the presumption that all NYC Adult Home Residents can live in Supported Housing, subject to the provisions of Section F (5).

    2.    Within 180 days of the execution of this Agreement or within 30 days of the commencement of activity on a contract awarded to a Housing Contractor, whichever is later, the State shall provide guidance and training to the Housing Contractors pertaining to their obligations to provide in-reach, including techniques of motivational interviewing, and the presumption that all NYC Adult Home Residents can live in Supported Housing, subject to the provisions of Section F (5).

**I.   TRANSITIONING**

    1.    The State shall require the Housing Contractors, Health Homes and MLTCPs to carry out their responsibilities so that the following schedule is achieved:

        a.    Within four years of execution of this Agreement, at least 2,500 NYC Adult Home Residents shall be assessed by Health Homes or MLTCPs pursuant to Section F and, if appropriate under a person-centered care plan developed pursuant to Section G, transitioned from NYC Impacted Adult Homes.

        b.    Within five years of the execution of this Agreement, all NYC Adult Home Residents shall be assessed by Health Homes or MLTCPs pursuant to Section F and, if appropriate under a person-centered care plan developed pursuant to Section G, transitioned from NYC Impacted Adult Homes.

    2.    The State shall provide any NYC Adult Home Resident who is otherwise eligible for Supported Housing pursuant to Section F, but who declines an offer for Supported Housing, with the opportunity for additional in-reach and, if the Resident so desires, the opportunity to move to Supported Housing, during the period in which this Agreement is in effect.  Such

11

additional in-reach shall be provided periodically, but on no less than an annual basis, by a Housing Contractor.  If no Housing Contractor is available, in the discretion of OMH, to provide such in-reach, the State shall provide or arrange for an equivalent in-reach function.

**J.    COMMUNITY SERVICES**

1.    For the duration of this Agreement, the State shall ensure that Health Homes and MLTCPs arrange for the provision of Community Services identified in NYC Adult Home Residents' person-centered plans, consistent with Section G, and ensure that such Services are available.

2.    For the duration of this Agreement, the Community Services available to NYC Adult Home Residents (whether through the Medicaid program or another program), if the Resident is eligible for the service, shall include the following services or, if the State replaces or changes the services, services that perform substantially the same function:  licensed mental health clinic services, assertive community treatment ("ACT"), home health services, mobile crisis services, care coordination, assistance with taking medication (including through prompting), and personal care services; provided, however, that eligibility for such services must be determined on an individual basis based on eligibility criteria that are comparable to criteria in place on the date this Agreement is executed.

3.    For purposes of determining an individual's eligibility for ACT, eligibility shall be determined by the OMH Statewide ACT Guidelines.

**K.    REPORTING**

1.    Until the Court terminates jurisdiction over this matter, Defendants shall provide to the Plaintiffs and the Independent Reviewer (defined in Section L below) a quarterly report that indicates:

a.    The number of Supported Housing units for which the State has provided funding and the Housing Contractors that received funding.

b.    The number of Supported Housing units created pursuant to this Agreement that are occupied by NYC Adult Home Residents.

c.    The name of each NYC Adult Home resident who has been identified as a Person with Serious Mental Illness at each of the NYC Impacted Adult Homes listed in Appendix A.

d.    The name of each NYC Adult Home Resident who has been assessed under Section F, the date of assessment, the NYC

Impacted Adult Home at which he or she resided when assessed, and the housing recommendation made as a result of each assessment.

e.  The name of each NYC Adult Home Resident who has transitioned, the Adult Home in which he or she lived, the date on which he or she moved, and the type of housing to which he or she moved.

f.  The name of each NYC Adult Home Resident assessed as not appropriate for Supported Housing, and the specific reasons why such Supported Housing is not appropriate.

2.  The quarterly report required in Section K(1) shall be provided in an electronic format that may be imported into standard spreadsheet software.

