UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

THE UNITED STATES OF AMERICA,

                              Plaintiff,                                  **13-CV-4165 (NGG) (MDG)**

          -against-

STATE OF NEW YORK,


                              Defendant.
------------------------------------------------------------------------X
RAYMOND O'TOOLE, ILONA SPIEGEL, and
STEVEN FARRELL, individually and on behalf
of all others similarly situated,

                              Plaintiffs,

          -against-                                                      **13-CV-4166 (NGG) (MDG)**

ANDREW M. CUOMO, in his official capacity as
Governor of the State of New York, NIRAV R.
SHAH, in his official capacity as Commissioner of
the New York State Department of Health,
KRISTIN M. WOODLOCK, in her official
capacity as Acting Commissioner of the New York
State Office of Mental Health, THE NEW YORK                              **MEMORANDUM & ORDER**
STATE DEPARTMENT OF HEALTH, and THE
NEW YORK STATE OFFICE OF MENTAL
HEALTH,

                              Defendants.
------------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Before the court is Plaintiffs' Motion for Final Approval of the Proposed Settlement Agreement and Attorney's Fees. (Class Dkt. 30.)[1] Plaintiffs Raymond O'Toole, Ilona Spiegel, and Steven Farrell ("Plaintiffs") brought this class action on behalf of themselves and a class of New York City adult home residents (the "Class"). On November 20, 2013, the court certified the class, preliminarily approved the Proposed Settlement Agreement, and approved the notice of the proposed settlement to be sent to class members. (Order (Class Dkt. 23).) The court held a fairness hearing on January 9, 2014. (See Jan. 10, 2014, Min. Entry.)

Having considered the statements at the fairness hearing and all written submissions, the court finds that the Class was afforded adequate notice, and the terms of the Proposed Settlement Agreement as revised (Dkt. 23; Class Dkt. 53) are fair, reasonable, and adequate. The proposed attorney's fee amount contained in the agreement is also reasonable. Accordingly, the court GRANTS Plaintiffs' Motion for Final Approval of the Proposed Settlement Agreement and Attorney's Fees in case No. 13-CV-4166. For purposes of the associated case No. 13-CV-4165, brought by the United States against the State of New York, the Proposed Settlement Agreement serves as a Consent Judgment and is also APPROVED.

## I.    BACKGROUND

Although the present cases were filed just eight months ago, they have a lengthy history. In 2002, the *New York Times* featured a series of articles on the deplorable conditions in many New York City adult homes. The articles documented the dangerously poor care afforded residents, the vermin and squalor present in the facilities, and the mismanagement of residents' funds entrusted to administrators. See Clifford J. Levy, For Mentally Ill, Death and Misery, N.Y.

---

[1]    For ease of reference, the court cites the docket corresponding to United States v. New York, No. 13-CV-4165 (NGG) as "Dkt." and cites the docket corresponding to O'Toole, et al., v. Cuomo, et al, No. 13-CV-4166 (NGG) as "Class Dkt."

Times, Apr. 28, 2002; Levy, Here, Life is Squalor and Chaos, N.Y. Times, Apr. 29, 2002; Levy, Voiceless, Defenseless and Source of Cash, N.Y. Times, Apr. 30, 2002.[2]

In 2003, Disability Advocates, Inc. brought suit to vindicate the rights of individuals with mental illness residing in, or at risk of entry into, New York City adult homes. See Disability Advocates, Inc. v. Paterson, et al., No. 03-CV-3209 (NGG) ("DAI").[3] Following years of litigation including extensive discovery, multiple expert reports, and a five-week bench trial, the court found that the State had violated the Americans with Disabilities Act of 1990 and the Rehabilitation Act by failing to serve adult home residents in the most integrated setting appropriate to their needs. Mem. & Order re Findings of Fact & Concs. of Law, DAI, 653 F. Supp. 2d 184, 314 (E.D.N.Y. Sept. 8, 2009). The court gave the State an opportunity to submit a proposed remedy to address these civil rights violations. Finding the State's proposal to be "egregiously deficient," the court subsequently adopted the plaintiff's remedial proposal with minor modifications and, over the State's objections, appointed a court monitor to oversee implementation of the remedy. Mem. & Order re Remedial Order & J., DAI, No. 03-CV-3209 (NGG), 2010 WL 786657, *1, 7 (E.D.N.Y. Mar. 1, 2010). The State appealed, and the Second Circuit vacated the court's decision on the grounds of standing but did not question the factual or legal findings on the merits. See Disability Advocates, Inc. v. N.Y. Coalition for Quality

---

[2] Some of the articles' findings had been previously highlighted in a 1979 investigation by the Brooklyn Deputy Attorney General. See Charles J. Hynes, Private Proprietary Homes for Adults: A Second Investigative Report (1979). Multiple studies and reports since that time further documented the ongoing problems with adult homes and concluded that they are not conducive to rehabilitation or care of persons with mental illness. See Lloyd I. Sederer, Chief Med. Officer, Office of Mental Health, Clinical Advisory (2012); N.Y. State Adult Care Facilities Workgroup, Report Submitted to the Commissioner, Department of Health (2002); N.Y. State Comm'n on Quality of Care for the Mentally Disabled, Exploiting Not-For-Profit Care in an Adult Home: The Story Behind Ocean House Center, Inc. (2001); N.Y. State Comm'n on Quality of Care for the Mentally Disabled & Mental Hygiene Rev. Bd., Adult Homes Serving Residents with Mental Illness: A Study of Conditions, Services, and Regulations (1990).