3.  Until the Court terminates jurisdiction over this matter, Defendants shall provide to Plaintiffs and the Reviewer:

a.  A copy of any training materials used in connection with the State's training pursuant to Section H.

b.  A copy of the Community Transition List, updated quarterly.

4.  Until the Court terminates jurisdiction over this matter, Defendants shall notify Plaintiffs and the Reviewer about any instances in which the State has received a report that a NYC Adult Home Resident is being discouraged by an Adult Home from exploring alternatives to or transitioning from Adult Homes.

5.  A request by Plaintiffs or the Independent Reviewer for relevant information shall not be unreasonably denied.  The Parties shall negotiate in good faith any areas of disagreement as to whether and when such information shall be made available.

6.  Any personally identifying information shared with the Plaintiffs or the Reviewer under this Agreement shall be treated and maintained as confidential.

7.  The Parties and the Reviewer shall meet quarterly to discuss implementation progress and obstacles and how to overcome obstacles to achieving the goals of this Agreement.

13

**L.   INDEPENDENT REVIEWER**

1.   The Parties agree that Clarence Sundram shall be the Independent Reviewer ("Reviewer") to monitor the State's implementation of this Agreement (the "Reviewer"). The State shall retain the Independent Reviewer within 60 days of executing this Agreement.

2.   In the event the Reviewer resigns or the Parties agree to replace the Reviewer, the Parties shall meet and confer within 30 days of the resignation or their agreement and select a replacement. If they are unable to agree on the replacement Reviewer at the "meet and confer," the Plaintiffs and the State shall each, within 21 days of the "meet and confer," nominate up to two individuals with expertise in the provision of community services to persons with mental illness. The Court shall select the Reviewer from among those nominated by the Parties.

3.   The annual budget for the Reviewer shall be $350,000.00. All reasonable fees, costs and expenses of the Reviewer, including the cost of any consultants or staff hired by the Reviewer, shall be borne by the State up to the amount of this annual budget. The Reviewer shall provide a monthly accounting justifying the fees, costs and expenses. In no event will the State reimburse the Reviewer for any fees, costs or expenses that exceed the amount of this annual budget. Provided, however, in the event of significant changes in circumstances that result in the Independent Reviewer having to spend substantially more time or incur substantial and unforeseen expenses, the Independent Reviewer may seek approval by the State for an amendment to the budget and submit a justification for such amendment. Within 30 days, the State may question the need for, or the amount of, such additional unforeseen expenses, may suggest other alternatives to avoid some or all of such expenditures, and may withhold approval of such expenses; provided that approval of the proposed amendment shall not be unreasonably withheld. The State shall be the final arbiter of what costs and expenses are considered reasonable; provided, however, that any costs incurred consistent with the methodology approved pursuant to Section L (11) shall be considered reasonable.

4.   Within the budget described in Section L (3) above, the Reviewer may hire staff and consultants, in consultation with and subject to reasonable objections by the State, to assist in his or her evaluation of the State's compliance with this Agreement. The Reviewer and any hired staff or consultants are neither agents nor business associates of the State, the United States, the Plaintiff Class, or the Court.

5.   The Reviewer shall confer regularly and informally with the Parties on matters related to implementation efforts and compliance.

6.      The Reviewer, and any hired staff or consultants, may:

    a.      Have ex parte communications at any time with the Parties, including counsel for the Parties, and employees, agents, contractors and all others working for or on behalf of the State, the Plaintiff Class or the United States to implement the terms of this Agreement.

    b.      Request meetings with either or both Parties. The purpose of these meetings shall include, among other things, prioritizing areas for the Reviewer to review, scheduling visits, discussing areas of concern, and discussing areas in which technical assistance may be appropriate.

    c.      Speak with stakeholders with such stakeholders' consent, on a confidential basis or otherwise, at the Reviewer's discretion.