[3] The subject matter of DAI was essentially the same as the present cases, and in that action, plaintiff Disability Advocates, Inc. was represented by the five legal organizations who here, collectively with Disability Rights New York, serve as Class Counsel.

Assisted Living, Inc., 675 F.3d 149 (2d Cir. 2012). The parties negotiated the proposed settlement in the aftermath of the Second Circuit's ruling.

The court recounts this history to provide context for this Memorandum and Order concerning settlement. While the court applauds the settlement reached by the parties, it notes that it has required decades of investigations, litigation, and settlement negotiations to compel the State to provide adult home residents what is due under the law. Relief for these residents is long overdue, and the court considers this delay to be unconscionable.[4]

## A.    The Present Cases

On July 23, 2013, the United States filed an enforcement action against the State of New York for failing to provide individuals with mental illness residential opportunities in the "most integrated setting" suited to their needs, as required by Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12131-12134 ("ADA"), section 504 of the Rehabilitation Act, 29 U.S.C. § 794, and their implementing regulations (as interpreted in Olmstead v. L.C., 527 U.S. 581 (1999)). (Compl. (Dkt. 1).) Plaintiffs simultaneously filed, on behalf of themselves and a class of individuals with serious mental illness who reside in 23 "impacted" adult homes[5] in New York City, an action for injunctive and declaratory relief on the same grounds. (Class Compl. (Class Dkt. 1).) The two cases were consolidated and assigned to this court. (Aug. 20, 2013,

---

[4]    Nonetheless, the court commends the State of New York, Governor Andrew M. Cuomo, and the coalition of plaintiffs, their counsel, and the Justice Department for their diligent efforts to resolve this controversy.
[5]    An "impacted" home is one in which at least 25% of the residents or twenty-five residents (whichever is fewer) have a mental illness. See N.Y. Exec. § 553.10 (McKinney 2013). The 23 impacted adult homes are Belle Harbor Manor, Brooklyn Adult Care Center, Central Assisted Living, LLC, Elm York LLC, Garden of Eden Home, Harbor Terrace Adult Home and Assisted Living, Kings Adult Care Center, Lakeside Manor Home for Adults, Mermaid Manor Home for Adults, New Gloria's Manor Home for Adults, New Haven Manor, Oceanview Manor Home for Adults, Park Inn Home, Parkview Home for Adults, Queens Adult Care Center, Riverdale Manor Home for Adults, Rockaway Manor Home for Adults, S.S. Cosmas and Damian Adult Home, Sanford Home, Seaview Manor LLC, Surf Manor Home for Adults, Surfside Manor Home for Adults, and Wavecrest Home for Adults.

4

Min. Entry.)  The parties immediately filed a joint proposed Stipulation and Order of Settlement.

(Dkt. 5; Class Dkt. 5.)  On November 20, 2013, the court certified the class as:

> All individuals with serious mental illness who reside in impacted
> adult homes in New York City with a certified capacity of 120 or
> more beds and a mental health census of 25 percent or more of the
> resident population or 25 persons, whichever is less.

(See Nov. 20, 2013, Order at 3-4; Memo. in Supp. of Pls.' Mot. for Class Cert. (Class Dkt. 14) at

1.)  The court also granted preliminary approval of the proposed settlement, approved the class

notice, and appointed as Class Counsel Paul, Weiss, Rifkind, Wharton & Garrison LLP;

Disability Advocates, Inc. (now doing business as Disability Rights New York); The Bazelon

Center for Mental Health Law; New York Lawyers for the Public Interest, Inc.; MFY Legal

Services; and the Urban Justice Center.  (Nov. 20, 2013, Order at 3-4.)

### B.    Proposed Settlement Agreement

The Proposed Settlement Agreement requires substantially the same relief as contained in

the court's remedial order in the DAI litigation.  Under the terms of the settlement, within five

years, the State must provide class members the opportunity to move into supported housing.