    d.      Speak with anyone else the Reviewer and any staff/consultants deem necessary for completing the compliance evaluations and reports required by this Agreement.  However, the State has no obligation to require any individual who is not a State employee or contractor to speak with the Reviewer.

    e.      Provide technical assistance to the State regarding any issue related to compliance with this Agreement.

    f.      Attempt to resolve any dispute arising out of a Party's position with regard to the construction or implementation of this Agreement.

    g.      Testify in this case regarding any matter relating to the implementation, enforcement, or dissolution of the Agreement, including the Reviewer's observations, findings and recommendations in this matter. The Reviewer may not voluntarily testify as an expert witness against the State in any other administrative or civil proceeding of whatever nature brought before any federal or state court or other administrative or judicial tribunal.  This limitation shall be a required term in the State's Contract with the Reviewer, which is subject to the approval of the New York State Comptroller.

7.      Throughout the pendency of this Agreement, the Reviewer will pursue a problem-solving approach so that disagreements can be minimized and resolved amicably and the energies of the Parties can be focused on the State's compliance with the provisions of the Agreement.

8.    The Reviewer shall comply with all federal and State patient rights and confidentiality laws and regulations, including, but not limited to, those set forth in the New York State Public Health Law and Mental Hygiene Law, the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), the Standard for Privacy of Individually Identifiable Health Information and Health Insurance Reform: Security Standards, 45 C.F.R. Part 164, alcohol and drug abuse patient records laws codified at 42 U.S.C. § 290dd-2 and 42 C.F.R. Part 2, the Health Information Technology for Economics and Clinical Health Act ("HITECH Act") adopted as part of the American Recovery and Reinvestment Act of 2009 (Public Law 111-5).  For the purposes of Mental Hygiene Law § 33.13 (c) 1, the need for the Reviewer to access all relevant, otherwise confidential information shall be deemed to significantly outweigh the need for confidentiality.

9.    The duties of the Reviewer shall be to observe, review, report findings, and make recommendations to the parties solely with respect to the implementation of and compliance with the Agreement.  The State shall direct all agencies, employees and contractors to cooperate fully with the Reviewer.  Neither Party shall interfere with the independent functions of the Reviewer.  The Reviewer shall devote such time as is necessary to fulfill the purposes of the duties and responsibilities of the Reviewer pursuant to this Agreement, but within the annual budget set forth in Section L (3).

10.   The Reviewer and any staff/consultants will have full access to the people, places, and documents that are necessary to assess the State's compliance with and/or implementation of this Agreement, as permitted by law and in accordance with the limitations set forth in Section L (8).

11.   The Reviewer shall consult with the Parties and shall submit a written plan with regard to the methodologies to be used by the Reviewer to assess compliance with and implementation of the Agreement.  The Parties shall approve the plan prior to implementation.  The Reviewer's evaluations may include regular onsite inspection of individuals' residences, with the consent of such individuals, and interviews with individuals receiving services under this Agreement who consent to be interviewed.

12.   In consultation with the Independent Reviewer, the State shall develop a work plan to guide its implementation of this Agreement within 120 days after the Reviewer is engaged by the State.  The State shall share the work plan with the Parties.

13.   The Reviewer shall conduct evaluations of and issue five annual written reports regarding the State's compliance.  The Reviewer shall produce five annual reports regarding the State's compliance with particular provisions

16

of the Agreement to the Parties pursuant to the time frame in Section L (14). The Reviewer will not file these reports with the Court without the express authorization of the Parties, unless submission to the Court is in connection with the process set forth in Sections M(2) or (3).

14.  The written report shall detail with as much specificity as possible how the State is or is not in compliance with particular provisions of the Agreement.  A draft of the Reviewer's report shall be provided to the Parties for comment each year within 30 days after the anniversary date of the Court's approval of this Agreement.  The parties shall have 30 days after receipt of such draft report to provide comments to the Reviewer, on notice to each other, and the Reviewer shall issue to the Parties a final annual report within 15 days after receiving such comments; provided, however, that the parties may agree to extend such deadlines.