(Amend. Stip. & Order of Settlement ("Settlement") (Dkt. 23; Class Dkt. 53) § I(1).)  The State

will provide a minimum of 2,000 supported housing units for current adult home residents, and

any additional units that are necessary.  (Id. § D(1)-(2).)  Adult home residents will have the

opportunity to undergo individual assessments to evaluate their eligibility for supported housing,

identify housing in the most integrated setting appropriate for their needs, and determine what

mental health services they would need in this setting.  (Id. § F.)  To help adult home residents

make an informed decision about whether to move, supported housing providers will conduct

"in-reach" to explain the benefits of supported housing, detail the options available, and address

any concerns.  (Id. § E.)  Eligible residents who choose to transition into supported housing or

other housing that is appropriate to their needs will receive services to aid with their move and transition into the community. (Id. § J.) The proposed settlement does not require any individual to move or undergo assessment against his or her will. (Pls.' Pre-Hr'g Mem. of Law in Supp. of Mot. for Final Approval of the Proposed Settlement and Atty's Fees ("Pls.' Mem.") (Class Dkt. 31) at 7; Pls.' Feb. 4, 2014, Ltr. (Class Dkt. 54) at 3-4.)

Implementation of the settlement will be monitored by the court and an Independent Reviewer. (Settlement § L(1).) Clarence Sundram, an experienced disability rights advocate who has served in a similar role in other cases, will serve as the Independent Reviewer. (Id.; Pls.' Feb. 4, 2014, Ltr. at 4-5.) He and any staff or consultants will work with the parties to resolve disputes that arise during implementation and may communicate with the court about progress, provided he submit a written summary of such communications to the parties after the fact. (Settlement §§ L(6), L(17).) The parties will submit quarterly progress reports to the court about implementation of the settlement. (Id. § K(1).) Mr. Sundram will submit five annual reports to the court about the State's compliance with the settlement. (Id. § L(13).) The court will retain jurisdiction to enforce the settlement until 60 days after the final annual report by the Independent Reviewer. (Id. § M(2).)

## C.    Notice of Proposed Settlement and Fairness Hearing

Following the court's certification of the class and preliminary approval of the settlement agreement, Class Counsel mailed the revised notice (Class Dkt. 22) to the 3,867 class members who were identified by Defendants. Class Counsel informed the court of a delay in transmitting the notice to some class members due to bulk mailing practices adopted by the retained mailing service. (Pls.' Dec. 20, 2013, Ltr. (Class Dkt. 28).) However, the parties swiftly addressed this problem by delivering notices to class members who reported that they had not received them,

issuing "Dear Administrator Letters" to adult home administrators to remind them of their duty to distribute the notice to residents, sending investigators to confirm compliance, and delivering additional copies of the notice by hand. (Id. at 1.) Class Counsel confirmed with the court that all notices were delivered by December 20, 2013.[6] (Id. at 2; Pls.' Mem. at 10.) Class Counsel also extended the deadline for class members to register to speak at the fairness hearing by nine days to compensate for the delayed notice. (Pls.' Dec. 20, 2013, Ltr. at 2.) In addition, the notice was posted in a public place in each adult home. (Id.) A cover sheet to the English notice contained instructions in four languages about how to obtain a copy of the notice in Spanish, Chinese, or Russian.

On January 9, 2014, the court held a fairness hearing to give class members the opportunity to express their views on the Proposed Settlement Agreement. Prior to the hearing, 125 class members registered to speak or attend, and 61 class members gave statements at the hearing, including six individuals who had not registered beforehand. In addition, the court invited "anyone who has not yet spoken at this hearing who wishes to be heard" to give a statement. (Jan. 9, 2014, Fairness Hr'g Tr. at 85.) The court also received nine written submissions from class members. (Class Dkts. 35-40, 45, 46, 58.) Class Counsel transmitted to the court additional comment letters received from 18 class members and declarations collected from 117 class members about their views on the settlement. (Decl. of Geoffrey Chepiga in Supp. of Pls' Mot. For Final Approval of the Proposed Settlement Agreement and Att'ys Fees ("Chepiga Decl.") (Class Dkt. 32) at ¶¶ 18-19). The court has received at least one submission or statement from a class member in each of the 23 impacted homes.

---

[6] Of the 3,867 notices that were mailed, as of January 8, 2014, only 19 had been returned as undeliverable. (Pls.' Mem. at 9 n.1.)

It is clear to the court that adult home staff exert a high degree of control over the residents' lives. (See Chepiga Decl. Ex. 4 at 7, 224.) Some class members were distrustful of or intimidated by the staff and feared retaliation for expressing their views about the proposed settlement. (See Pls.' Feb. 4, 2014, Ltr. at 7.) For this reason, residents who spoke at the fairness hearing were identified by number only (see Dec. 20, 2013, Order), their names have been withheld or redacted from the transcript, and written submissions from adult home residents have been kept under seal.

In the many oral and written statements submitted to the court, class members overwhelmingly expressed support for the proposed settlement. Class members described their feelings of confinement, mental deterioration, and unhappiness in adult homes. (See, e.g., Fairness Hr'g Tr. at 15 (Speaker No. 8); Chepiga Decl. Ex. 4 at 29, 134, 261.) Some class members also reported dangerous or unsanitary living conditions in their adult homes, recounting incidents in which they were administered the wrong medication by staff, (Chepiga Decl. Ex. 4 at 154-55), were denied toilet paper by maintenance persons (id. at 245), coped with bedbug infestations (Fairness Hr'g Tr. at 66, 68 (Speakers No. 33, 41)), or were attacked by other residents (id. at 65 (Speaker No. 31)). Many residents complained of a lack of privacy and the quality of the food in their adult homes and stated that they longed for a home in which they could spend time alone or with friends and family. (See, e.g., id. at 27 (Speaker No. 107); Chepiga Decl. Ex. 4 at 36, 200.) They supported the settlement because it offered an opportunity to be more independent and enjoy the simple joys many people take for granted: living without an assigned roommate, cooking their own meals, or buying cut flowers. (Fairness Hr'g Tr. at 23, 63 (Speakers No. 47, 117); Chepiga Decl. Ex. 4 at 226.)