15.  The Reviewer, including any hired staff or consultants, shall not enter into any new contract with the State, the Plaintiff Class, or the United States while serving as the Reviewer without the written consent of the other Party.

16.  The Reviewer, including any hired staff or consultants, shall not be:

a.  Liable for any claim, lawsuit, or demand arising out of the reviewing functions set forth in this Settlement Agreement.  This paragraph does not apply to any proceeding before this Court for enforcement of payment of contracts or subcontracts for reviewing functions under this Settlement Agreement.

b.  Subject to formal discovery, including, but not limited to, deposition(s), request(s) for documents, request(s) for admissions, interrogatories, or other disclosures.  The Parties are not entitled to access the Independent Reviewer's records or communications, although the Independent Reviewer may provide copies of records or communications at the Reviewer's discretion.  The Court may review relevant records of the Reviewer in an enforcement proceeding pursuant to Court order under Section M of this Agreement.

## M.  ENFORCEMENT

1.  The Parties agree jointly to file this Agreement with the United States District Court for the Eastern District of New York.

2.  The Court shall retain jurisdiction to assure compliance with this Agreement but not for more than 60 days after the Reviewer has provided

17

the Parties with its fifth and final report, at which time this Agreement shall expire, provided, however:

    a.    The Parties may agree to jointly ask the Court to terminate the Agreement earlier. Upon 30 days' notice to the Parties and the Independent Reviewer, the State may also move to terminate the Agreement, which motion shall be granted if the State demonstrates that it has substantially complied with all its obligations as set out in this Stipulation. Before the Court considers the motion, the Independent Reviewer shall evaluate the State's compliance since the last annual report and the Parties shall have an additional 30 days to review the evaluation.

    b.    Plaintiffs may move to extend the Court's jurisdiction, which motion shall be granted if the Plaintiffs advise the Court, on notice to the State, no later than 60 days after receiving the Independent Reviewer's fifth and final report, that the State is not in substantial compliance with the Agreement. In such case, Plaintiffs shall describe with as much specificity as possible how the State is not in substantial compliance with particular provisions of the Agreement. If the State contends that it is in substantial compliance, the Court shall schedule further proceedings, and in such proceedings the burden shall be on the State to demonstrate substantial compliance as to the provisions identified by Plaintiffs. If the State demonstrates such substantial compliance, the motion to extend the Court's jurisdiction shall not be granted.

3.    In the event Plaintiffs allege non-compliance by Defendants with a material provision of this Agreement, counsel to the Parties shall meet and confer in an effort to resolve the reported non-compliance within 30 days after Defendants' counsel receives written notice.

    a.    If such efforts fail to achieve a resolution of the issue within 60 days of such "meet and confer," Plaintiffs may bring a motion for enforcement of this Agreement and the Court shall determine a reasonable schedule for the hearing and determination of such motion.

    b.    In the event of such a motion, Defendants will be considered to be in "compliance" unless Plaintiffs establish that Defendants' failures or omissions to meet the terms of this Agreement were not minimal or isolated but were substantial and sufficiently frequent or widespread to be systemic.

**N.    ATTORNEYS' FEES; POST-SETTLEMENT ACTIVITIES**

1.    Defendants shall pay to Plaintiff Class the sum of $200,000 in full satisfaction of any and all claims in this lawsuit and in *Disability Advocates, Inc. v. Paterson*, 03 CV 3209 (NGG), for attorneys' fees, costs and disbursements up to and including the date of execution of this Agreement, which fees, costs and disbursements shall be substantiated by back-up documentation including contemporaneous time sheets. In the event that payment of this amount is not made within one hundred twenty (120) days after the receipt by defendants' counsel of a copy of this fully executed Agreement, approved by the Court, interest shall accrue on the outstanding balance at the rate set forth in 28 U.S.C. § 1961, beginning on the one hundred and twenty-first day after receipt by defendants' counsel of a copy of this fully executed and so-ordered Agreement. The foregoing payment shall be made payable to Disability Advocates, Inc. and sent to Disability Advocates, Inc. DBA Disability Rights New York, 5 Clinton Square, Albany, NY 12207, or in the event its offices shall relocate to its then current address.