The court received objections to the settlement from three class members (see Fairness Hr'g Tr. at 30-32, 38-40 (Speakers No. 71, 115); Chepiga Decl. Ex. 5 at 28-171) as well as a law firm representing "19 impacted adult homes, a Resident Association comprised of almost 3,000 residents of those homes . . . and a statewide trade association that represents the interests of adult care facilities and skilled nursing facilities in New York State" (collectively "Adult Home Operators"). (Adult Home Operators Jan. 14, 2014, Ltr. (Class Dkt. 47); see also Adult Home Operators Nov. 13, 2013, Ltr. (Class Dkt. 24); Adult Home Operators Aug. 21, 2013, Ltr. (Class Dkt. 10).) These are discussed more fully below.

## II.  DISCUSSION

### A.  Adequacy of Notice

The standard for whether notice in a class action is adequate under Federal Rule of Civil Procedure 23(e) is reasonableness. See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc., 396 F.3d 96, 113-14 (2d Cir. 2005). A notice is reasonable if it "fairly apprise[s] the prospective members of the class of the terms of the proposed settlement and of the options that are open to them in connection with the proceeding." Id. at 114 (citing Weinberger v. Kendrick, 698 F.2d 61, 70 (2d Cir. 1982)). "Notice need not be perfect, but need be only the best notice practicable under the circumstances, and every class member need not receive actual notice so long as class counsel acted reasonably in choosing the means likely to inform potential class members." In re Merrill Lynch Tyco Research Sec. Litig., 249 F.R.D. 124, 133 (S.D.N.Y. 2008) (citing Weigner v. City of New York, 852 F.2d 646, 649 (2d Cir. 1988)).

The court finds that notice was adequate, both in its content and its dissemination. The revised notice communicated the terms of the settlement in clear, simple language and provided points of contact for class members' questions or requests for transportation assistance. It

provided easy-to-understand instructions about how to submit written comments about the proposed settlement or arrange to speak at the fairness hearing. Given the large number of class members and varying levels of comprehension and ability among the class, the simple and direct notice was "the best notice practicable under the circumstances." In re Merrill Lynch, 249 F.R.D. at 133.

Despite initial glitches that arose during the mailing of the notice, the court finds that the ultimate methods of delivery were adequate. The parties' troubleshooting efforts to ensure delivery to class members in each adult home were "likely to inform potential class members." Id. Indeed, only 19 of the 3,867 notices mailed were returned as undeliverable. (Pls.' Mem. at 9 n.1.) Therefore the court finds that the parties have complied with Rule 23(e)'s notice requirements.

### B. Approval of the Settlement

Federal Rule of Civil Procedure 23(e) provides that "the court may approve [a proposed settlement] only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). "When a settlement is negotiated prior to class certification . . . it is subject to a higher degree of scrutiny in assessing its fairness." D'Amato v. Deutsche Bank, 236 F.3d 78, 85 (2d Cir. 2001). In these circumstances, a court must examine both the negotiation process and the settlement's substantive terms to determine its fairness. Id.

### 1. Procedural Fairness: The Negotiation Process

In assessing the procedural fairness of the settlement, the court looks to whether the agreement was the product of "arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." Id. (quoting Weinberger, 698 F.2d at 74).

Although the fact that the proposed settlement was filed the same day as the complaint in each case may give the appearance of hasty agreement, there is evidence that settlement negotiations were serious and deliberate. The settlement was reached after more than sixteen months of negotiations, in addition to prior rounds of settlement discussions that took place during the predecessor DAI litigation. (Pls.' Mem. at 3-4.) Throughout, Plaintiffs have been represented by a team of capable attorneys from six legal organizations who collectively serve as Class Counsel. They are experienced in class actions generally and had specific experience in this matter from litigating the DAI case. (Id. at 12.) The United States, represented by attorneys from the Department of Justice and the U.S. Attorney's Office for the Eastern District of New York, also participated in negotiations, bringing with it additional experience with Olmstead settlements. (Id. at 4.) Although the parties did not engage in discovery in this action, the proposed settlement benefitted from information they gleaned during discovery and trial in DAI, including expert reports, witness testimony, and the court's prior opinions. (Id. at 4.) Finally, Plaintiffs report that negotiations involved "significant wrangling." (Id. at 12.) Based on the foregoing, the court is satisfied that the settlement is the product of serious and deliberate negotiations between experienced and informed counsel who zealously represented their clients' interests.