2.    During the term of this Agreement it is anticipated that Plaintiff Class will incur certain legal fees, and other costs and disbursements. Plaintiffs, Plaintiff Class and counsel for the Plaintiff Class agree to limit all such attorneys' fees, costs and disbursements to what is directly and reasonably necessary, up to a combined total, which shall not exceed $75,000 per year, calculated on the basis of a 365 day year, beginning on the date of execution of this Agreement and ending on the date this Agreement expires under Section M.2. During the term of this Agreement, Counsel for the Plaintiff Class agree to submit vouchers and contemporaneous time records to defendants' counsel on a semi-annual basis for any such attorneys' fees, costs and disbursements and defendants agree to reimburse counsel for the Plaintiff Class within one hundred twenty (120) days of receipt of such vouchers. If payment is delayed beyond one hundred twenty (120) days, defendants will also pay interest at the rate set forth in 28 U.S.C. § 1961, which shall accrue beginning on the one hundred twenty-first day. The foregoing payment(s) shall be made payable to Disability Advocates, Inc. and sent to Disability Advocates, Inc. DBA Disability Rights New York, 5 Clinton Square, Albany, NY 12207, or in the event its offices shall relocate to its then current address.

3.    For and in consideration of the payments referred to in paragraph N.1 and N.2 above, the sufficiency of which is hereby acknowledged, Plaintiffs, Plaintiff Class, Paul, Weiss, Rifkind, Wharton & Garrison LLP, Disability Advocates, Inc., New York Lawyers for the Public Interest, Bazelon Center for Mental Health Law, Urban Justice Center and MFY Legal Services, Inc., hereby release and forever discharge the State of New York, OMH, DOH, and all of their present and former principals, officers,

19

directors, members, employees, agents, attorneys, insurers, subdivisions, subsidiaries, heirs, administrators, and assigns, individually and in their official capacities, from any and all claims for attorneys' fees, costs, and/or disbursements incurred in connection with this action, including but not limited to all pre-litigation activities including negotiations, and all claims for attorneys' fees, costs, fees, and/or disbursements incurred in connection with *Disability Advocates, Inc. v. Paterson*, 03 CV 3209 (NGG) in the United States District Court for the Eastern District of New York, and in this Action.

4. The payment(s) referenced in paragraph N.1 and N.2 of this Agreement are subject to the approval of all appropriate state officials in accordance with N.Y. Public Officers Law § 17.

## O.   MISCELLANEOUS

1. In the event that, subsequent to the date of execution of this Agreement, a court of competent jurisdiction issues a temporary restraining order, a preliminary or permanent injunction, or judgment staying the enforcement of, or invalidating, whether in whole or in material part, the Adult Home Regulations (as defined herein), the Parties shall meet and confer in good faith to determine appropriate modifications to this Agreement that would give effect to the original intent of the Parties as expressed herein. The Parties commit to meeting and conferring in good faith at least three times during a period of 120 days after such a court order. If, after the 120-day period, the Parties fail to reach an agreement on appropriate modifications to this Agreement, then this Agreement will become null and void, and the Parties retain all rights to revive any claims or defenses otherwise barred by operation of this Agreement. For purposes of this subsection, the term "Adult Home Regulations" shall refer to any of 18 NYCRR § 487.4(c) or 14 NYCRR §§ 580.6(c)(2) or 582.6(c)(2) as adopted January 16, 2013 (I.D. No. HLT-32-12-00020-A, and I.D. No. OMH-32-12-00019-A). or as thereafter amended. Notwithstanding any of the foregoing, the parties may mutually agree to a stay of enforcement of this Agreement, during which it will not be rendered null and void.