2.    Substantive Fairness: Fairness, Reasonableness, and Adequacy

To grant final approval of a proposed settlement, the court must find that its terms are "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In City of Detroit v. Grinnell Corp., the Second Circuit developed nine factors to consider in making this determination:

> (1) the complexity, expense and likely duration of the litigation;
> (2) the reaction of the class to the settlement;
> (3) the stage of the proceedings and the amount of discovery completed;

(4) the risks of establishing liability;
(5) the risks of establishing damages;
(6) the risks of maintaining the class action through the trial;
(7) the ability of the defendants to withstand a greater judgment;
(8) the range of reasonableness of the settlement fund in light of the best possible recovery;
(9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.

495 F.2d 448, 463 (2d Cir. 1974), abrogated on other grounds by Goldberger v. Integrated Res., Inc., 209 F.3d 43 (2d Cir. 2000). "A court need not find that every factor militates in favor of a finding of fairness; rather, a court considers the totality of these factors in light of the particular circumstances." See In re Merrill Lynch, 249 F.R.D. at 143.

a. *Complexity, Expense, and Likely Duration of the Litigation*

The court need not speculate on the potential complexity, expense, and duration of litigation here because this matter was previously litigated and went to trial in DAI. Although the predecessor case was not a class action, it still involved intricate factual and legal issues, required substantial time and expense by the parties, and consumed significant judicial resources. The posture of the present cases—a class action and parallel government enforcement action—would only add another layer of complexity. See In re Austrian and German Bank Holocaust Litig., 80 F. Supp. 2d 164, 174 (2000) ("Most class actions are inherently complex and settlement avoids the costs, delays and multitude of other problems associated with them."). Because litigation would impose significant expense on the parties and further delay relief to class members, the court finds this factor militates in favor of approving the settlement.

b. *Reaction of the Class to the Settlement*

"If only a small number of objections are received, that fact can be viewed as indicative of the adequacy of the settlement." Wal-Mart Stores, Inc., 396 F.3d at 118 (citations omitted). Here, the reaction of the class to the proposed settlement has been overwhelmingly positive. In

the statements and submissions submitted to the court, only three class members objected to the settlement. Furthermore, although the court has taken steps to protect the identities of class members who expressed their views about the settlement, other class members may have declined to speak at the fairness hearing or submit a letter out of fear of retaliation by adult home operators. (See Dec. 20, 2013, Order; Pls.' Mem. at 14.) Therefore it is possible that support for the settlement is even greater than the number of oral or written submissions to the court suggests. Due to the small number of objectors among class members, the court concludes that this factor weighs in favor of settlement. D'Amato, 236 F.3d at 86-87.

### c. Stage of Proceedings and Amount of Discovery Completed

This factor concerns whether there is "some evidentiary foundation in support of the proposed settlement." Plummer v. Chem. Bank, 668 F.2d 654, 659 (2d Cir. 1982). "If all discovery has been completed and the case is ready to go to trial, the court obviously has sufficient evidence to determine the adequacy of settlement." Wal-Mart Stores, Inc., 396 F.3d at 118. However, "the absence of formal discovery has not always prevented consideration of the settlement." Chatelain v. Prudential-Bache Sec., Inc., 805 F. Supp. 209, 213 (S.D.N.Y. 1992).

As discussed above, although there has been no discovery in these cases, the parties participated in extensive discovery and trial during the predecessor litigation, with which the court is intimately familiar. DAI, 653 F. Supp. 2d at 189 ("Twenty-nine witnesses testified, more than three hundred exhibits were admitted into evidence, and excerpts from the deposition transcripts of twenty-three additional witnesses were entered into the record, along with the 3,500 page trial transcript."). After trial, Class Counsel also followed up with visits to all impacted adult homes, and Elizabeth Jones, an expert who testified in DAI, conducted follow-up interviews of residents in some of the homes. (Pls.' Mem. at 15; Chepiga Decl., Ex. 6 (Decl. of

Elizabeth Jones).) Based on this record, the court finds that, "counsel had sufficient information to act intelligently on behalf of the class." Chatelain, 805 F. Supp. at 213.

d. *Risks of Continuing Litigation*

The court considers together the fourth, fifth, and sixth factors—risks of establishing liability, risks of establishing damages, and risks of maintaining the class action through trial—as they all relate to the risks of continuing litigation. See Wal-Mart Stores, Inc., 396 F.3d at 118 (considering these factors collectively); Padro v. Astrue, No. 11-CV-1788 (CBA), 2013 WL 5719076, at *6 (E.D.N.Y. Oct. 18, 2013) (same). On these issues, a court should "assess the risks of litigation against the certainty of recovery under the proposed settlement." In re Global Crossing Sec. & ERISA Litig., 225 F.R.D. 436, 459 (S.D.N.Y. 2004).