2. The Defendants shall use best efforts to seek and secure funding necessary to implement the terms of this Agreement. This Agreement is subject to legislative appropriation of such funding and if such appropriations are not made, the Parties shall retain all rights to revive any claims or defenses otherwise barred by operation of this Agreement.

3. Solely for purposes of this agreement, the Parties agree to entry of an Order certifying the class, defined as NYC Adult Home Residents, as defined in Section C (4). Any costs associated with certification of or notification to such class shall be borne by Plaintiffs. In the event that the

class is not certified, this Agreement shall remain unaffected as between the Named Plaintiffs, the United States and the State.

4. Nothing contained herein shall be deemed to be an admission by the Defendants that they have in any manner or way violated the Plaintiffs' or any individual Adult Home Resident's rights, or the rights of any other person or entity, as defined in the constitutions, statutes, ordinances, rules or regulations of the United States, the State of New York, or the City of New York or any other rules, regulations or by-laws of any department or subdivision of the State of New York.

5. This Agreement shall not be admissible in, nor is it related to, any other litigation or settlement negotiations, except in an action or proceeding by the Plaintiff to enforce the terms of this Agreement, or in a civil action involving the State and another party in which the validity of the regulations adopted on January 16, 2013 (I.D. No. HLT-32-12-00020-A, and I.D. No. OMH-32-12-00019-A), or as thereafter amended, is at issue.

6. Nothing in this Agreement shall be enforced in a manner that would require a fundamental alteration of the State's programs, activities, or services for Persons with Serious Mental Illnesses. Nothing in this paragraph is intended to amend or change in any way the obligations set forth in this Agreement, or prevent appropriate enforcement of this Agreement.

7. This Agreement contains all the terms and conditions agreed upon by the parties hereto, and no oral agreement entered into at any time nor any written agreement entered into prior to the execution of this Agreement regarding the subject matter of the instant proceeding shall be deemed to exist, or to bind the parties hereto, or to vary the terms and conditions contained herein.

8. All Parties to this Agreement have participated in its drafting; consequently, any ambiguity shall not be construed for or against any party.

9. If any of the dates or periods of time described in this Agreement fall or end on a public holiday or on a weekend, the date or period of time shall be extended to the next business day.

10. All correspondence concerning this Agreement should be sent to the following (or to such other address as the recipient named below shall specify by notice in writing hereunder):

To Defendants:

Barbara K. Hathaway, Assistant Attorney General

Office of the Attorney General
120 Broadway 24th floor
New York, New York 10271
Tel: 212-416-8560
e-mail: barbara.hathaway@ag.ny.gov

To Plaintiff United States:

Chief of the Disability Rights Section
U.S. Department of Justice
950 Pennsylvania Ave., NW – NYA
Washington, DC 20530
Tel: 202-307-0663

To the Plaintiff Class:

Andrew G. Gordon
PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064
Tel: 212-373-3543

-and-

Cliff Zucker
DISABILITY ADVOCATES, INC.
5 Clinton Square, 3rd floor
Albany, NY 12207
Tel: 518-432-7861

11.    This Agreement may not be modified without the express written
       agreement of counsel for the Parties.  Absent such agreement, the Parties
       may seek a modification of this Agreement only for good cause shown,
       with the Court's approval, upon thirty (30) days' written notice to counsel
       for the other Parties.

12.    This Agreement may be executed in counterparts, and each counterpart,
       when executed shall have the full efficacy of a signed original.
       Photocopies of such signed counterparts may be used in lieu of the
       originals for any purpose.

13.    Signatories

       a.    The undersigned representative of the Defendants and the Attorney
             General of the State of New York certifies that he or she is

22

authorized to enter into the terms and conditions of this Agreement and to execute and bind legally such Defendants to this document.

b.    Each undersigned representative of Plaintiffs certifies that he or she is authorized to enter into the terms and conditions of the Agreement and to bind legally the Plaintiff to this document.