Although in DAI, the court found that plaintiff Disability Advocates, Inc. had established liability, there is no guarantee that the outcome of a retrial would be the same, and Plaintiffs would likely again have to defend any favorable judgment on appeal. Even if Plaintiffs ultimately prevailed, the remedy would likely resemble the original remedial order in DAI. In the proposed settlement, Plaintiffs can secure substantially similar relief while avoiding the uncertainty and delay of continuing litigation. Proceeding with litigation presents no risk related to establishing damages, which Plaintiffs do not seek in this case, and only a "limited risk" of decertification. (Pls.' Mem. at 17.) However, Class Counsel avers that "Plaintiffs have negotiated a settlement that gives Class Members the relief they seek—and sooner rather than later. Plaintiffs thus have little additional to gain from proceeding to trial." (Pls.' Mem. at 16.) The court agrees and finds that although the risks of continuing litigation may be low, they are outweighed by the "certainty of recovery" and immediacy presented by the proposed settlement. In re Global Crossing, 225 F.R.D. at 436.

e. *Range of Reasonableness of the Settlement in Light of the Best Possible Recovery and Attendant Risks of Litigation*

The seventh factor, the ability of Defendants to withstand a greater judgment, does not apply here because Plaintiffs seek only declaratory and injunctive relief. Although there is no "settlement fund" in this case, the court considers the eighth and ninth factors together as a determination of the reasonableness of the proposed settlement in light of the best possible recovery and risks of litigation. In this inquiry a court may compare the proposed settlement to the relief sought by the plaintiffs. See Padro, No. 11-CV-1788 (CBA), 2013 WL 5719076, at *7.

The proposed settlement offers class members robust relief and reforms sought by Plaintiffs and disability rights organizations throughout the present cases, DAI, and decades of prior advocacy: the opportunity to transition into the most integrated setting suitable to their needs. The State will provide enough supported housing units to meet demand, with a minimum of 2,000 units. Class members may undergo assessment to determine their eligibility to move into supported housing, and will be offered services to aid in their decision to move, transition, and daily life while in supported housing. When, as here, "[t]he settlement offers the class members the most important, most tangible form of relief sought by plaintiffs," these factors weigh in favor of approval of the settlement. Id.

## C. Attorney's Fees

Under the ADA and the Rehabilitation Act, a court may award "the prevailing party, other than the United States, a reasonable attorney's fee." 42 U.S.C. § 12205; 29 U.S.C. § 794a. "Ideally . . . litigants will settle the amount of a fee." Hensley v. Eckerhart, 461 U.S. 424, 437 (1983). A court assesses the reasonableness of a fee in light of the time and effort expended, the complexity of the cases, the high quality of representation, and public policy considerations. See Wal-Mart Stores, Inc., 396 F.3d at 121.

15

Under the proposed settlement, Defendants have agreed to pay $200,000 in satisfaction of any claims for Plaintiffs' attorney's fees in case No. 13-CV-4166 and the DAI litigation. Defendants have also agreed to pay up to $75,000 annually for Plaintiffs' fees and expenses from the date of this Memorandum and Order through the term of the Agreement. (Pls.' Mem. at 22.) Class Counsel avers that they have expended a combined 1,158.5 hours drafting the Complaint and negotiating the settlement in this case.[7] (Id. Mem. at 22.) This makes for an effective billing rate of $173, below rates typically approved in this District for experienced attorneys. See Konits v. Karahalis, 409 F. App'x 418, 422 (2d Cir. 2011) (summary order) ("[T]he prevailing rates for experienced attorneys in the Eastern District of New York cases range from approximately $300-400 per hour.") (citations omitted); Trs. of the Local 813 I.B.T. Ins. Trust Fund v. Sprint Recycling, Inc., No. 09-CV-04435 (FB), 2010 WL 3613839, at *4 (E.D.N.Y. Aug. 6, 2010) ("In the Eastern District of New York, reasonable hourly rates for attorneys have ranged from $200 to $350 an hour for partners [and] $200 to $250 an hour for senior associates."). The court is also aware that these hours represent only a portion of the work Class Counsel performed on this case, and the fee amount is exceedingly modest in consideration of the hours dedicated to the complex DAI litigation. Therefore the court finds the negotiated fee amount for past and prospective work to be reasonable.

**D.    Objections**

Objections to the proposed settlement fall into two categories, (1) those from class members, and (2) those from the Adult Home Operators.

---

[7]    As Paul, Weiss, Rifkind, Wharton & Garrison litigated this case on a pro bono basis and is not seeking attorney's fees to which it might otherwise be entitled, the many hours its attorneys devoted to this case are not included in this figure. (Pls.' Mem. at 22 n.7.) The court makes special note of that firm's outstanding and comprehensive advocacy in the DAI case.