23

For Plaintiff UNITED STATES OF AMERICA:

Dated: _July 22, 2013_


LORETTA E. LYNCH
United States Attorney
Eastern District of New York


By:  MICHAEL J. GOLDBERGER
Assistant United States Attorney
Eastern District of New York


JOCELYN SAMUELS
Acting Assistant Attorney General
Civil Rights Division

EVE L. HILL
Deputy Assistant Attorney General
Civil Rights Division

ALISON N. BARKOFF
Special Counsel for *Olmstead* Enforcement
Civil Rights Division

REBECCA B. BOND, Chief
SHEILA M. FORAN, Special Legal Counsel
Disability Rights Section
Civil Rights Division


AMANDA MAISELS
NICHOLAS C. LEE
Trial Attorneys
Civil Rights Division
U.S. Department of Justice

For the Plaintiff Class:

Dated: 7/12/13

_____
Andrew G. Gordon
Julie E. Fink
Geoffrey Chepiga
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064

_____
Cliff Zucker
Timothy A. Clune
DISABILITY ADVOCATES, INC.
5 Clinton Square, 3rd floor
Albany, NY  12207

_____
Veronica S. Jung
Roberta Mueller
NEW YORK LAWYERS FOR THE PUBLIC
INTEREST, INC.
151 West 30th Street, 11th floor
New York, NY  10001-4007

_____
Ira A. Burnim
Jennifer Mathis
BAZELON CENTER FOR MENTAL
HEALTH LAW
1105 15th Street, N.W., Suite 1212
Washington, DC  20005

_____
Mara Kuns
URBAN JUSTICE CENTER
123 William Street, 16th floor
New York, NY  10038

_____
Jeanette Zelhof
Kevin Cremin
Jota Borgmann
MFY LEGAL SERVICES, INC.
299 Broadway, 4th floor
New York, NY 10007

For the Plaintiff Class:

Dated: _7/10/13_

---

Andrew G. Gordon
Julie E. Fink
Geoffrey Chepiga
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019-6064

---

Veronica S. Jung
Roberta Mueller
NEW YORK LAWYERS FOR THE PUBLIC
INTEREST, INC.
151 West 30th Street, 11th floor
New York, NY 10001-4007

---

Mara Kuns
URBAN JUSTICE CENTER
123 William Street, 16th floor
New York, NY 10038

---

Cliff Zucker
Timothy A. Clune
DISABILITY ADVOCATES, INC.
5 Clinton Square, 3rd floor
Albany, NY 12207

---

Ira A. Burnim
Jennifer Mathis
BAZELON CENTER FOR MENTAL
HEALTH LAW
1105 15th Street, N.W., Suite 1212
Washington, DC 20005

---

Jeanette Zelhof
Kevin Cremin
Jota Borgmann
MFY LEGAL SERVICES, INC.
299 Broadway, 4th floor
New York, NY 10007

25

For the Plaintiff Class:

Dated:  _7/12/13_

---

Andrew G. Gordon
Julie E. Fink
Geoffrey Chepiga
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064

---

Cliff Zucker
Timothy A. Clune
DISABILITY ADVOCATES, INC.
5 Clinton Square, 3rd floor
Albany, NY  12207

---

Veronica S. Jung
Roberta Mueller
NEW YORK LAWYERS FOR THE PUBLIC
INTEREST, INC.
151 West 30th Street, 11th floor
New York, NY  10001-4007

---

Ira A. Burnim
Jennifer Mathis
BAZELON CENTER FOR MENTAL
HEALTH LAW
1105 15th Street, N.W., Suite 1212
Washington, DC  20005

---

Mara Kuns
URBAN JUSTICE CENTER
123 William Street, 16th floor
New York, NY  10038

---

Jeanette Zelhof
Kevin Cremin
Jota Borgmann
MFY LEGAL SERVICES, INC.
299 Broadway, 4th floor
New York, NY 10007