1.    Class Members' Objections

The court received three objections from class members.  At the Fairness Hearing, two class members spoke in opposition to the settlement.  (See Fairness Hr'g Tr. at 30-32, 38-40 (Speakers No. 71, 115).)  Speaker No. 71 "like[d] the home" where the speaker lived and described it as "very neat" and "very clean."  (Id. at 31.)  The speaker appreciated having medical professionals and staff close by and enjoyed being around residents who "care[d] about each other."  (Id. at 31.)  Speaker No. 115 expressed concerns about whether residents who moved into supported housing would be able to maintain their medication regimens without supervision.  The speaker had previously lived in supported housing and cautioned that "it's not like an *apartment* apartment.[8]  You would have to live with other people and everything."  (Id. at 39.)  A third class member submitted a series of largely repetitive letters opposing the settlement but did not state the reasons for this opinion.  (See Chepiga Decl. Ex. 5 at 28-171.)

The court takes class members objections seriously but finds they do not present grounds that preclude approval of the proposed settlement.  The proposed settlement requires that class members be given *the choice* to move into supported housing if they are found eligible.  It does not force anyone to move or even to undergo an assessment to determine eligibility.  The court believes this flexibility will allow the proposed settlement to respect the choices of all class members.  As for concerns about whether class members can manage their medication, this will likely be incorporated into the assessment for suitability to move into supported housing.  See Proposed Settlement Agreement § F(d).  In addition, community services such as "assistance with taking medication (including through prompting)" will be available for residents who transition into supported housing.  Id. § J(2).  Finally, while the court hopes that class members

---

[8]      Although the speaker referred to "assisted living," from context it appears the speaker meant supported housing.

do not have inflated expectations of the comfort or luxury of supported housing, this concern presents no basis to deny them the opportunity to choose to live there.

### 2. Adult Home Operators' Objections

As a general rule, "[n]onparties to a settlement generally do not have standing to object to a settlement of a class action." Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck–Medco Managed Care, L.L.C., 504 F.3d 229, 244 (2d Cir. 2007); see also In re Drexel Burnham Lambert Grp., Inc., 130 B.R. 910, 923 (S.D.N.Y. 1991). As the Fourth Circuit observed in Gould v. Alleco, a rule that "routinely allow[ed] non-class members to inject their concerns via objection at the settlement stage" would result in "eleventh hour expansion of class actions." 883 F.2d 281, 284 (4th Cir. 1989). The Fourth Circuit concluded that any "[i]nterjection of the opposing views of non-class members should proceed via intervention under Rule 24." Id.

As a preliminary matter, the court remains skeptical of the Adult Home Operators' role and motives in this case. It does not escape the court that adult homes and their representative trade association have a financial interest in preventing residents from leaving their facilities, which may face funding or staff reductions should residents transfer to alternative housing. The Adult Home Operators have sought neither intervention under Federal Rule of Civil Procedure 24 nor leave to file an amicus curiae brief under Federal Rule of Civil Procedure 29, instead attempting to influence the settlement from the sidelines as non-parties. Even when the court welcomed comments from anyone present at the Fairness Hearing, no representative from the Adult Home Operators spoke out against the settlement. While the Adult Home Operators claim to speak for adult home residents, citing 382 surveys collected from residents, they failed to

submit these surveys to the court.[9] This conduct does not strike the court as that of stakeholders committed to productive engagement in this action.

However, the court will nevertheless address the Adult Home Operators' objections, particularly in light of the fact that the group claims to include adult home residents. The Adult Home Operators have submitted three letters to the court presenting four main objections to the proposed settlement: (1) problems with the notice procedure, (2) flaws in the "in-reach" process, (3) the limited role for residents' treating healthcare professionals and the lack of standards in the assessment process, and (4) the lack of oversight and accountability. (See Nov. 13, 2013, Ltr.; Jan. 14, 2014, Ltr.; Feb. 6, 2014, Ltr.)

### a. *Problems With the Notice Procedure*

The Home Adult Operators contend that there has been "no accountability for the problems associated with the Class Notification." (Jan. 14, 2014, Ltr. at 2.) As discussed above, the court finds that the problems that arose during the notice process were swiftly remedied by the parties and promptly reported to the court, and that the parties' ultimate methods of delivering the notice were "likely to inform potential class members." In re Merrill Lynch, 249 F.R.D. at 133.

### b. *Flaws in the "In-Reach" Process*

The Home Adult Operators object to the "in-reach" process as "narrowly designed to persuade residents of the attractiveness and benefits of supported housing." (Jan. 14, 2014, Ltr. at 2.) They claim that representatives conducting in-reach did not address the potential

---

[9]     The Adult Home Operators claim to have collected 382 surveys from residents of several adult homes that "indicate that residents do not wish to participate in the assessment process" (Jan 14, 2014, Ltr. at 3), but did not submit these surveys to the court.  Because class counsel made copies of the surveys and submitted them, the court was able to review them, and finds that while some residents do not want to move or be assessed, none directly express a view on whether the proposed settlement should be approved.

challenges of supported housing, have misrepresented the services available to residents in supported housing, and have excluded adult home staff from the sessions. (Id. at 2-4.)