25

For the Plaintiff Class:

Dated: 7/12/2013

_____
Andrew G. Gordon
Julie E. Fink
Geoffrey Chepiga
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064


_____
Cliff Zucker
Timothy A. Clune
DISABILITY ADVOCATES, INC.
5 Clinton Square, 3rd floor
Albany, NY  12207


_____
Veronica S. Jung
Roberta Mueller
NEW YORK LAWYERS FOR THE PUBLIC
INTEREST, INC.
151 West 30th Street, 11th floor
New York, NY  10001-4007


_____
Ira A. Burnim
Jennifer Mathis
BAZELON CENTER FOR MENTAL
HEALTH LAW
1105 15th Street, N.W., Suite 1212
Washington, DC  20005


_____
Mara Kuns
URBAN JUSTICE CENTER
123 William Street, 16th floor
New York, NY  10038


_____
Jeanette Zelhof
Kevin Cremin
Jota Borgmann
MFY LEGAL SERVICES, INC.
299 Broadway, 4th floor
New York, NY 10007

For the Plaintiff Class:

Dated: ___7/12/13___

---
Andrew G. Gordon
Julie E. Fink
Geoffrey Chepiga
PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY  10019-6064

---
Cliff Zucker
Timothy A. Clune
DISABILITY ADVOCATES, INC.
5 Clinton Square, 3rd floor
Albany, NY  12207

---
Veronica S. Jung
Roberta Mueller
NEW YORK LAWYERS FOR THE PUBLIC
INTEREST, INC.
151 West 30th Street, 11th floor
New York, NY  10001-4007

---
Ira A. Burnim
Jennifer Mathis
BAZELON CENTER FOR MENTAL
HEALTH LAW
1105 15th Street, N.W., Suite 1212
Washington, DC  20005

---
Mara Kuns
URBAN JUSTICE CENTER
123 William Street, 16th floor
New York, NY  10038

---
Jeanette Zelhof
Kevin Cremin
Jota Borgmann
MFY LEGAL SERVICES, INC.
299 Broadway, 4th floor
New York, NY 10007

25

For Defendants STATE OF NEW YORK, ACTING COMMISSIONER KRISTIN M.
WOODLOCK, THE NEW YORK STATE OFFICE OF MENTAL HEALTH,
COMMISSIONER NIRAV R. SHAH, THE NEW YORK STATE DEPARTMENT OF
HEALTH, and GOVERNOR ANDREW M. CUOMO:

Dated: _July 15, 2013_ By: _Barbara K. Hathaway_
Barbara K. Hathaway
ERIC T. SCHNEIDERMAN
Attorney General of the State of New York
120 Broadway
New York, NY 10271
(212) 416-8560


**SO ORDERED**

Dated: _____, New York
_____, 2013


_____
United States District Judge

26

**Appendix A:**
**NYC Impacted Adult Homes[1]**

1. Belle Harbor Manor
2. Brooklyn Adult Care Center
3. Central Assisted Living, LLC
4. Elm York LLC
5. Garden of Eden Home
6. Harbor Terrace Adult Home and Assisted Living
7. Kings Adult Care Center
8. Lakeside Manor Home for Adults, Inc.
9. Mermaid Manor Home for Adults
10. New Gloria's Manor Home for Adults
11. New Haven Manor
12. Oceanview Manor Home for Adults
13. Park Inn Home
14. Parkview Home for Adults
15. Queens Adult Care Center
16. Riverdale Manor Home for Adults
17. Rockaway Manor HFA
18. S.S. Cosmas and Damian Adult Home
19. Sanford Home
20. Seaview Manor, LLC
21. Surf Manor Home for Adults
22. Surfside Manor Home for Adults, LLC
23. Wavecrest Home for Adults

---

[1] This list is based on the New York State Department of Health's Adult Care Facility Annual Census Report.