As a preliminary matter, in-reach by supported housing contractors, as outlined by the proposed settlement, has not yet begun (Pls.' Feb. 4, 2014, Ltr. at 8), so the court presumes that the Adult Home Operators' objections pertain to meetings between Class Counsel and residents. The court has reviewed the proposed settlement and does not find that it requires a one-sided presentation of only positive aspects of supported housing. With the goal of enabling residents to make an "informed choice" about moving, the proposed settlement requires housing contractors to "discuss any concerns" about supported housing and requires the State to use its best efforts to locate persons living in supported housing to speak with adult home residents.[10] (Settlement § E(2)(a)-(b).) To the extent that in-reach representatives do not abide by the precepts of the proposed settlement, make misrepresentations, or improperly pressure residents to move, the agreement creates an oversight mechanism to address such concerns—the Independent Reviewer. Finally, in light of the fears of retaliation by adult home staff against residents who pursue transition to supported housing, the court finds it sensible that Class Counsel has excluded adult home staff from their meetings with Class Members.

      c. *The Assessment Process: Role of Residents' Treating Healthcare Professionals & Standards*

The Adult Home Operators also claim that the proposed settlement does not require "consult[ation] with the residents' treating physicians, mental health professionals, or other healthcare providers." (Jan. 14, 2014, Ltr. at 4.) This is plainly false. Under the proposed settlement, Health Homes and Managed Long Term Care Plans will conduct the assessments of

---

[10]    The video that Class Counsel has shown to residents, "Coco's Story," also discusses potential challenges of living in supported housing such as budgeting, following a medication regimen, and dealing with loneliness. See CIAD Media Team, *Choice in Housing: Coco's Story*, YouTube (Sept. 29, 2009), https://www.youtube.com/watch?v=T9o0sKUkI0A.

residents to determine eligibility to transition into supported housing. (Settlement § F(1).) These entities are staffed by healthcare professionals who coordinate each resident's various caregivers and medical providers. (See DOJ Feb. 4, 2014 Ltr. (Dkt. 24) at 6 n.6.) To gather information as part of the assessment, Health Homes and Managed Long Term Care Plans will consult with and collect records from residents' medical providers as needed. (See Id. at 6; Pls.' Feb. 4, 2014, Ltr. at 4.)

The Adult Homes Operators further object to the assessment process as lacking standards to determine whether a resident is suitable for supported housing. This is incorrect, as section F(5) of the proposed settlement sets forth standards to guide the assessment, including considerations of whether the resident has dementia, "would be a danger to self or others," or requires nursing care. (See Settlement § F(5).)

### d. *Oversight and Accountability*

Finally the Adult Home Operators claim the proposed settlement "lacks any meaningful mechanism for oversight and accountability." (Jan. 14, 2014, Ltr. at 6.) The issue of oversight has been a focus for the court, which previously raised concerns about provisions governing monitoring of the settlement. (See Oct. 4, 2013, Order (Class Dkt. 12).) In response, the parties modified the proposed settlement to require that the State's quarterly reports and the Independent Reviewer's five annual reports be submitted to the court, and to enable the court and Independent Reviewer to communicate freely, provided that a summary of these communications subsequently be provided to the parties. (See Sept. 16, 2013 Ltr. (Class Dkt. 11); Dec. 10, 2013, Ltr. (Class Dkt. 26).) In addition, the court will retain jurisdiction to enforce the settlement throughout its implementation. To the extent that any of the issues raised by the Adult Home Operators present problems during the implementation of the settlement, the Independent

Reviewer should be able to address them and make recommendations accordingly. Because the proposed settlement permits the Independent Reviewer to consult with stakeholders (Settlement § L(6)(c)), the Adult Home Operators will be able to communicate with Mr. Sundram should their concerns persist. The court is satisfied that these mechanisms will allow for sufficient oversight and accountability.

In sum, the court finds that the proposed settlement agreement adequately addresses the concerns presented by the Adult Home Operators. In addition, the Adult Home Operators have presented no evidence that class members oppose the settlement. As for residents who may not want to move, under the proposed settlement, their wishes will be respected. The settlement need not be perfect in order to be fair, reasonable, and adequate, and in the court's view, the proposed settlement indeed goes beyond these legal requirements. This view is bolstered by Amici Curiae Mental Health Organizations, a coalition of ten mental health organizations that supports the proposed settlement, applauding it for "secur[ing] the most important relief that Adult Homes residents have been seeking since at least 2003." (See Memorandum of Law of Amici Curiae Mental Health Organizations in Support of Proposed Settlement Agreement (Dkt. 19; Class Dkt. 43).)

## III. CONCLUSION

For the foregoing reasons, the court finds the proposed settlement to be fair, reasonable, and adequate. The court also finds the attorney's fees to be reasonable. Plaintiffs' Motion for Final Approval of the Proposed Settlement Agreement and Attorney's Fees in case No. 13-CV-4166 is GRANTED. For purposes of the associated case No. 13-CV-4165, the Proposed Settlement Agreement serves as a Consent Judgment and is also APPROVED.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
       March 17, 2014

NICHOLAS G. GARAUFIS
United States District Judge