UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————

| THE UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STATE OF NEW YORK, | ) | Civ. Action No. 13-CIV-4165 (NGG) |
| | ) | |
| | ) | |
| Defendant. | ) | |

—————————————————————

—————————————————————

| RAYMOND O'TOOLE, ILONA SPIEGEL, and | ) | |
|---|---|---|
| STEVEN FARRELL, individually and on behalf | ) | |
| of all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| | ) | |
| ANDREW M. CUOMO, in his official | ) | Civ. Action No. 13-CIV-4166  (NGG) |
| capacity as Governor of the State of New | ) | |
| York, NIRAV R. SHAH, in his official | ) | |
| capacity as Commissioner of the New York | ) | |
| State Department of Health, KRISTIN M. | ) | |
| WOODLOCK, in her official capacity as | ) | |
| Acting Commissioner of the New York | ) | |
| State Office of Mental Health, THE NEW | ) | |
| YORK STATE DEPARTMENT OF | ) | |
| HEALTH, and THE NEW YORK STATE | ) | |
| OFFICE OF MENTAL HEALTH, | ) | |
| | ) | |
| Defendants. | ) | |

—————————————————————

**FOURTH ANNUAL REPORT SUBMITTED BY
CLARENCE J. SUNDRAM
INDEPENDENT REVIEWER**[*]

—————————————

[*] The members of the Independent Review team, Mindy Becker, Thomas Harmon and Stephen Hirschhorn, contributed substantially in the research and preparation of this report.

# Contents

Executive Summary ........................................................................................................................... 4

I. Introduction ................................................................................................................................. 10

II. Methodology .............................................................................................................................. 11

III. Updating the class list ............................................................................................................... 14

IV. Review of a sample of class members in transition ................................................................... 15

    A.   Housing choice ................................................................................................................ 17

    B.   Transitions that worked well ........................................................................................... 19

    C.   Class members who experienced difficulty but remained in the community .................. 22

        1.   Condition of the apartments ...................................................................................... 23

        2.   SNAP benefits ............................................................................................................ 24

        3.   Financial problems ..................................................................................................... 26

        4.   Issues with housemates ............................................................................................. 28

        5.   Medications and mental health treatment ................................................................ 31

        6.   5K funds enhancement pilot project .......................................................................... 32

V. Review of class members in Assisted Living Program (ALP) beds ............................................... 35

    A.   Introduction .................................................................................................................... 35

    B.   Background ...................................................................................................................... 36

    C.   Staffing ............................................................................................................................ 37

    D.   Methodology/Sample ..................................................................................................... 38

    E.   Overall findings ............................................................................................................... 38

        1.   The homes and services ............................................................................................. 38

        2.   Class members in the sample ..................................................................................... 41

        3.   Impact on transitions ................................................................................................. 43

        4.   ALP code .................................................................................................................... 47

VI. In-reach .................................................................................................................................... 48

    A.   In-reach data .................................................................................................................. 48

VII. Assessments ............................................................................................................................. 50

    A.   Continuing delays in the assessment process ................................................................ 51

    B.   Changes in assessment recommendations/outcomes ................................................... 52

    C.   Settlement Agreement performance standard ............................................................... 54

D.   A new approach to assessments ...................................................................... 55

E.   HRA review of housing recommendations ......................................................... 56

VIII. HRA review and Unable to Complete (UTC) cases ................................................ 58

IX. Person-centered care planning process ............................................................... 62

A.   Improvements and ongoing problems in person-centered care planning ................... 62

1.   Delays in the delivery of services .............................................................. 63

2.   Care management teams supporting class members ...................................... 63

3.   An advance towards more robust person-centered care planning ...................... 64

4.   Adult Home Plus (AH+) care management program ...................................... 67

X. Need for formal quality assurance mechanisms ..................................................... 70

XI. Conclusion ................................................................................................... 75

XII. Recommendations ......................................................................................... 78

Appendix A Table of Acronyms and Abbreviations ..................................................... 81

Appendix B Definitions of Health Home Reportable Incidents ....................................... 84

## Executive Summary

**Figure. 1. Overview of the status of implementation as of March 16, 2018[1]**



---

[1] The data in this report are drawn from the Defendants' weekly reports up to Week 209, ending on March 16, 2018.

The two most significant developments in the implementation of the Settlement Agreement in Year Four have been: 1) the significant slowdown in the pace of movement of class members from adult homes to community settings; and 2) the ongoing discussions between the parties and the Independent Reviewer to redesign the entire process of implementing the Settlement Agreement to address obstacles and inefficiencies that are believed to impede community transitions of class members at the rate anticipated in the Settlement Agreement. These discussions culminated in a Supplement to the Second Amended Stipulation and Order of Settlement ("Supplemental Agreement") that has been filed with the Court (Doc. 196-1, filed March 12, 2018 in 1:13-cv-04166-NG-ST).

Out of the 4,081 class members identified as of March 16, 2018, 4,989 have received in-reach by a Housing Contractor during the implementation of the Settlement Agreement, and 2,578 of those class members have expressed an interest in moving to supported housing.[2] As of March 16, 2018, 655[3] had been moved over the first 19 quarters that the Settlement Agreement has been in effect.[4]

There continues to be progress, albeit slow, towards the goals of the Settlement Agreement in Year Four. In previous reports, we have described the assessment process as a significant bottleneck that has impeded the progress of class members who expressed an interest in moving to community housing. During the past year, there has been improvement in reducing the number of people "stuck" in the assessment stage and the duration of time for which they have been stuck (Report, Section VII).

While the number of cases backlogged in the assessment phase has been reduced by nearly 59% in the past year (from 811 to 336), troubling issues described in the Independent Reviewer's Third Annual Report concerning assessment outcomes persist. These include high rates of class members being recommended for Level II housing[5] (for which there is no specific allocation of beds for the class); being determined not to have a serious mental illness, and therefore excluded from the class; and being determined to have "declined assessment" which

---

[2] As explained in more detail below, the 4,081 class members represent a snapshot at a point in time. Due to admissions and other additions to the class list, there are more people during a year who are eligible to receive in-reach.

[3] Although 655 class members had transitioned from adult homes as March 16, 2018, 30 had returned to adult homes and will continue to receive in-reach as active class members.

[4] The State has noted that the Settlement Agreement did not come into effect until the Court's final approval was ordered on March 17, 2014, and that in-reach efforts began on the same day, and assessments on April 3, 2014. The timelines in the Settlement Agreement, however, are measured from the date of its execution on July 23, 2013.

[5] Level II Housing refers to other types of OMH housing, including Community Residence-Single Room Occupancy (CR/SRO); Congregate Treatment; and Apartment Treatment.

prevents an evaluation of their eligibility for community transition. Recommendations for supported housing as a percentage of all assessment outcomes fell from highs of 72% and 70% in 2014 and 2015, respectively, to 45% in 2016; Transitional Services Inc. assumed assessment responsibility in July 2016. The rate of recommendations for supported housing has continued to decline to 39% in 2017 and 36% in the first quarter of 2018.

Moreover, despite the improvements in the timeliness of assessments, the overall amount of time it takes to effect a transition has grown. As reported previously, the lengthy delays class members encounter from the time they first express an interest in moving may be having a discouraging effect on their ability to persevere through the complexity and opaqueness of the process. As has been the case in each of the previous three years, the length of time it takes for the class as a whole to navigate the multiple steps leading to community placement continued to increase in Year Four.



**Figure 2. Median Days from In-reach to Transition as of March 16, 2018**

The pace of transitions is still slower than what would be required to meet the Settlement Agreement goals. The Settlement Agreement required that by Year Four (July 23, 2017) the State would have assessed 2,500 class members and, if appropriate, transitioned them to supported housing or another appropriate least restrictive alternative. The Weekly Report submitted by the State for the week ending July 28, 2017, reports that 2,328 class members had at least one completed assessment since the start of the Settlement Agreement. Of these, in 587 cases, the individual was reported as refusing the assessment. As discussed more fully in the Assessment section of this report, the Supplemental Agreement now distinguishes between completed assessments and assessments which are closed out without being completed. (Supplemental Agreement, §B (3) and (4); Report §VII, fn. 21) Of the 1,187class members

assessed and recommended for supported housing (1,010) or other licensed OMH housing (177), 540 had transitioned by July 28, 2017.



**Figure 3. Transitions of class members, by quarter as of March 16, 2018** [6]

Overall, since the first class members began transitioning to the community in Quarter 5 (7/1/14-9/30/14), the pace of transitions has fluctuated and, as depicted in Figure 3, has been on a downward trend since Quarter 13 ending in September 2016. Figure 4 illustrates that Settlement Agreement transitions account for 40.8% of the class members leaving impacted adult homes. The remainder have left via non-transitional discharges (1,198) or death (407).



**Figure 4**. **Community Transitions, Non-transitional discharges and deaths.**

It is apparent that the implementation of the Settlement Agreement has not proceeded as originally anticipated and that the pace of transitions of class members who are interested in

---

[6] The data for Q 19 is partial, as the Quarter does not end until March 31, 2018.

moving to supported housing or other community residential alternatives has been considerably slower than envisioned. The State regulations[7] that were intended to prevent new admissions of persons with serious mental illness into the impacted adult homes have been the subject of a Temporary Restraining Order issued in a State Court, with the consent of the State Defendants. (*Doe v. Zucker*, Index No. 07079/2016 (Albany County))[8] Consequently, new admissions to the impacted adult homes have continued, adding to the original class. As can be seen in Figure 1, despite all of the efforts over the past four years, the overall size of the class remains about the same.

The parties have been engaged for most of the past calendar year in reviewing the entire implementation process, along with members of the Independent Reviewer team, with a view to streamlining the process in order to facilitate the achievement of the goals of the Settlement Agreement. This process concluded with the Supplemental Agreement cited earlier. The State has already begun implementing some of the changes. Among the significant changes are the following:

1. The assessment process will be changed by lodging responsibility for the assessments with the Housing Contractors. This is intended to simplify and streamline the process and reduce the number of people and agencies that class members have to interact with.

2. The State will implement a program of Peer Bridgers – persons with a lived experience of mental illness who live in the community – who will be present in the adult homes to work with current residents throughout the process of in-reach, assessment, planning and transition to the community. At least three full time peers will be assigned to each of the impacted adult homes and work closely with the Housing Contractor staff.

3. The agreement sets specific timelines for various tasks to be performed, and thresholds for compliance.

4. The agreement sets forth specific transition metrics to be measured every six months, with the Independent Reviewer reviewing and reporting upon compliance to the parties and the Court.

---

[7] *See* 18 NYCRR §§ 487.4(c) provides:

> No operator of an adult home with a certified capacity of eighty or more and a mental health census. .. of 25 percent or more of the resident population shall admit any person whose admissions will increase the mental health census of the facility.

14 NYCRR § 580.6(c)(2), 582.6(c)(2) prohibit a hospital from discharging any person with serious mental illness to an adult home with a certified capacity of eighty or more and a mental health census of 25 percent or more unless the person was a resident of the home immediately prior to his or her current period of hospitalization.

[8] Subsequently removed to the United States District Court in the Northern District of New York (No. 17-1005, Suddaby, C.J.)

5. The agreement creates a new Quality Assurance and Performance Improvement process which requires the collection, analysis and reporting from various data pertaining to compliance with the metrics described above. These will be included in the quarterly reports submitted to the parties and the Court.

6. There are new provisions addressing discouragement and interference by adult home providers, including a new complaint investigation and tracking system.

7. The parties agreed upon a cap on the class as of September 30, 2018. Individuals who are admitted to the impacted adult homes after that date will not be entitled to relief under the Settlement Agreement, but the State will continue to make efforts to transition those individuals into supported housing as desired and appropriate. No later than September 30, 2019, class members who wish to be assessed must make their decision known and the State will not be obligated to assess or transition class members who do not indicate their desire by this date. The agreement provides for notice to the class to be provided no later than March 31, 2019 of these provisions. It is important to note that class members admitted prior to September 30, 2018 will be receiving in-reach to individually inform them of their rights and option to move to supported housing. The Supplemental Agreement provides that it does not and is not intended to prejudice the rights or claims of persons admitted to impacted adult homes after September 30, 2018.

8. The Court's jurisdiction to ensure compliance with the agreement will terminate on December 31, 2020 if, as of that date, the State has transitioned substantially all eligible class members who are appropriate to be transitioned and has substantially complied with its other obligations as set forth in the Settlement Agreement and the Supplemental Agreement. The parties may jointly ask the Court to terminate the agreement and supplement earlier than December 31, 2020.

The Governor's Executive Budget includes a request for five million dollars in new funds for the implementation of these and other initiatives in support of the Supplemental Agreement implementation. As this case is halfway through its fifth and, what was anticipated to be, its final year, it is apparent that much work remains to be done to transition all interested and eligible class members to supported housing or other appropriate community living arrangements.

## I. Introduction

Paragraph 13 of the Settlement Agreement requires the Independent Reviewer to provide five written annual reports to the parties and the Court regarding the State's compliance. Paragraph 14 of Section L of the Settlement Agreement in this matter provides:

> A draft of the Reviewer's report shall be provided to the Parties for comment each year within 30 days after the anniversary date of the Court's approval of this Agreement.  The parties shall have 30 days after receipt of such draft report to provide comments to the Reviewer, on notice to each other, and the Reviewer shall issue to the Parties a final annual report within 15 days after receiving such comments; provided, however, that the parties may agree to extend such deadlines.

The Court's final approval of the Settlement Agreement was filed on March 17, 2014. Based on that date, the Independent Reviewer prepared and submitted to the parties a schedule for the preparation of the required five annual reports. For the fourth year, the schedule requires that the Independent Reviewer's draft be provided to the parties by February 16, 2018, with their comments due by March 19, 2018, and the final report submitted by April 3, 2018.[9] A draft of this report was shared with the parties as required by Paragraph L. 14. of the Settlement Agreement and comments were provided by them. The Independent Reviewer has considered all comments received and made revisions to the draft as warranted.

A caveat noted in previous annual reports regarding the data contained herein bears repeating. The Independent Reviewer and the Plaintiffs receive regular weekly reports from the Defendants on the progress being made in each of the many steps of the transition process. These reports in turn are drawn from data reported to the Defendants by the adult homes, Housing Contractors, Health Homes and Managed Long Term Care Programs (MLTCP), some of which also rely upon downstream providers to deliver services and report upon them.  In addition to these weekly reports, the Independent Reviewer has requested and received from the Defendants various data reports in the course of preparation of this annual report. It has been our experience that both the weekly reports and the other data reports we have received contain missing information, anomalies and inconsistencies, and some obvious errors for a variety of reasons. These include incomplete data submission by vendors, inaccurate recording of data, and errors in compiling the reports from several different data sources. Assembling data on different dates can also result in inconsistencies, as the underlying data bases are "live" and are constantly changing

---

[9] Annual reports have been filed previously as follows: Independent Reviewer's Annual Report, Doc. # 36, filed March 30, 2015, hereinafter "First Annual Report;" Independent Reviewer's Second Annual Report, Doc. # 63, filed April 1, 2016, hereinafter "Second Annual Report;" and Independent Reviewer's Third Annual Report, Doc. # 102, filed April 3, 2017, hereinafter "Third Annual Report."

due to admissions and discharges. In some cases, these have been called to the attention of the Defendants. We alert the reader that the statistical analyzes contained in this report, to the extent that they rely on the data provided as described above, may not be precisely accurate, although we do not believe that any errors are large.

The primary focus of this report is on the experiences of class members who have gone through the in-reach, assessment, approval by the New York City Human Resource Administration ("HRA") and care planning processes, and have been transitioned to supported housing in the community which is the ultimate objective of the Settlement Agreement. To that end, in this report we will describe in some detail our review of a sample of 35 class members who had transitioned to supported housing between September 1, 2016 and June 1, 2017. In addition, we will report on each of the stages of the transition process – in-reach; assessment; HRA approval; Housing Contractor placement process; services provided by Housing Contractor case managers, care coordinators from Health Homes (HH) and MLTCPs, and the Adult Home Plus Care Managers;[10] person-centered planning and quality assurance.

## II. Methodology

Over the past year, the Independent Reviewer and his associates (Mindy Becker, Thomas Harmon and Stephen Hirschhorn) continued monitoring the implementation of the Settlement Agreement in accord with the provisions of the Agreement and a Monitoring Plan developed by the Independent Reviewer and approved by the parties as described in detail in the Independent Reviewer's First Annual Report.

Generally, the Monitoring Plan called for reviewing training materials and tools developed for frontline staff responsible for transition-related activities; site visits; interviewing class members and reviewing their records on a sample basis; observing and participating in various transition-related activities (e.g., in-reach, assessment, care planning, etc.); and reviewing and analyzing reports by the State and its contractors concerning implementation activities.

The Monitoring Plan also called for the Independent Reviewer to provide the parties with regular reports of findings and observations as well as recommendations to facilitate the successful implementation of the Settlement Agreement. In addition to formal communications, such reports would be made in writing or at periodic meetings with the State and Plaintiffs with

---

[10] There are many different terms used to refer to these staff who assist class members during various phases of the transition process. For the sake of consistency and clarity, in this report we will refer to the Housing Contractor staff as case managers, to the staff of the Health Home and MLTCPs as care coordinators, and to the Health Home Adult Home Plus Care Managers by the shorthand AH+CM.

the goal of providing the parties with information as early as possible to enable them to act as warranted to achieve the shared objective: successful implementation of the Settlement Agreement.

Among the specific monitoring activities carried out by the Independent Reviewer and his associates during the past year which inform the content of this annual report were:

1. Participated in and observed 14 training sessions sponsored by the State for Housing Contractors, Health Homes and MLTCPs. These educational sessions focused on the goals of the Settlement Agreement and the skills these frontline staff required in conducting in-reach, assessment, care planning and care management.

2. Reviewed tools and guidelines developed for use by frontline staff responsible for in-reach, assessment, person-centered planning/management and transition.

3. Participated in regularly scheduled State-sponsored meetings of all eight[11] Housing Contractors responsible for in-reach, supported housing development, transition of residents and their housing/case management following transition, as well as in periodic meetings of the Housing Contractor supervisors.

4. Met with representatives of the Coalition of Institutionalized Aged and Disabled (CIAD), the Mental Health Association in New York State (MHANYS), the New York Association of Psychiatric and Rehabilitation Services (NYAPRS) and the Schuyler Center for Analysis and Advocacy (SCAA) which provide advocacy services on behalf of adult home residents and are active in homes covered by the Settlement Agreement.

5. Met with 135 class members during educational sessions, visits to adult homes or visits to apartments after their transition.

6. Also participated in care planning and transition-related conference calls for 187 class members including:

   • Sixty-three pre-transition conference calls in which Housing Contractors, HH/MLTCP staff and DOH and OMH representatives confer to ensure that all elements of a successful transition (housing, utilities, community supports, entitlements/benefits, etc.) are in place for an individual. Such calls usually happen about three weeks before the individual moves.

   • Forty-eight post-transition conference calls in which Housing Contractors, HH/MLTCP staff and DOH and OMH representatives discuss how an individual's transition went and any outstanding matters in need of attention

---

[11] There were originally nine Housing Contractors, but one, Federation, Employment and Guidance Services (FEGS), went out of business and its operations were absorbed by the Jewish Board of Family and Children's Services.

following the transition. Such calls usually happened about three to four weeks after transition.

- Forty-six "Level II" conference calls. These interdisciplinary calls involving Housing Contractors, HH/MLTCP staff and DOH and OMH representatives focus on individuals whose assessment resulted in a recommendation for transition to a level of care higher than that provided in supported housing.

- Twelve calls in which the assessment process resulted in a recommendation that the individual remain in an adult home.

- Eighteen miscellaneous calls concerning individuals whose care plans or situations required special attention by Housing Contractors, HH/MLTCP staff and/or DOH and OMH representatives.

7. Conducted a focused review of 13 class members who reside in Assisted Living Program (ALP) beds within adult homes. The review was intended to learn more about services provided to individuals in ALP beds and whether being in an ALP bed has any impact on the transition process. It included interviews with the residents and staff and a review of assessment-related and ALP and adult home service records.

8. Conducted an in-depth review of a sample of 35 class members who had transitioned from adult homes to supported housing. Thirty-two of the 35 were selected randomly. The three others were part of the ALP review described above who had transitioned to supported housing subsequent to their selection for the ALP review. This involved reviews of their Housing Contractor and HH/MLTCP records, and for some class members, reports from the Psychiatric Services and Clinical Knowledge Enhancement System ("PSYCKES"); interviews with key staff; and, with their permission, visits to their apartments to observe their new environs and to hear their perspectives on their transition, their new living arrangements, the adequacy of services and matters that might be improved.

9. Followed up on several class members who died or were involved in serious incidents following transition.

10. Through the above activities, had opportunities to observe and/or review the work of all Housing Contractors and most of the HH/MLTCPs and their downstream providers involved in the implementation.

11. Reviewed case specific data reported weekly by the State on implementation activities as individuals pass through the in-reach, assessment, care planning, HRA approval and transition phases of the Settlement Agreement, as well as quarterly reports and other reports prepared by the State on the status of the Settlement Agreement's implementation.

13

12. Consulted with the NYC HRA concerning their process for reviewing and approving applications for transitions to supported and/or Level II housing, and cases reviewed in the past year.

13. Maintained regular contact through telephone calls and emails with DOH and OMH staff responsible for Settlement Agreement implementation and had periodic face-to-face meetings with such staff to share the Independent Reviewer's observations and to discuss progress, developments and changes in the implementation process.

14. Maintained regular contact with the attorneys for the Plaintiffs and the United States Department of Justice through meetings, email and periodic telephone conferences.

15. In addition to participating in four status conferences and hearings convened by the Court, participated in scores of meetings and conference calls with State officials and attorneys for the Plaintiffs and the United States Department of Justice as the parties endeavored to redesign the Settlement Agreement whose implementation has proven problematic, as detailed in the Independent Reviewer's various reports.

The Independent Reviewer and his team have relied upon the cooperation of the staff from the DOH and the OMH in responding to innumerable requests for data and information. They have been generally responsive to requests for information that has been needed to perform our monitoring functions. We have also received assistance from the staff of the NYC HRA. The staff of the Housing Contractors, Health Homes and MLTCPs, and their downstream providers, have also been cooperative with the Independent Reviewer and generous in their time and assistance. We have also had unimpeded access to the impacted adult homes to meet with class members. The Independent Reviewer would like to acknowledge the assistance of all of these parties, which has been of immense help.

## III. Updating the class list

The initial certified class list contained 3,867 names, to which seven additional class members were added, for a total of 3,874, which was reported to the parties and the Court on June 10, 2014 (Doc. # 30-1). The DOH has periodically updated the class list based on rosters that it receives quarterly from the adult homes reflecting admissions, discharges and deaths. As of December 15, 2017, 2,181 people were added to the list to reflect new admissions to impacted adult homes, as well as the identification as class members of persons previously admitted.

The most recent class list as of March 16, 2018, requested by the Independent Reviewer, contained a total of 6,357 class members. However, since this list contains all persons who have ever been identified as a class member and does not remove names as people die, are discharged or are subsequently determined not to qualify for class status as they do not have a serious

mental illness, it overstates the number of people who are eligible to be transitioned to supported housing or other alternatives pursuant to the Settlement Agreement. Removing these leaves 3,456 "active" class members eligible for assessment and transition as of March 16, 2018 pursuant to the Settlement Agreement, as displayed in Table 1 below.

| | |
|---|---|
| Grand Total class members | 6357 |
| Non-SA discharge | -1457 |
| Deceased | -517 |
| Determined not a class member | -302 |
| SA transition | -655 |
| SA transition but returned to adult home | +30 |
| Current active class members | 3456 |

**Table 1.  Active class members**

## IV. Review of a sample of class members in transition

As was done last year, the Independent Reviewer team conducted an in-depth review of a sample of 35 class members who had expressed an interest in transitioning from adult homes to supported housing, and who transitioned between September 1, 2016 and June 1, 2017. The sample class members had been in the community long enough to have settled in and able to provide a perspective on their experience of moving out of an adult home and into community living. During this period, a total of 154 class members transitioned to supported housing, with the sample representing 23% of those moving to supported housing. The sample included class members from 18 of the 22 adult homes who were served by all eight Housing Contractors. They were also provided behavioral health services from eight Health Homes and managed long term care services from seven MLTCs.

The sample included 17 women and 18 men. The youngest was a 39 year-old man and the oldest a 75 year-old woman. There was one class member in his 30s, six class members were in their 40s, 10 in their 50s, 16 in their 60s and three in their 70s. Measured from the most recent in-reach to the date when they moved out of the adult home, the quickest move took 106 days while the lengthiest took 882 days. The median time for the sample was 405 days.  The median length of time to transition for the 163

> The sample class members had been in the community long enough to have settled in and able to provide a perspective on their experience of moving out of an adult home and into community living. . . The sample included class members from 18 of the 22 adult homes who were served by all eight Housing Contractors.

15

class members who transitioned during the reporting period (March 11, 2017-March 16, 2018) was 411 days.

The members of the class are a diverse group with some physically healthy and able to function independently with relatively little support, while others have significant medical and mental health problems that require ongoing treatment and who need support to attend their appointments, and follow their treatment plans. These class members also have variable degrees of support in the community from family, friends and peers.

In conducting this review, as needed, we obtained and reviewed case notes from Housing Contractor case managers, and Health Home and MLTCP care coordinators and nurses. For some cases, we also obtained and reviewed a summary of medical and mental health services provided to them over the past two years as compiled from Medicaid claims data in the PSYCKES maintained by the NYS OMH.

One of the class members in our sample died of natural causes before we could visit him. Three others refused to meet with a member of the Independent Reviewer team. In these cases, we relied upon a review of the records as described above, supplemented by interviews with case managers and care coordinators as needed.

With a few exceptions, we met with the class members in their homes to hear their perspectives on their transition, their new living arrangements, and the adequacy of services and matters that might be improved. As available, we interviewed their case managers, care coordinators, AH+CMs, and home health aides, PCWs or RNs who provided them with direct support. In some cases, we also spoke to supervisory staff of the Housing Contractors, MLTCPs and Health Homes, and mental health programs they attended.

A note from the Third Annual Report bears repeating.

The reader should keep in mind that many class members who leave an adult home maintain some level of connection to the people they left behind, especially as they often do not have other social networks at the time of transition. Successful transitions where the class members are safe, happy in their new surroundings and enjoying greater freedoms, choices and new experiences can be a positive motivating force for those who are uncertain about the decision they have to make.  But this is a two-edged sword. The challenges, frustrations and adverse experiences of the movers –delays in getting their money, SNAP benefits, or linkage to medical and mental health care, bad experiences with housemates, etc. --can also dissuade the stayers from taking the same step. It is an unfortunate truism that bad news tends to travel faster and wider than good news. Case managers, care coordinators and others supporting the class members would do well to keep in mind that their efforts are likely to have an impact well beyond the individuals they work with directly. (Third Annual Report, p. 15)

## A. Housing choice

The responses to the original OMH RFP of August 10, 2012 submitted by Housing Contractors for this initiative, included that they would offer the choice to live alone in a studio or one bedroom apartment, or to live with others. The percentage of class members who transitioned to single supported housing units increased from 24.5% as of March 11, 2016 to 33% as of March 10, 2017, and continues to rise. As of March 11, 2018, 35% or 215 of the 614 class members who moved to supported housing, have transitioned to single units. This includes 59 of the 143 class members, or 41%, who transitioned between March 11, 2017 and March 11, 2018 and moved to a studio or one bedroom apartment. It is a positive sign that each of the eight Housing Contractors appear to be making greater efforts to provide the opportunity to class members, who elect to do so, to live alone. Reflecting an overall increase in the number of class members who moved into one bedroom or studio apartments, 17 of the 35 class members in the sample (48%) lived alone, a significant improvement in the ability to accommodate their choice. (See Table 2 below)

| Supported Housing Contractor | Studio/One Bedroom | Two Bedrooms | Three Bedrooms | Totals |
|---|---|---|---|---|
| ComuniLife | 14 (9) | 29 (22) | 2 (2) | **45 (33)** |
| Federation of Organization | 12 (9) | 27 (13) | 33 (23) | **72 (45)** |
| Institute for Community Living, Inc. | 13 (6) | 64 (54) | 1 (0) | **78 (60)** |
| Jewish Board of Family and Children's Services | 35 (28) | 117 (98) | 1 (1) | **153 (127)** |
| Pibly Residential Programs | 79 (56) | 15 (14) | 5 (3) | **99 (73)** |
| St. Joseph's Medical Center | 23 (20) | 24 (21) | 0 (0) | **47 (41)** |
| Staten Island Behavioral Network, Inc. | 14 (10) | 42 (30) | 1 (0) | **57 (40)** |
| Transitional Services for NY (TSI) | 25 (18) | 31 (28) | 7 (6) | **63 (52)** |
| Total | 215 (156) | 349 (280) | 50 (35) | **614 (471)** |

**Table 2.**[12] **Class Members Transitioned to Supported Housing as of March 11, 2018**

As in years past the highest percentage of studio or one bedroom apartments is currently provided by Pibly, which serves the two adult homes in the Bronx. Of the 26 class members that they have transitioned since March 10, 2017, 23 (88%), have moved to single units. Seven of the 11 class members (64%) who transitioned since March 10, 2017 with TSI also moved to single unit housing.

---

[12] ( ) = Class members Transitioned to supported housing as of March 10, 2017 (Third Annual Report; p 17).

Another element of choice is the desire of some class members to live in a borough other than that served by the Housing Contractor assigned to their adult home. As of March 11, 2018, 29 class members have moved to supported housing with contractors able to offer an apartment in another borough, an increase of 13 since our last annual report. Seven of the eight Housing Contractors have been successful in securing housing for these class members in Queens (7); Bronx (12); Brooklyn (9); and Staten Island (1).

As mentioned in the Third Annual Report (p.17), another aspect of choice arises when a class member moves from the initial apartment to which he or she was transitioned. These moves may occur because the leases expired and the landlord refuses to renew it; because the situation with a housemate has become so dysfunctional that a move is necessary; or because conditions in the apartment necessitate a move. There have been instances when a secondary move is required, where a Housing Contractor attempts to hold the class member who lived in a shared apartment, to their initial choice, rather than recognize and respect their desire to live alone.

- *In the case of JP, the landlord wanted the apartment where he and ER had lived since transition, and they had to move in the next few months. The class members had been good friends from the adult home, who had gotten along in the past and seemed to care about each other. However, both class members had struggled with substance abuse in the past. ER began to use again within a few months of moving to their first apartment. JP worked to remain sober despite ER's drug use, and began asking to live apart from ER in late 2015. JP's request was first denied; he was told that because he had agreed initially to live in a shared apartment, he could not change his mind and ask for a single residency apartment later. He appealed the decision through the Housing Contractor's internal grievance process. It was agreed that the two class members would continue to live together in the new apartment, as a single unit was not immediately available, but the agency agreed to make every effort to find a suitable studio or one bedroom apartment for JP within the next year. Keeping their promise, JP was moved four months later to a modern one bedroom, with which he has been happy.*

- *In the case of JR, (discussed in Section X: Need for formal quality assurance mechanisms) the failure of the landlord, who wanted JR to move, to address multiple physical plant problems in JR's apartment, including the collapse of the kitchen and living room ceilings, floor damage and multiple water leaks, necessitated his move to another apartment. Initially the Housing Contractor reportedly insisted that JR move to a shared two-bedroom apartment that was readily available, but he refused. In fact, JR valued his privacy and his independence and felt so strongly about not sharing an apartment, that he said he would rather return to the adult home. He visited the adult home and reported that the Administrator was willing to accept him back. While the Housing Contractor sought an available single unit, conditions in the apartment worsened. A report to the State by the Independent Reviewer's office regarding the unsafe conditions in the apartment resulted in moving JR within a matter of days to a studio apartment that he had visited and to which he approved.*

18

In most of the cases these staff made regular and frequent contact with class members to monitor their services and intervene to provide assistance when it was needed. Although there are a few exceptions, from review of the documentation, there seems to be a good level of communication between Housing Contractors, Health Homes and MLTCs, and as needed with providers of medical and mental health services, as reflected in the progress notes we reviewed.

## B.  Transitions that worked well

Although many of the class members in our sample complained about the length of time and some of the missteps along the way to their transition to supported housing, virtually all were happy to have left the adult home and were enjoying the privacy, freedom to come and go as they pleased, ability to prepare and eat foods that they enjoyed, and to engage in activities of their choice. Two class members in the sample were not satisfied with the convenience of their locations to stores, banks, laundromats or other services, and one of them wished she had done more exploration. Only one class member was clearly unhappy with her move and soon after moving she disengaged from most interactions with her Housing Contractor and Health Home, and was unavailable to meet with a member of the Independent Reviewer team (MM, discussed below).

> Virtually all of the class members we interviewed expressed satisfaction with having moved out of the adult home. Although, as described below, several experienced bumps along the way in the transition to the community or soon thereafter, the problems they encountered were eventually resolved through the efforts of case managers and care coordinators.

- ***Although SP,*** *a 50-year-old man, said Yes to moving at in-reach, nothing seemed to happen for a very long time. "They kept putting it off." He eventually saw two apartments in the same building, and chose the one that he is currently occupying. He is very happy to have his own place. He would have preferred to have a one bedroom apartment, but agreed to share the apartment with a housemate. As he put it, he was sharing the same room in the adult home with a housemate, so having their own bedrooms in an apartment is much better. They knew each other and get along well. They mostly keep to themselves.*

  *SP reports that his transition was easy. He was very complimentary about the assistance that he receives from the case manager and his care coordinator. He did not know the neighborhood, but explored by walking around. The immediate area is residential, but there are stores and restaurants within relatively easy walking distance, and many medical and other providers in the area. However, he sees the doctors who have been serving him for many years in Forest Hills. It is a lengthy journey, taking about six hours*

*every month to travel there and back via public transportation, but he prefers the continuity of care.*

*SP is an independent person who does not desire to attend a day program but prefers doing things that he wants. He loves to fish and would ride his bike to the beach and fish. He purchased and rigged a bike to carry a fishing rod. However, he developed respiratory problems which were later diagnosed as emphysema and COPD. This has restricted his ability to walk around and to bike back from the beach, which is uphill. He manages his own money, and although he would like to have more, he seems to have enough funds to cover his expenses, as well as some extras like his fishing equipment, bicycle, and large screen TV. He and his housemate have been talking about buying a car together, and his case manager does not believe that this is an unrealistic goal. Despite his recent health problems, which include blood clots in his legs, he has refused the offer of a home health aide to help with chores such as laundry and cooking. He says he is quite able to manage on his own.*

*He has a sister in Maspeth, Long Island, and another sister in Myrtle Beach, South Carolina. He had just returned from a vacation to South Carolina, where his family had owned a condo for many years. He has friends in Glendale whom he visits periodically, although it takes two hours to get there. He also has a girlfriend whom he talks to on the phone several times a week.*

- *JC, a 59 year-old woman, said "the only downside was that the whole process took TOO LONG." (15 months from in-reach to moving.) She asked if anything can be done to shorten the time…She said "people give up hope, which is so easy to do in an adult home". She said the adult home has a way of stealing people's confidence that they can live independently, cook for themselves, shop, do laundry, clean up after themselves.*

  *She goes to PROS twice a week for full days. She loves it and has made many friends with whom she stays in touch when not at the program, via video chat. Her goals right now focus on anger management (the things that upset her) and socialization. (Collateral notes among the HC, HH and PROS indicate she is doing very well and that journaling has been a tremendous help.)*

  *She has a daily routine for non-PROS days. She exercises in the mornings (using stretch bands and weights). She also walks every day. She will go to the park or the boardwalk with her crossword puzzle and listen to music. She also has a couple of hobbies that she spends time on. She likes tending to plants which she keeps in her room. In fact, her housemate so liked her plants, that the housemate bought plants for the living room which she tends to. JC also has two aquariums in her room for fish (Glofish and Betta fish).*

- *AD, a 67-year-old man, is very independent in cooking, cleaning, and shopping. He has used Access-A-Ride for years to get around. AD loves his apartment and, unlike the Spartan look of most class members' apartments, his bedroom was attractively decorated with art that he had made. He loves music, has a surround sound system in his room, and*

*a large CD collection he recently recovered from his wife, and an Alexa. He used to play keyboard in a rock band in his late teens, and early twenties and said he would like to get a keyboard now and take lessons in reading music, as he generally just played by ear. He used to run and now speed walks, likes to bowl and loves being in the community again. A park and a golf course were nearby with an available jogging trail. AD now works part-time at a local barber shop three days a week. He is preparing to take his Master Barber's licensing exam that he feels will open many doors for him, and allow him to cut hair of men and women.*

- ***CF, a 64 year-old woman***, *said it is wonderful having a place of one's own. She loves living alone in her a one bedroom apartment. She takes pride in her apartment and has decorated it with wall hangings, photos, knick-knacks, etc. It was also spotless. CF does all the cleaning and has all the needed supplies. She enjoys the freedom to have visitors like her daughter whom she likes to cook for.*

  > *"I can cook my own meals…do my housekeeping…shop…do my laundry…I can do all the things that supposedly 'I couldn't do' while living at [adult home]."*

  *In April she was diagnosed with cancer (breast and cervix). At first, she was reluctant to go for treatment ("let nature take its course") but then had a mastectomy and is now discussing chemotherapy with her doctor. Before her surgery, she would visit friends in Flushing and go out to have lunch. Now she is beginning to take walks in the neighborhood, shop, greet neighbors/storekeepers, etc.*

- ***TH, a 54 year-old woman***, *said she waited about a year and half to move and it was hard "as I am not a very patient person." She said that living with 365 people was rough and she "wanted her independence again." She said she loves having moved and that it "has changed my personality." She said "I can sleep when I want and prepare my own meals." She said she has reconnected with some old friends that she has met in programs she has been in over the years, and spoke of going out to lunch or a movie with them, while also acknowledging that "I miss the people." When asked about the cons of the move she mentioned being lonely, and "not having too many friends." She said she wants to join the Y to play basketball and swim a couple of days a week.*

- ***SJ, a 68 year-old woman***, *indicated she is very, very happy to no longer be living in the adult home. She has a one room apartment. The number one joy according to her:*

  > *is being independent, being able to do the things you once did, but couldn't in the adult home, like paying your bills, going food shopping, cooking your own meals. At the adult home, staff would tell you that you can't do these things…living alone wouldn't be good for you…we take care of you. They would make you afraid of moving…but now I have my independence to do what **I want to do**…and I'm doing it…it is a whole new world.*

## C. Class members who experienced difficulty but remained in the community

> Some class members experienced problems with the condition of their apartments or in adjusting to the responsibility to manage their own lives, to take their medications and keep medical and mental health appointments, to purchase and prepare food, and to manage their finances.

Despite the generally high levels of satisfaction with having transitioned to supported housing in the community, this is not to say that the transitions were trouble-free. The problems in obtaining timely and adequate SNAP benefits, which has been the subject of discussion in each of the annual reports, persist and affected 19 class members in the sample. Others had difficulty adjusting to living with a housemate and managing the responsibility to maintain their living environment. A few made bad decisions about letting other people have access to their apartments and found it difficult to extricate themselves from the consequences of their decisions.

In all but a handful of cases, these issues were managed with the assistance of Housing Contractor case managers and Health Home care coordinators. For at least eight of the class members in the sample, the difficulties they encountered required a move from their initial apartment for a variety of reasons. In some cases, there were conflicts with the housemate with whom they shared the apartment [CF, MH]. In others, problems developed with the apartment (e.g., utility interruption [EC]; a collapsed porch [SH]. Some moves were the consequence of decisions made by the class members which required their relocation. [e.g., MM, AM]

An example of the efforts made by Housing Contractors and mental health staff is the following case:

- **KR**, *a 53 year-old man, who was hospitalized for several days less than two months after he transitioned to supported housing. His mother had noticed that he seemed "off" and she wondered if he was taking his medication. Soon after his discharge, he displayed sexually inappropriate activity towards his case manager. He was promptly evaluated by the Assertive Community Treatment (ACT) team which resulted in a two week respite stay. Since his return to supported housing, his progress has been closely monitored and he has done fairly well. Although he had not lived independently before, he is independent in most of his ADL skills, including shopping, cleaning, meal preparation and budgeting. He works well with his ACT team, which currently provides care management services to him in his apartment. ACT team notes reflect his ongoing struggle to not respond to voices telling him to do sexually inappropriate things. In response, his medication was adjusted several times, with good effect. He struggles with*

22

*his psychiatric symptoms, but keeps a journal of his symptoms and is working with his ACT team to learn ways to cope with his symptoms.*

### 1. Condition of the apartments

Throughout the course of this initiative, substantial efforts have been made to plan the transition of class members to supported housing. These include the development of a checklist of items that need to be addressed, the scheduling of a pre-transition call approximately three weeks prior to a planned move to review readiness, and repeated training sessions addressing the importance of early and continuous person-centered planning. Notwithstanding these efforts, the Independent Review team was surprised to encounter a number of significant problematic conditions in 14 of the apartments we visited. Some of these preexisted the planned move and had not been attended to and remained unaddressed for weeks or months. Others were identified after the class member had moved in but were slow to be corrected. Beyond diminishing the enjoyment and comfort of class members, some of these conditions threaten their safety or cause unnecessary fear, discomfort or anxiety. In two cases, they required moving the class members to another apartment.[13]

- ***PB,*** *a 68 year-old woman, despite her history of falls and being at high risk, a safety bar placed in her tub more than a month after she moved in, was secured at the back of the tub and not near the front where she would be standing to take a shower. The second safety bar was not installed until ten days after she returned from Rehab and seven months after her transition.*

- ***BG,*** *a 51 year-old woman, discovered on the day of her move that the lock on her apartment door was coming off the hinges. The care coordinator contacted the Housing Contractor about the problem. The next day, BG told her AH+CM that she did not want to leave the apartment until the lock was fixed. A note from her Housing Contractor case manager indicated that the lock was not fixed until five days after the move. There were lesser issues including broken blinds, a broken bathtub stopper that prevented BG from taking baths, a clogged sink and a non-functioning intercom.*

- ***RK****, a 66 year-old man, complained of not having hot water with which to bathe/wash. It took nearly three weeks to resolve the issue. In March 2017, RK complained that his couch was broken/had sunken-in and the lack of support was hurting his back. The care coordinator alerted the Housing Contractor about the need for a new love seat/recliner. However, three months later, no new love seat/recliner had arrived. Mice and flies were also a recurring problem over the course of his nearly nine-month stay at the apartment despite his frequent complaints and the intervention of others.*

---

[13] Another class member, not in the sample, also had to be moved due to a dangerous level of mold in his apartment. (Discussed in Section X: Need for formal quality assurance mechanisms.)

- **GS,** *a 57 year-old woman, complained that there was no heat in the apartment when she moved in in early December. The care coordinator contacted the Housing Contractor case manager repeatedly but the problem with the heat persisted all through December and into January, and was noted by the care coordinator. She had to buy a space heater. A case manager's note on March 8, 2017 recorded that the client complained that she was "freezing in the apartment." She said there had been very little heat in the apartment for the past three days, and the case manager confirmed that the radiators were cold to the touch. GS complained about the combination door lock not working since she moved, and the other doorknob has a loose screw that causes it to keep slipping. Although it has been tightened, it did not work as of the date of the October 24, 2017 site visit. Complaints about the door lock were also raised by the care coordinator with the Housing Contractor as recently as October 17, noting that the issue had been raised for at least a month previously, but had still not been resolved.*

- **MD,** *a 64 year-old woman, broke her femur a few years ago and still has difficulty with ambulation and has a fear of falling. She moved on May 1, 2017 and was promised that grab bars would be installed, but as of a site visit in late October, this had not happened. Interestingly, the Discharge Planning Tool does not identify this as a need. A variety of other long-standing problems were also noted, including:*
  - *The front door to her apartment does not close properly because it does not fit into the doorjamb.*
  - *In the bathroom, the shower rod is broken, there is no rack for the towel (there is only one retaining bracket installed), and no exhaust fan. As a result, the steam from the shower sets of the smoke alarm which is placed just outside the bathroom door.*
  - *There is also a broken smoke alarm that is currently on the kitchen table, but belongs on the wall outside the entryway.*

  *(These conditions were promptly corrected shortly after the Independent Reviewer called them to the attention of the Housing Contractor and OMH.)*

- **VJ,** *a 66 year-old woman, has had some serious problems in physical maintenance of the apartment. The intercom has reportedly not worked since she moved in, as she had to hook up her phone to it and this has not been done. There have been ongoing problems with drainage of the pipes in the apartment, and clogging of the sink, documented since May 2017, for more than six months (although reportedly fixed as of December 6, 2017). At the time of a site visit on November 17, the sink was more than half filled with water, which seemed to render the sink unusable to clean dishes, etc.*

**2. SNAP benefits**

24

It should be kept in mind that class members live on limited budgets, with little margin to deal with unexpected expenses or loss of benefits. While no one went without food as a result of the delays in qualifying for benefits and in receiving the full amount of their benefits, which sometimes took months, their need to rely on food pantries or supplemental assistance from Health Homes, Housing Contractors or family members increased their sense of dependency.

> The most common problem, experienced by 19 of the class members in the sample, was qualifying for and receiving SNAP benefits, an issue that was discussed extensively in the Second and Third Annual Reports (pp. 28-31), and does not seem to have improved.

The issue that arises for most is proving income and expenses to justify the level of benefits. In some cases, the problem of delay can be traced to difficulty with getting the Housing Contractor agency to provide documentation of the lease and utility expenses which is necessary to qualify for more than the minimum SNAP benefit of $16 a month. In others, the problem seemed to be the availability of the class members when they were contacted to confirm information provided to the SNAP office. In a few cases, there was inconsistent or delayed follow up by care coordinators who were to assist the class member obtain the benefits.

- ***VJ,*** *a 66 year-old woman,  experienced significant delays in getting SNAP and she did not get $16 until November 2017, more than six months after her move. The reason she cannot get more is that she has refused to agree to pay the Housing Contractor for the utilities (which they normally pay for) which would allow her to qualify for the full SNAP of $194/mo. There have been some problems having sufficient food, but housing and care management always ensured she had enough.*

- ***JI,*** *a 63 year-old man, has had ongoing issues with SNAP.  At the time of the site visit, he was receiving only $20.  He said he does not know why, but notes indicated that no one went to reapply until after September 2017. Notes after that do not indicate when/if his new application was made since he moved.  He also had an issue with getting his SSI check due to SSA having the wrong zip code.*

- ***MH,*** *a 50 year-old man, also did not initially obtain food stamps, in part because he failed to cooperate with his case manager to engage in the application process. His effort to get the full amount of food stamps was never resolved while in supported housing, and was ongoing through his transfer to Level II housing. When he ran out of food, often very early in the month, food was provided by his housing case manager, his care coordinator, and sometimes his father.*

- ***SJ,*** *a 68 year-old woman, had to go to two fair hearings over six months before she received the full amount of her SNAP benefits.*

25

- **GS,** *a 57 year-old woman, waited from December 2016 until May 2017 to receive the full amount of her benefits.*

### 3. Financial problems

Compounding the problems caused by delayed receipt of full SNAP benefits were other financial problems experienced by 12 of the class members in our sample. These included the timely receipt of their SSI benefits at the new address, continued certification for SSI and Medicaid benefits, and their own ability to manage their finances and ensure that their available funds lasted to the end of the month.

- **BG** *is a 51-year-old woman whose care coordinator indicated that she was having difficulty getting her SSI checks. She was supposed to receive them the first Tuesday of each month, but they were not always available at that time, leaving her frustrated and wanting to become her own payee. Progress notes also indicated she never received her SSI checks for April and May 2017. On May 30th, her AH+CM contacted the Housing Contractor to check on this and they responded that they needed to verify some information and that was the reason she had not received the checks yet. On September 6, 2017, another inquiry was made to the Housing Contractor about the April and May checks and by September 11th, there was a note from the AH+ CM that she had not received an answer yet. The Housing Contractor staff and her AH+CM reported that she did receive her checks subsequently.*
  *Progress notes indicated that she also has a habit of spending a lot of money on scratch off lottery tickets, at one-time spending $600 on them. But, there was no indication that she was not paying her bills. She agreed to receiving her checks weekly to assist her with money management/budgeting.*

- **RT,** *a 45 year-old woman, reported to her AH+CM throughout her time since transition that she did not have enough food or money. However, as late as February 2017, five months after her move in September 2016, she still did not have SNAP benefits because her AH+CM had not taken her to the SNAP office. However, the Housing Contractor case manager notes indicated that while she did say sometimes that she didn't have food, she was either directed to the food pantry, was due for her next check so she could go shopping, and/or assisted by her cousin or aunt with help buying groceries. It did not appear she ever went without food and mostly was looking for money for cigarettes. Her issues with being able to manage her finances appear to be related to her spending her money on cigarettes ($12.50/pack for at least a pack a day).*

- **MH,** *a 50 year-old man, had serious ongoing problems with money that were documented in the housing and care management records. Specifically, he failed to respond to Social Security letters requesting that he be recertified. This resulted in his SSI and his Medicaid being terminated. He never received his full SNAP benefits. SSI and Medicaid were eventually reinstated in late July 2017, after which the Housing*

*Contractor deducted the arrears that were owed to them. He eventually received $465 a month SSDI and a $250 monthly payment from a lawsuit, prior to his transfer to Level II housing due to other problems he experienced since his transition to supported housing.*

- ***FG,*** *a 74 year-old woman, had her Medicaid discontinued due to her not receiving her recertification letter (they had the wrong apartment number). This had a significant negative effect.  She was not able to go to her PROS program due to not having transportation.  Her PROS program would not provide transportation from her apartment in Queens Village to Far Rockaway.  FG was not comfortable taking public transportation there which would have involved taking multiple trains and buses.  At the time of our visit, she was still waiting for her Medicaid to be reinstated so she could go back to her program (she said she was approved and should be going back the week after the site visit). She was very anxious to go back.  She stated she likes the groups there and misses seeing her friends.*

- ***MM,*** *a 44 year-old woman, refused to pay her rent and utilities almost from the start of her move to supported housing in November 2016. She also disengaged from contact with her service providers and was unavailable for a visit by the Independent Reviewer team. On May 3, 2017, heat and hot water in her apartment were turned off by National Grid because of nonpayment and arrears of over $1000. Her Housing Contractor staff accompanied her the following day to make minimal payment and get services restored, along with her agreeing to a payment plan. Shortly thereafter she stopped paying the bills again. In September 2017, staff became aware that heat and hot water had been turned off for nonpayment of $1200 in arrears, and $850 was needed to reactivate the account. MM was refusing to go to National Grid to resolve the matter or to Social Security to address her benefits issue. She has not paid rent since her admission to supported housing over a year ago, and is her own representative payee. Eventually, as a result of these and other issues, she was moved to Level II housing.*

- ***RS,*** *a 46 year-old man, was consistently running out of food and food stamps early on in the month.  The progress notes indicated that he was buying cigarettes with his food stamps from a neighborhood bodega. He was receiving approximately $150/month in PNA.  He consistently ran out of money.  Notes indicated he borrowed money from people at his day program and needed to pay them back.  His finances and budgeting issues were addressed by his care coordinator and Housing Contractor case manager according to progress notes.  There was no indication that he was not paying his rent or bills. (He refused to be interviewed by the Independent Reviewer team.)*

- ***JM,*** *a 63 year-old man, struggled with maintaining sobriety. When intoxicated, or gambling on the horses, he struggles to have enough money for food, and comply with his treatment plan. That he was able to use his SNAP benefits to purchase alcohol, complicated the problem.  It is clear that his ability to have food in the house is tied to his money management which is closely linked to his drinking, as well as his penchant for going to the racetrack to gamble. These problems are referenced in the records, and also reported by JM.  In January 2017 housing notes, it was mentioned that his gas and*

*electric bills were both overdue. In February 2017, he had his phone turned off for nonpayment as he had gotten a lower sum of money that month.*

### 4. Issues with housemates

As noted earlier, 17 of the 35 class members in our sample lived alone in a one bedroom or studio apartment, diminishing the possibility of friction with a housemate. One of them had moved initially to a two-bedroom apartment that she shared with her boyfriend, but when that arrangement did not work as expected, she moved to a one bedroom apartment. Several of the class members shared their apartments with another person whom they had not known previously and did not select. Nevertheless, despite occasional friction and disagreements over issues like smoking, stealing food, sharing household tasks and paying their share of the bills, these housing arrangements seem to be working out satisfactorily for them.

- *CF, a 64 year-old woman, first moved out of an adult home in December 2016 with her boyfriend. But they soon started arguing/having fights. On at least one occasion, the police were called. By the month's end, she wanted to move out. During the first week of January, CF was moved to a respite bed and began looking for single room apartments. The records indicate that this was all discussed/coordinated with her Health Home care coordinator. Later in January, she moved to her current location which she loves.*

- *JC, a 59-year-old woman, reported that she didn't know her housemate nor did they have a chance to meet or get to know each other prior to moving in. But now they are the best of friends. She says they've never had any disagreements/problems.*

- *MR, a 57-year-old woman, stated that she lucked out with her apartment and housemate. They eat and drink coffee together and then clean up together. She said that they met when she toured the apartment before she moved in. MR moved in first and had the apartment alone for several months before her housemate moved in (sometime in early August 2017-8 months after).*

- *SH, a 42-year-old man, and his housemate both indicated that they did not know each other before they moved in. They came from two different adult homes. They did have a chance to meet each other prior to moving in and have had no problems.*

- *AD and his housemate ClF, both 67 years old, came from two different adult homes, but met once when both were at the DMV seeking identification. There was no real matching or interviews between them prior to both sharing an apartment. In fact, AD had seen the apartment first and selected his room, even though ClF moved in almost six months before AD, due to AD's delay for medical reasons. ClF said that he wanted to have his own apartment, but they told him "it would take a year to get one," so he agreed to share. He and his housemate, however, have an ongoing conflict over the payment of the electric bill. ClF feels strongly that AD leaves lights on all the time, including when he sleeps, and should pay more towards the bill, and at times he has refused to pay. The Housing Contractor case manager had tried to intervene, but this issue has not been*

*resolved. He said they got a turn off notice and AD went down and paid half of it. It sounds like he is trying to work it out and then get the money back from his housemate, ClF. ClF feels AD has more money because he works. All this aside, AD still likes living there and is willing to work around this problem.*

- **RL** *is a 62-year-old man. Following the site visit, RL's housemate who had moved in two months ago, called the reviewer. He reported that he and RL do not get along that well. RL steals his food and there was disagreement about household tasks. This was stressing him out and he was not sure if he wanted to continue living there. With his consent, we contacted his support team members who facilitated a satisfactory resolution of this problem.*

In eight cases, there were serious problems which eventually required secondary moves to alternate housing arrangements for the class members. These include the two referenced earlier, where problems with the apartment necessitated the move.

- **MH,** *a 50-year-old man, was living in his third apartment since he left the adult home nine months prior to the date of the site visit in August 2017. His initial move to a two-bedroom apartment ended due to threatening his housemate and illegal drug activity. His stay in the second apartment also ended due to drug activity and because a female friend living in the apartment generated noise complaints. His stay in a third apartment ended when he seriously assaulted his housemate who was blocking the TV. He was arrested and then transferred to a respite bed, and eventually admitted to a Level II Congregate Care Facility. He displayed an angry, often threatening demeanor and presented major challenges for the Housing Contractor and the Care Management agency.*

- **AM,** *a 63 year-old man, was in his second apartment since transitioning. At his first apartment, he gave his keys out to neighbors and other people from the neighborhood who would come to his apartment and do drugs. He left the apartment and was eventually located at a shelter. He was there for approximately 2 ½ weeks until his current apartment was ready for him. It should be noted that most of his belongings were missing from the apartment when the Housing Contractor went to retrieve them (clothing, a TV and radio).*

- **RT,** *a 45-year-old woman, originally moved to an apartment in East New York in Brooklyn. Shortly after, she began complaining that there were mice in her apartment, including a nest of them in her stove. She could not use her stove and was disturbed by the mice. There were also cockroaches on her stove. It took over a month before an exterminator came to her apartment and they replaced the stove. This was from early October until mid-November 2016. By the end of December 2016, she was moved to a new apartment in a different neighborhood. None of the notes explained why, but she told the reviewer it was because the neighborhood was not safe, and people were doing drugs. However, there have been reports at her new apartment that multiple men have been visiting her, and she has been told that she is at risk of losing her current apartment if she continues this behavior.*

- ***MM,*** *a 44-year-old woman, has been one of the most challenging class members to support almost from the start of her move to supported housing.[14] She began refusing to cooperate with most of those involved in supporting her transition to supported housing. She consistently complained about the apartment and talked about wanting to return to the adult home, but was reportedly unresponsive to staff's efforts to concretely address her concerns. She refused to pay rent from the time of transition; lived without heat and hot water due to nonpayment of National Grid bill for several months; refused to share information about her medication/treatment with her providers; stopped attending clinic and getting refills for her medication by January 2017; did not return calls from SNAP, or go to other agencies/appointments with staff; refused to comply with SSI recertification and was cut off; refused, until recently to have a cell phone; and repeatedly would either deny access to her housing case manager and/or her care coordinator, or would allow them in, curse at them to leave or refuse to speak with them. The police were called and she was taken for psychiatric evaluation multiple times, most often to be returned to her apartment, until late in 2017, when she was psychiatrically hospitalized several times. She also refused to meet with APS, to whom she had been referred during April 2017 because of pending eviction proceedings for nonpayment of rent. Eventually APS obtained a Court order to mandate a psychiatric evaluation which occurred on September 20, 2017. In addition to recommending financial management services to assist MM in avoiding eviction, the APS psychiatrist also recommended ACT treatment services to provide her support with medication and symptom management.[15] However, the APS legal process takes several months, and was still pending as of December 27, 2017 when she was moved to Level II housing. Mobile crisis was also involved and visited several times before closing her case. Although there was also consideration given to referring her to ACT, until December 2017 her treatment team believed that she did not meet the required number of acute psychiatric hospitalizations.[16] In addition, her Housing Contractor states they*

---

[14] Also discussed above under Financial Problems.

[15] OMH ACT Program Guidelines  (https://www.omh.ny.gov/omhweb/act/program_guidelines.html) state that the purpose of Assertive Community Treatment (ACT) is to deliver comprehensive and effective services to individuals who are diagnosed with severe mental illness and whose needs have not been well met by more traditional service delivery approaches. ACT provides an integrated set of evidence-based treatment, rehabilitation, case management, and support services delivered by a mobile, multi-disciplinary mental health treatment team. ACT teams are comprised of 5-7 clinical staff, and include a Team Leader, a Psychiatrist or Psychiatric Nurse Practitioner (PNP), a Nurse and additional clinical staff to achieve minimum staffing consistent with the ACT Team model.   The minimum staffing must include individuals with at least one year of experience or training in substance abuse, employment, and family, as well as a wellness self-management specialist. The minimum clinical staff to client ratio is 9.9:1. The ACT team, including the Psychiatrist or PNP, is available to meet with the client in their home, with a minimum of six visits per month, of which three can be collateral.

[16] In their comments to the Independent Reviewer's Fourth Annual Report, the Plaintiff's pointed out that there are several other bases for eligibility for ACT services, some of which it appears MM may have exhibited (e.g., inability to participate or succeed in traditional, office-based services or case management). In reviewing the ACT Program Guidelines referenced above there is a listing of many qualifying conditions, of which the applicant would only have

*would need her consent to release the required documentation for consideration for ACT. Assignment of a guardian through APS is also being considered, but that would also take several more months once initiated. She has also recently refused referral to a new mental health provider who has additional expertise in working with individuals with both mental illness and developmental disabilities. Eventually, she was moved to respite and then a supervised community residence. Her boyfriend, who had moved with her, who was reportedly showing signs of decompensation in light of the conditions in the apartment, was moved to crisis respite housing on October 11, 2017 and into another supported housing apartment on November 14, 2017.*

### 5. Medications and mental health treatment

Eight of the class members in our sample experienced some problems with their medications and treatment following their discharge from the adult home. These included occasional interruptions in the delivery of their medications and their own issues with compliance with the medication/treatment plan.

> Eight of the class members in our sample experienced some problems with their medications and treatment following their discharge from the adult home. These included occasional interruptions in the delivery of their medications and their own issues with compliance with the medication/treatment plan.

- *MH, a 50-year-old man, refused to consistently attend a mental health clinic or receive his monthly Abilify injections,        for roughly six months following his transition. This resulted in several ER visits  and three hospital stays. Housing and care management records document issues with MH's failure to keep his medical and mental health appointments through May 2017, when he requested and was assigned a new AH+ CM. However, following his hospital stay in May 2017, he was reported to be more compliant with this regimen and consistently attended his weekly therapy and monthly appointments for his IM injection, travelling from Brooklyn to Far Rockaway to do so.*

- *AM, a 63 year-old man, had a rocky transition.  The records indicated that AM was not medication compliant until about mid-April 2017.  He was refusing nursing visits by either not being home or not answering his phone at times of visits.  He required daily visits to ensure he was taking his insulin injections, but then would not take his evening injections.  Notes indicated that he had the capability of doing this on his own, but says he forgets or decides not to take it.  He also did not consistently take his other*

---

to meet one or more. This demonstrates the need for dissemination of this information among care management and housing providers in this initiative to increase awareness and understanding of this valuable resource in addressing the challenges presented in cases like MM.

*medications. When he was not taking his medications as prescribed, he displayed inappropriate behavior with female HHA's who refused to return to work with him, and he refused some HHA services. His MLTC advocated that he be moved to Level II housing because of these issues. His Housing Contractor put him on a waiting list and DOH was notified. There was even discussion of him going back to an adult home until a Level II bed became available. In the end, AM did not agree to it, and things seemed to improve after a meeting with him and all his team to discuss this on April 13, 2017. He had a male HHA who was coming in daily and he had improved medication compliance with reminders. There were many bumps in the road for the first five months after he transitioned, but it appears that the issues were handled appropriately, services put in to place and everything was well documented. Also, there was good communication between the providers, which helped get him to the place he is now.*

### 6.   5K funds enhancement pilot project

On October 1, 2014 OMH announced the availability of funds for the development of a two-year pilot program to enhance reimbursement to a provider that admits an individual directly into their supported housing program from an adult home, nursing home, state psychiatric center or state correctional facility, as these individuals require higher levels of support services to facilitate the successful sustainability in the community. A total of six million dollars was made available for the project statewide.

OMH agreed to provide a one-time $5,000 enhancement to the standard supported housing rate for every non-duplicated admission up to 1,200 non-duplicated admissions in the two-year pilot program funded with Medicaid housing resources. It was the intention that these funds would help to provide enhanced services to facilitate the transition into the community. Procedurally, OMH sent an email to every provider who had eligible individuals as listed in CAIRS. Providers were then required to submit a Support Plan for each eligible individual, which detailed how the enhancement funds would be used. After the plan was approved, a request would be made for the issuance of a voucher to the provider.

Guidelines were provided by OMH that stipulated what the funds could and could not be used for. The Support Plans were to be person-centered and suggestions were made on things that may be included, such as peer staff to assist the resident with transitioning to independent living; training and support for meal planning and preparation, as well as household tasks; education and related expenses; membership in a local gym; purchase of a computer/internet access for educational assistance; etc. Providers were encouraged to "think outside of the box." An example of a person-centered Support Plan, as well as a detailed listing of over one hundred suggestions, was included.

In order to understand the 5K enhancement funds pilot project, the Independent Reviewer and members of his team spoke with the Director of Housing Development and Support for OMH at the time the project was initiated and again in January 2018. In an earlier conversation,

she informed us that the pilot project would be ending February 1, 2017. While it was anticipated that the funds would cover what was in the approved Support Plan, she stressed that needs often change. When asked about time lines for spending the funds she said the funds were intended for use "during the transition period only," but pointed out, that too can be very variable, and can be very short for some and very long for others. There were no parameters set for this.

In preparation for this report, the Independent Reviewer received a listing by Housing Contractor of all class members who had been approved for 5K enhancement funds, along with a copy of the Support Plan. Based on the information provided, during the two-year pilot, which ended on February 1, 2017, all of the eight supported Housing Contractors had participated in the program, and had received 5K funds for a total of 381 class members. While the agencies received the 5K funds for each approved class member who transitioned, it was never intended to provide $5,000 to each class member directly, as seemed to be perceived by many class members to whom the Independent Reviewer's team had spoken while the initiative was in effect. The agencies were never asked to provide OMH a dollar amount in the plan, or to provide an accounting of what was spent. OMH may have been clear in its description of the intent of the initiative; however, based on how it was communicated to class members by the Housing Contractors, in-reach workers and others, most class members believed that they were entitled to all of the 5K when they moved. In fact, it was even perceived by some class members as an enticement to moving.

> While the agencies received the 5K funds for each approved class member who transitioned, it was never intended to provide $5,000 to each class member directly, as seemed to be perceived by many class members to whom the Independent Reviewer's team had spoken while the initiative was in effect.

Many of the class members we spoke with about the 5K enhancement funds received some, but not all of what was on the Support Plan; others received nothing; and for some who were eligible, a plan was never submitted. Of the 35 class members in this year's sample, eight were admitted to supported housing after February 1, 2017, and were not eligible. Of the 27 class members in our sample who were eligible, 22 had Support Plans submitted and approved by OMH. Of the five class members that were eligible but did not have Support Plans, four were from the same Housing Contractor (RT, MR, AM, JT).  The other class member that was not listed (BS), actually informed the Independent Reviewer's staff that he had received a computer from the 5K funds. OMH was asked to look into the discrepancy and determined that the Housing Contractor was sent notification that BS was eligible, but OMH never received a Support Plan or request. (The Housing Contractor subsequently clarified that the computer was provided through agency funds, and not the 5K program.)

- ***JM*** *said that he would like to get a laptop and learn to use it, and thought he had put this on his original 5K request, along with winter clothing. However, JM's Support Plan only listed clothing which he reported he needed, including coats, sweater, shirts, pants, socks and warm boots. His Housing Contractor reported that he had been given a gift card to buy the clothing, and also received FIOS Cable service, which had just been installed at the time of our visit, although this was <u>not</u> noted on the 5K Support Plan.*

- ***IL*** *said that she likes to write poetry and has a computer, printer and a desk through 5K funds so she can write poetry, which was consistent with the approved Support Plan.*

- ***RT*** *said that she still had not received her 5K funds, a year after she had moved in. Included in her plan were reportedly art supplies, a radio, a coffee maker, clothing, a George Forman grill and a DVD player, which was confirmed by her housing case manager, who had been requesting the funds for RT for several months. In fact, RT. was not on the list provided by her agency of those who had Support Plans submitted, which was confirmed by the Housing Supervisor, who said they were not sure what happened. In fact, the same Housing Contractor had not submitted plans for any of the other three class members eligible for these funds that were in the Independent Reviewer's sample of transitioned class members for this year's Annual Report, as noted above.*

- ***RK*** *was college educated as an electrical engineer and wanted to use the 5 K funds to take classes in IT and get a better computer. The Support Plan which was approved in November 2016 included these items as well as an entertainment center, cable TV and Internet service; peer support; and a six month membership to the YMCA, among other items. There is no indication in the housing records that these items were received before he passed away in June 2017.*

- ***GP***'s *Support Plan requested monthly tickets for six months to the various Broadway shows in the city; payment assistance with Time Warner Cable (TWC), Internet, and landline telephone; and purchase of new seasonal clothing. Seven months after transition, funds had been spent on clothing (about $250) and TWC (about $240), with nothing spent on shows and music, etc.*

- ***AA***'s *plan called for a watch; paid services from Time Warner Cable for six months; and clothing including a suit so he could dress for church. After eight months the Housing Contractor had used some of the funds for clothing, a watch and one month of Time Warner Cable, for a total of $441.95. When meeting with Mr. A he didn't understand why his housing counselor could not just give him the money to shop for clothing, the watch and other items, or why they had to go with him. Similar to the sentiments we heard from many other class members, AA thought the money was his to do with as he chose.*

In summary, although well intentioned and helpful to many class members, there was a lot of confusion, particularly among class members, about what the 5K enhancement funds were actually for and how to obtain them. Many thought of it as an entitlement which they could spend on things they wanted, and were chagrined to learn that they were not going to receive the funds either because: a) they had transitioned after February 1, 2017 when the program terminated; b) their Housing Contractor had not submitted a Support Plan on their behalf; c) a Support Plan had not been approved; d) if approved, the funds had not been allocated to them; and e) that they received a small portion of the $5,000 they had expected. Most class members did not understand that the money could also be used to provide staff supports for them or to defray expenses of the Housing Contractor. While some elements of a Support Plan could be reasonably expected to create a need for the Housing Contractor to provide training and support to a class member in the use of the resources provided (e.g., peer supports), others were one-shot purchases of items which seemed to create little or no need for additional Housing Contractor staff support (e.g., clothing purchases).

> Although well intentioned and helpful to many class members, there was a lot of confusion, particularly among class members, about what the 5K enhancement funds were actually for and how to obtain them.

There was very little accountability for the funds to ensure that the money was, in fact, spent for the class member. To the extent that there are disappointed and disheartened class members who saw this program as a benefit flowing from their decision to transition from the adult home, it is likely that they are communicating their views to people who are still in the decision-making process.

The stated goal of the pilot program was to link the expenditures to improvements in the transition process and outcomes such as smoother transitions, possible reductions in psychiatric hospitalizations, lower number of discharges from supported housing; and other possible measures of success, that were anticipated. However, to date, there has been no analysis of the outcomes of the pilot program.

## V. Review of class members in Assisted Living Program (ALP) beds

### A. Introduction

The Independent Reviewer staff conducted a focused review of 13 class members who reside in ALP beds within adult homes. The focus of the review was to learn more about services provided to individuals in ALP beds and whether being in an ALP bed has any impact on the transition process. It included interviews with the residents and staff, and a review of assessment-

related documents, and ALP and adult home service records. Based on data provided by the Department of Health, 2,232 of the 4,486 beds (50%) at the 22 adult homes covered by the Settlement Agreement are certified as ALP beds. The 2,232 ALP beds are located in 12 of the 22 Adult Homes (see Table 3).

## B. Background

An Assisted Living Program, which is available in some adult homes and enriched housing programs, combines residential and home care services. It is designed to serve persons who are medically eligible for nursing home placement but serves them in a less medically intensive, lower cost setting. The operator of the assisted living program is responsible for providing or arranging for resident services that must include room, board, housekeeping, supervision, personal care, case management and home health services.

| Adult Home | Total Beds | # (%) ALP beds | # CMs in ALP as of 3/16/18 |
|---|---|---|---|
| Lakeside Manor | 200 | 200 (100) | 40 |
| Central Assisted Living | 186 | 186 (100) | 123 |
| Kings Adult Care | 200 | 200 (100) | 0 |
| Seaview Manor | 118 | 114 (96) | 75 |
| Brooklyn ACC | 210 | 200 (95) | 26 |
| Mermaid Manor | 200 | 190 (95) | 126 |
| Surfside Manor | 200 | 190 (95) | 78 |
| Garden of Eden | 201 | 192 (95) | 2 |
| Oceanview Manor | 176 | 160 (91) | 84 |
| Elm York | 262 | 200 (76) | 113 |
| Queens Adult Care | 352 | 200 (57) | 117 |
| Harbor Terrace | 363 | 200 (55) | 84 |
| Riverdale Manor | 256 | 0 | NA |
| Parkview Manor | 134 | 0 | NA |
| Brooklyn Terrace | 200 | 0 | NA |
| Belle Harbor | 162 | 0 | NA |
| Park Inn | 181 | 0 | NA |
| Sanford Home | 200 | 0 | NA |
| Wavecrest Manor | 120 | 0 | NA |
| Mariner Residence, Inc. | 270 | 0 | NA |
| New Gloria's Manor | 172 | 0 | NA |
| New Haven Manor | 123 | 0 | NA |
| Total | 4486 | 2232 | 868 (47%) |

Table 3. ALP Beds at Adult Homes Covered by Settlement Agreement

Specifically, the types of services ALPs provide (beyond what a regular adult care facility provides) are: personal care (included in the medical assistance capitated rate), home health aides, personal emergency response services, nursing, physical therapy, occupational therapy,

speech therapy, medical supplies and equipment, adult day health care, a range of home health services, and the case management services of a registered professional nurse.

The ALP portion of the adult care facility must either be a certified home health agency, or contract with a certified home health agency or long-term home health care program for the provision of nursing and therapy services.

Individuals being recommended/referred to an ALP require more care and services to meet daily health or functional needs than can be provided directly by an ACF; and admission requires a pre-assessment screening, a nursing assessment and an assessment of the individual's functional needs, and the ability of the program to meet those needs. The assessments are conducted by the operator and, if required, by a certified health agency or long-term home health care program.

As part of the 4500 Conversion for Transitional Adult Homes, which added 4500 new ALP beds, the adult homes seeking these beds also needed to ensure the following provisions:

- Resident choice in choosing from whom to receive services and supports;
- Shared units only by choice;
- Privacy in the sleeping unit will be provided unless a roommate is chosen;
- Individual and shared dwelling units must contain separate living, dining, and sleeping areas which provide adequate space and comfortable, home-like surroundings;
- The unit must contain a full bathroom;
- Adequate closet space for storing personal belongings;
- Units must have lockable doors, with appropriate staff having keys;
- Must have the freedom and support to control their own schedules and activities and have access to food at any time;
- Have a kitchen (area for food storage, refrigeration, and meal preparation);
- Have the right to decorate and furnish their unit; and
- Can have visitors of their choosing at any time.

In addition to the general regulations for Adult Care Facilities, the relevant regulations specific to ALPs can be found in NYCRR Title 10, Part 494.

## C. Staffing

According to regulations, ALP Operators are required to provide sufficient staff to perform case management functions for assisted living residents and to ensure their health, safety and well-being.  ALPs are required to provide a staffing plan for review by the DOH.   The main difference between an ALP and a regular adult care facility is that that operator must develop and submit to the DOH a plan to assure that all staff assigned to perform personal care functions are trained as required in section 505.14(d) and (e) (personal care under general medical services

regulations) or successfully complete a basic training program in home health aide services or an equivalent examination by the Department of Health.

### D.  Methodology/Sample

A sample of 13 class members receiving ALP services were selected from the six adult homes with the highest number of class members in ALP beds- Mermaid Manor (2), Elm York (2), Queens Adult Care Center (2), Surfside Manor (2), Harbor Terrace (3), and Central Assisted Living (2). All the class members in the sample had been assessed for transition and recommendations were made: eight were recommended for supported apartments, four to remain in the adult home (pending testing),[17] and one for Level II housing.  The four class members who were recommended to remain in the adult home pending testing did not have an AH+CM assigned to them.  However, they had an AH+CM prior to (and for some, a period of time after), when they were recommended to stay in the adult home.[18]

Twelve of the 13 class members in our sample were visited and interviewed. One person was not interviewed due to being at a long-term care facility.  The three class members who had transitioned prior to our visit to the adult home, were visited at their supported apartment, and are part of the sample of 35 described earlier. We also interviewed the Administrator of the adult home or his/her designee, toured the homes and reviewed the most recent two CHHA or LHCSA Care Plans for a one year period (April 1, 2016- April 30, 2017), Home Health Aide Plans of Care, progress notes, the assessment packets (final AHRAR, CMHA, CPE/psychosocial), the UAS-NY, Adult Home case management notes (as needed), initial ALP medical evaluation, and any other documents in the adult home record pertinent to ALP services or transitioning process for all the class members in the sample.

### E.  Overall findings

#### 1.  The homes and services

The six homes all had a licensed CHHA or LHCSA on site and a case manager, nurses and home health aides to provide the ALP services. The homes varied in the staffing levels for the ALP services. As mentioned above, the regulations do not specify the number of staff needed, as long as there are enough to meet the needs of the individuals.  This could have accounted for the variation in the number of staff and aides employed by the ALP.

---

[17] Usually for neurological testing due to possible cognitive deficits or psychiatric evaluation, although there are other types of tests as well.

[18] DOH has commented that if a class member is recommended to stay in the adult home after a formal assessment, the Adult home Plus Care Manager must disenroll from the Health Home since the member is enrolled in an ALP and not eligible for Health Home care management as it would be a duplication of service provided in the benefit package of the ALP licensed bed.

> For the most part, there was no distinction in the overall services provided by the adult homes for residents in ALP beds or regular adult home beds other than the enhanced personal care services. Most of the class members did not know they were receiving any different services than anyone else in the adult home.

For the most part, there was no distinction in the overall services provided by the adult homes for residents in ALP beds or regular adult home beds other than the enhanced personal care services. Most of the class members did not know they were receiving any different services than anyone else in the adult home.

All six homes visited provided similar ALP services. They use a personal care model with supplemental skilled nursing care as needed, including, assistance and/or supervision with showering, grooming, oral hygiene, toileting/incontinence care, transfers, and mobility. They also provide assistance to residents at meal times and medications, and escorts to doctor's appointments as needed. The nurses provide skilled nursing such as wound care and diabetes care (insulin injections). The services needed for each resident are identified through an the assessment (UAS) done by a nurse at the time of admission, and a Plan of Care is formulated. All the homes visited had these Plans of Care and a Home Health Aide Checklist, individualized for each resident in the ALP.

One home reported that they also have a case management meeting every day to discuss pertinent issues regarding the residents, and that the minimum expectation of the home health aides is that they ensure that everyone is dressed appropriately, bathed, and coming for meals and medications. They also do checks every hour to see where residents are or if they need assistance with anything.

Another home's Administrator reported that the ALP residents are integrated with the other residents in the adult home. They do not receive additional clinical services and the big difference is their Personal Care Service Program. They provide hands-on care for grooming and other ADL services for those individuals that are less self-directed and anxious about safety, or physically challenged. The ALP program offers these residents more engagement.

However, many of the extra requirements of homes under the 4500 ALP Initiative were not observed in the six homes visited. For example, only two of the six homes visited had areas where residents could store and prepare food items on their own. One home had small lounges located on each residential floor with a microwave, large refrigerator, sink and cabinets, and a small table with chairs, where residents could prepare food and eat if they so choose. The lounges also had a sofa and a television. Another home had a "Snack Shack" which was an area in which residents can prepare food, whenever they want. It was designed with a kitchen area

containing a large refrigerator (stocked with fruits, premade sandwiches, etc.), sink and cabinets, as well as a larger sitting area with tables, chairs and microwaves. These areas were being used during the site visit.

> However, many of the extra requirements of homes under the 4500 ALP Initiative were not observed in the six homes visited.

Three homes had areas with microwaves and a refrigerator, but residents needed staff assistance to use the rooms, and they were not available at all times of the day or night, and one home did not have any means for the residents to prepare food items other than the regular meals and snacks offered by the home.

Only one of the homes provided small refrigerators to their residents in their bedrooms. The other five homes permitted small refrigerators in bedrooms, but at the residents' own expense. One of the homes also had separate laundry room with 5-6 washing machines and dryers for residents to do their own laundry, and a separate small kitchen one of the floors. While the kitchen is currently being used by staff to make cakes on residents' birthdays and for other special occasions or socials (sometimes with residents' assistance), the administrator discussed the possibility of starting a program to teach cooking and doing laundry before moving. This home also has a computer room for residents' use.

Additionally, interviews with the administrators indicated that they would try to accommodate choice in roommates, but that seemed to be the exception, and only two of the 13 class members in the sample indicated that they choose their roommate (JL, PM) in their double occupancy rooms. The shared bedrooms did not provide privacy, and while all had a bathroom attached to the bedrooms, some were shared with an enjoining bedroom. All the homes provide options for locked storage on wardrobes and/or dresser drawers; however, not all the residents had locks.

The homes visited had a large percentage of people in ALP beds, and the above-mentioned "extras" were offered to all residents of the homes and not specific to people in the ALP (three of the homes had 95 to 100 percent certified as ALP beds, and the other three had 55 to 76 percent ALP beds.)

The six homes were found to be clean in all areas. Two of the homes were undergoing renovations, making them esthetically pleasing with new furniture, flooring and décor, and tiled bathrooms with new fixtures. Bedrooms varied in whether they had decorative or personal touches. It was reported that it is the residents' choice in how, or if, their rooms were decorated.

### 2. Class members in the sample

Of the 13 class members in the sample, three were not available due to having had transitioned to supported housing (PB, MD, FG) or were in long term rehabilitation facility (RD).  The class members who had transitioned were interviewed at their supported apartment.

The 13 class members in the sample ranged in age from 45 to 82 years old, with an average age of 65 years old.  They had initially been admitted to an ALP bed from the following places:

- current adult home (RJ, RD, PM, JL, RE);
- a nursing home/rehabilitation center (FG, PB, MD, LL, NL);
- a psychiatric hospital (MC, JR); or
- another adult home (RC).

The approximate lengths of stay in the ALP ranged from 1.5 to 6.5 years; however, several people had lived in an adult home in a regular bed for much longer (15-33 years).  In addition to their psychiatric diagnosis, the class members in the sample had multiple medical diagnoses, including, diabetes, heart related diseases, history of a stroke, seizure disorder and hypertension, to name a few.

Most of the class members were primarily receiving personal care services including intermittent assistance and/or supervision with bathing, grooming, ambulation, and toileting and reminders to be compliant with medication and meals.  They usually did not require hands-on assistance.  Some had their HHA escorting them to get medications and to the dining room for meals.   It was reported that these individuals needed this level of care because they would not do these things on their own.  A couple of class members also needed nursing services for wound care.

> Each resident in an ALP bed is recertified every six months.  Despite this, there was little to no changes in the Plans of Care for the 13 class members from the time they were admitted to the most recent Plan of Care reviewed.

Each resident in an ALP bed is recertified every six months.  Despite this, there was little to no changes in the Plans of Care for the 13 class members from the time they were admitted to the most recent Plan of Care reviewed. Each had an up-to date Plan of Care and Plan of Care checklist that were initialed by the home health aide, that they had completed the service.  The class members also sign off that the service was completed.  However, in a few instances, during interviews, the class members' description of the services they were receiving did not match what the checklist indicated was being provided.

- *One class member (**FG**), who had already transitioned, stated that she did not receive or require any assistance with ADLs while in the ALP, although her Plan of Care and progress notes stated that the home health aides provided "intermittent assistance and*

*supervision with eating, transferring and toileting. HHAs remind and assist resident to go to the dining room for meals and take her medications on time. The HHAs make sure [FG] is ready for a program daily. The aide assists resident in keeping the room clean and environment safe. HHAs assist her in putting her dirty clothes in laundry and fix her clean clothes. The resident has a cane and aide makes sure that she uses it all times when walking...... Without the above-mentioned level of care, these tasks will not be completed."*

- ***RC*** *is a 60-year-old man who was admitted to the ALP on January 7,2010 from another adult home. He has many physical ailments that require him to use a rolling walker. During the interview, he stated that he received the same services as everyone else and that his aides only made his bed and took his laundry downstairs twice a week. He was adamant that he did all his ADLs on his own. His Plan of Care states that he receives assistance with ADLs and incontinence care, and maintaining a safe and hygienic environment. While the aide Plan of Care check list indicates that he receives the services listed in the Plan of Care, it was difficult to confirm that he was actually receiving the services.*

There were five class members who were admitted to the ALP following a hospital stay or from a rehabilitation facility and came into the ALP requiring more care than a regular adult home provides (FG, PB, MD, LL, NL).

- ***FG*** *is a 74-year-old woman who was living independently in an apartment, until she fell and fractured her hip requiring a total hip replacement. She spent some time in a rehabilitation facility and was discharged to an ALP bed on March 31, 2014. At that time, according to the Plan of Care, she was receiving intermittent assistance and supervision with eating, transferring and toileting and reminders and assistance with going to the dining room for meals and taking her medications. Her most recent Plan of Care on February 27, 2017 was basically the same. She uses a cane to ambulate and received reminders to always use her cane when walking to prevent falls.*

- ***PB*** *is a 68-year-old year-old woman who suffered a heart attack and stroke and required a lot of personal care services due to being a fall risk. She was admitted to the ALP program on April 30, 2015 and was receiving assistance with showering, which was hard for her to do alone. She was also receiving assistance with toilet and bathing transfers (set up only), supervision dressing her upper body and limited assistance dressing her lower body, and assistance with mobility, along with some other basic services offered by the ALP. She ambulates with the assistance of a rollator.*

- ***MD*** *is a 64-year-old woman who was admitted to the ALP on March 3, 2015 following a stay in a rehabilitation facility due to a fall and hip fracture requiring surgery. She required assistance of a home health aide to transfer due to her physical limitations. She also received daily assistance with bathing, dressing and grooming, and intermittent supervision with transfers as needed.*

42

- *LL* *is a 59-year-old woman who was admitted to the ALP on August 16, 2015.  She had moved to the adult home after a year-long stay at a nursing home following a stroke with some partial paralysis.  She was receiving assistance with personal care, including bathing, oral care, grooming, lotion/skin care, and dressing.  She had a serious incident on January 23, 2017 where she accidently burned herself by setting her hair on fire while smoking a cigarette.  She was hospitalized on a burn unit for several weeks.  Upon her return, the only change in the Plan of Care was for skilled nursing for wound care, but no mention of safety concerns on the check off sheet, even though her readmission assessment mentioned that she was unable to self- preserve during an emergency.*

- *NL* *is a 70-year-old man who was admitted to the ALP on July 15, 2016 following a nursing home stay for an unknown reason, but has diagnoses of peripheral vascular disease of both legs and cellulites which causes severe leg sores.  He has had several hospitalizations and admissions for rehabilitation due to these problems.  At the ALP, he stated he receives assistance from home health aides to shower, change his sheets and pillow cases and clean his room.  The nurse also changes his dressings on his leg wounds daily. According to his Plan of Care he also receives assistance with grooming and dressing and daily skin and foot care.*

- *RE* *is a 45-year-old man with multiple medical ailments.  He walks with a cane.  He was initially admitted to the ALP on January 15, 2015, and on July 15, 2017 following an admission to a rehabilitation facility (May 25, 2017-July 5, 2017).  His records indicate he has had frequent falls due to not using his cane, requiring frequent medical emergency room visits. His Plan of Care indicates he receives intermittent assistance/supervision to perform ADLs and personal care, and maintain a clean/safe environment, and monitor compliance with medications and meals.  He also receives reminders to use his cane while walking. During the interview, he was very complimentary of the aides stating that they really help him and "they make my day."*

### 3. Impact on transitions

The six adult homes visited reported that they have little involvement with the transition process for class members.  Most indicated that the only real contact is with the Health Home care coordinators and/or Housing Contractors if they need paperwork or other information about a class member from the adult home.  The adult home and/or ALP case management notes indicated that there was some communication, but usually only noted if the class member put in his/her 30-day notice to transition.  There were some other instances of notes related to transition, as necessary (adult home case manager helping class member get ID's, relaying to the AH+ CM concerns by a family member about the class member moving).  In one instance, the AH+ CM's notes indicated that she met with or contacted the adult home's case manager for an update when she couldn't reach the class member (JR).

One home conducts daily rounds (case manager meetings) to discuss issues impacting the residents.  For one class member in the sample (MC), there were notes regarding these meetings, which included concerns expressed by the class member's Health Home care coordinator and Housing Contractor and her non-compliance with medications and dialysis treatments.  The note indicated that her move was being delayed because of this.  Another note indicated the new date for transition.

Despite these few examples, there was little evidence of involvement by the adult home in assisting class members with the transition process.

Follow up on the 13 class members, after the completion of the site visits, indicated that the status for some of the class members had changed. The current status for the 13 class members in the sample are as follows:

- five were transitioned to supported housing (FG, PB, MD, JR, MC);
- one (JL) was approved for supported housing and awaiting a planned move;
- four had been recommended to remain in the home pending testing, but none are currently in that status:
    - RJ was determined not to have a SMI after she was reassessed;
    - RD was a non-transitional discharge to a nursing home;
    - LL was in-reached again, but declined assessment and did not express an interest in moving at that time; and
    - PM was approved to receive in-reach again;
- two were approved for supported housing and interviewed by their housing contractor, but have not transitioned (RC, NL); and
- one was approved for Level II housing, but has not transitioned (RE).

While there was movement for some class members in the transition process, there is a concern for the class members who did not have an AH+CM to assist with the process.  There were four class members in the ALP review sample who did not have AH+CMs assigned to them at the time they were assessed and recommended to remain in the adult home pending further testing.

Information was obtained from the Department of Health's Office of Community Transition (DOH) about the process for following up on the individuals who were recommended to remain in the adult home pending further testing, and what follow up was conducted.

There have been 23 class members, to date, in this status as of January 19, 2018.  It should be noted that two-thirds of the people in this status were/are in ALP beds (15 of the 23.)  Currently, there are 15 people in this status.

The DOH staff described the process used to follow up with class members who, after assessment, were recommended to stay at the adult home pending additional testing or evaluation

(usually for neuropsychological testing due to possible cognitive deficit or psychiatric evaluation, but there are other types of testing under this category).

According to the DOH staff, timeframes are individualized with follow up every one to two months. For example, they would not need to follow up with someone who had been hospitalized or in a rehabilitation facility with no discharge date. It was explained that for people who have AH+CMs, the Nurse Community Transition Coordinators (CTCs) have weekly calls with the Care Managers and the Health Homes and would follow up every 1-2 weeks to determine if the testing is being arranged and completed.

If someone is in an ALP and does not have an AH+CM, DOH will follow up directly with whoever was responsible for arranging the testing or evaluation. In general, though, it appears that the decision for who is supposed to follow up to ensure the evaluation/testing is arranged, is done during the "remain in adult home" call, and that person/entity (MLTC, MH provider, etc.) is identified for the designated staff responsible at the DOH to follow up.

Once the testing is done and whatever issue was "resolved," and it is determined that the person can move forward, their status would be changed, and they would go back through in-reach, assessment, etc.

A review of these cases revealed that the process for following up on these cases needs to be strengthened. In many of these cases, the class members did not have an AH+CM due to the recommendation to remain in the adult home. Having someone who has regular contact with the individual, who could routinely follow up on whether the recommended testing was completed, would strengthen this process.

For three of the four class members in the sample (PM, RJ, LL) who were in this status, it appears that follow up was not done in a timely manner to ensure that recommended testing was completed or reported to the appropriate person to ensure that the class member would be put back on the in-reach list and have an opportunity to be reassessed. The fourth class member was in a nursing home at the time the determination was made and subsequently was discharged to the nursing home (RD).

- ***PM's*** *AHRAR was distributed on September 12, 2016. He is in an ALP bed and does not have an AH+CM. He was recommended for neuropsychological testing. DOH staff spoke with the adult home Administrator on December12, 2016 and was told that he was undergoing medical testing for a cancer diagnosis, so no neuropsychological testing was done. Another call was made on April 3, 2017 to follow up, but the call was not returned at that time. After further follow up, it was learned that a neurological test was completed on July 7, 2017. He also had a follow up psychological evaluation which noted cognitive decline. An email was sent to OMH on November 20, 2017 that he was cleared to be in-reached again. He has not had the in-reach to date.*

- ***RJ's*** *AHRAR was distributed on February 2, 2017. She was recommended to get neuropsychological testing due to possible cognitive deficits She is in an ALP bed and does not have an AH+CM. The AH Administrator got a copy of the AHRAR and was supposed to follow up with her medical doctor to arrange for testing. When DOH staff followed up with the Administrator on April 3, 2017, it was learned that an appointment had not been arranged. At that time, more follow up was needed. A psychological evaluation was done on July 13, 2017 and it was determined that she has dementia and "simple schizophrenia," and her functional disability is due to the dementia. She was in-reached again on October 19, 2017 and assessed by TSI on November 24, 2017, when she was determined not to have a serious mental illness. Her final AHRAR was distributed on December 8, 2017.*

- ***LL*** *was assessed on March 8, 2017 and it was reported that she expressed that she was not ready for a supported apartment, that she needed 24-hour supervision and she requested to move to a CR-SRO. She was recommended to stay in the adult home pending neurological testing due to memory impairment and wound care. She failed the short term memory assessment, and it was determined she is not capable of self-preservation. She accidently burned herself and could not figure out how to put the fire out resulting in her spending several weeks in a burn unit, then to rehabilitation facility in January 2017. She returned to the adult home on March 6, 2017 and was still receiving on site skilled nursing for wound/burn care at the time of the "remain in the adult home" call. She was recommended to stay in the adult home pending testing on April 20, 2017. She was in-reached again on November 8, 2017 and said she was not interested in being assessed or moving at that time.*

Additionally, there were three other class members who were not part of the ALP review sample, but were recommended to remain in as adult home pending testing, were in ALP beds and did not have AH+CMs at the time of the determination. These examples further illustrate the need for better follow up and coordination in these cases.

- ***LLo's*** *AHRAR was distributed on March 10, 2017. She was hospitalized in February 2017 and then sent to a nursing home. At the time of the transition call, there was a question of whether she would be able to return to the adult home due to her medical condition. She eventually did return to the adult home and resides in an ALP bed as of June 2017, but was refusing to follow up with her PCP for a medical evaluation. She was reassigned an AH+CM, but as of January 19, 2017, no follow up had been conducted to find out if she had her evaluation.*

- ***GG****-AHRAR distributed March 23, 2017- He is in an ALP bed and has no AH+CM. He was recommended to get a full psychiatric work up. He presented as delusional during the assessment. On April 12, 2017, DOH staff spoke with the social worker in the AH and was told he was in the hospital for a medication adjustment from March 20, 2017- March 21, 2017. He has been compliant with medications. The social worker said she was going to follow up with his psychiatrist to review medication. It was reported that he*

46

*has been stable since the medication change.  An email to OMH was sent December 13, 2017 to be in-reached. But he has not been in-reached to date.*

- *CZ- AHRAR was distributed on April 3, 2017.  She is in an ALP bed and does not have an AH+CM.  She was recommended for neuropsychological testing due to possible cognitive deficit.  The administrator received the AHRAR on April 14, 2017 and was responsible for contacting her doctor to arrange for the testing.  An updated psychiatric evaluation was done on July 29, 2017 and she was in-reached on November 16, 2017 and again on January 11, 2018.  Both times she stated she is uncertain if she wants to move, but is considering it.*

### 4. ALP code

Another issue that is unique to class members in ALP beds, is the added burden of making sure that the ALP code is removed so that they can receive Health Home long term the services once they move.  The Health Homes cannot bill Medicaid for these services until that code is removed, which is done by the ALP (need to contact Medicaid).  This affects the class members who transition to supported housing, who cannot receive home health aides or personal care workers, until this happens.  Some of the Health Home care coordinators and other parties associated with the transition process have come up with creative ways to deal with this issue. Anecdotal information has also been received about using informal supports (family members or peers) to assist class members with grocery shopping, preparing meals, ADLs etc., until a referral can be made for CHHA services. However, there have been instances where people do not get the needed services they need to live comfortably and safely once they transition.

This was the case for two of the three of the class members from our sample who transitioned to supported housing.

- *PB moved to her supported apartment on April 27, 2017. According to her AH+CM, she had an ongoing problem establishing eligibility for MLTC services, due to the failure of the adult home to remove the ALP code following her transition. This resulted in her having a delay in getting a home health aide to assist her, and while as of December 15, 2017, she had short-term CHHA services, she did not feel they were adequate to assist her, and MLTC services were still not in place. The interim short term HHA provided were as follows:*
  *May 1- May 31- HHA 5 days a week for 3 hours a day,*
  *Canceled May 31, 2017 due to "insurance issues."*
  *June 29 – July21, 2017- HHA 3 days a week for 2 hours a day*
  *Canceled July 21, 2017 due to "insurance issues."*
  *July 25, 2017 - Fracture sustained by fall*
  *August 7, 2017- Surgery*
  *August 8 – December 8, 2017- SI Cares Rehab Center*
  *December 8, 2017- Reevaluated by Maximus*

*December 15, 2017- Short term HHA resumes 3 days a week for 2 hours a day*

- **FG** *moved to her supported apartment on June 1, 2017. She was initially receiving short term HHA services due to the ALP code not being removed until sometime around July 28, 2017 (nearly 2 months after she moved.) However, when she was finally assessed for long term services, she refused them, stating she did not need the assistance.  In this case, even though she had been in an ALP bed receiving personal care services, she has been taking care of her personal care and ADLs independently.*

## VI. In-reach

The Settlement Agreement requires the State to arrange for the entities that provide supported housing to conduct in-reach in the NYC Impacted adult homes on a regular and continuing basis to provide information about the benefits of supported housing and discuss any concerns that class members may have about moving to supported housing. (Settlement Agreement, ¶ E. 1) It also requires that residents who decline an offer to move to supported housing be offered the opportunity of additional in-reach periodically but on no less than an annual basis. (*Id.* ¶ I. (2)) The Settlement Agreement identifies some strategies for effective in-reach, including conversations with persons who already live in supported housing, visits to apartments, and the use of photographs and virtual tours. There are also provisions requiring adult homes to provide reasonable access of Housing Contractors to class members, and requiring that they not discourage class members from meeting with the Housing Contractors. (*Id.* ¶ E. (3) (4))

### A.  In-reach data

| | | |
|---|---|---|
| **Class members with 1 IR session** | **1,837** | **36.8%** |
| Class members with 2 IR sessions | 881 | 17.7% |
| Class members with 3 IR Sessions | 728 | 14.6% |
| Class members with 4 IR sessions | 692 | 13.9% |
| Class members with 5 IR sessions | 455 | 9.1% |
| Class members with 6 IR sessions | 229 | 4.6% |
| Class members with 7 IR sessions | 91 | 1.8% |
| Class members with 8 IR sessions | 41 | 0.8% |
| Class members with 9 IR sessions | 20 | 0.4% |
| Class members with 9+IR sessions | 15 | 0.3% |

**Table 4. Distribution of 4,989 Class Members having 13,506 in-reach sessions, by number of in-reach sessions and percent of totals**

48

As of March 16, 2018, in-reach had been offered to 4,989 of the 4,081 class members,[19] and 2,578, or 52% of individuals in-reached had said Yes. (See Fig. 4) Although the current rate of individuals saying Yes to in-reach is lower than that of the first year (60%), it is slightly higher than the rates of 47% and 51% reported in the Independent Reviewer's Second and Third Annual Reports respectively.

By March 16, 2018, most if not all of the class members had received in-reach at least once, most more than once. The 4,989 members in-reached had received a total of 13,506 in-reach contacts; 63% had received in-reach at least twice and 46% had received three or more in-reach contacts. Seventeen percent had five or more in-reach sessions. Nevertheless, the rate of class members expressing interest in transitioning remains at 52%, and the net gain of Yes responses since Year Three is a modest 315.



**Figure 5.  Class members expressing initial interest in supported housing**

As reflected in our Second and Third Annual Reports, there appear to be a number of factors contributing to the low rate of interest in transitioning at the point of in-reach.

- First, the list of people placed on the "Fast Track" early on in the process (i.e., people expressing interest in moving even before or during the course of the Settlement Agreement) has essentially been exhausted; they have received in-reach and many transitioned when the process moved more rapidly than it has in recent years.

---

[19] Due to admissions and discharges, the 4,081 is a snapshot in time and there are actually more class members in adult homes during the course of a year. See Table 1.

- According to in-reach staff, many people who have lived in adult homes for many years report being "comfortable" there and fear the unknown of "supported housing." Some residents also report confusion about what the transition will entail which fuels uncertainty about moving.

- Reportedly, some residents have been influenced by what they hear from adult home staff or other residents about individuals who have transitioned and have experienced problems, such as delays in SNAP or other benefits or needed services, or have returned to adult homes.

- Discouragement or other influence, subtle or otherwise, by adult home administrators or staff, was also cited by Housing Contractors who reported their access to individuals has been limited or has been confined to settings that are not conducive to private, uninterrupted conversations about transitioning. (It should be noted that the Settlement Agreement (¶ E. 4) notes "The State shall advise NYC Impacted adult homes that they may not interfere with the reasonable access of Housing Contractors to the NYC impacted adult homes and may not discourage NYC adult home residents from meeting with Housing Contractors."

- Instances of discouragement by family/guardians, as well as by therapists, were also reported by Housing Contractors. Some family members believe that their loved one would be "safer" in the adult home and find support from their relative's therapist, who may also question the individual's readiness for independent living.

## VII. Assessments

The Settlement Agreement sets forth a schedule that within four years of its execution (July 23, 2013), at least 2,500 class members shall be assessed by Health Homes or MLTCPs and, if appropriate under a person-centered care plan developed pursuant to ¶ G, transitioned from NYC Impacted adult homes. Within five years of the execution, *all* class members shall be assessed by Health Homes or MLTCPs pursuant to ¶ F and, if appropriate under a person-centered care plan, transitioned from NYC Impacted adult homes. (Settlement Agreement, ¶ I)

The purpose of a comprehensive assessment is to determine the person's housing and service needs and qualifications for the purpose of transitioning from an adult home. (Settlement Agreement, ¶ F (1) (2)) There is a presumption in the Settlement Agreement that class members can live in, and will be considered appropriate for supported housing if desired by the resident, unless the assessment discloses a disqualifying condition. (*Id*. (4) (5)) If the assessment concludes that a class member is not appropriate for supported housing, it must specify the reason and the class member must be provided the opportunity to live in the most integrated setting desired that is appropriate to his or her needs. (*Id.* (7))

As discussed in the Independent Review's first three annual reports, the assessment phase of the transition process has been plagued by problems resulting in delays of individuals desiring to move from their adult homes to actually transitioning out. Over time, the State has taken a number of steps to address this issue, including augmenting the types of required psychiatric records that could be included/considered in the assessment process, expanding the types (and thus the number) of licensed clinicians who could conduct components of the assessment process and, most recently on July 1, 2016, vesting assessment responsibilities, which previously had been spread across a multitude of Health Homes and MLTCPs, in one entity: Transitional Services of New York, Inc. (TSI). Also in 2016, the State instituted a practice of offering the opportunity for assessment to class members who said No or were Uncertain about transitioning so that they would have an understanding of the housing and service options available to them if they decided to transition.

## A. Continuing delays in the assessment process

As reported in the Third Annual Report, and illustrated in Table 5 (below), on March 10, 2017 there were 811 class members willing to move who were in the assessment phase of the transition process, the median length of time they had been there since indicating a willingness to move was 269 days and 58.5% had been in this phase for more than six months.

> Since March 10, 2017, considerable progress has been made in reducing the backlog of cases and time spent in the assessment process.

Both the number of individuals in the assessment phase and their length of time there had grown significantly from 2015. It should be noted that during this period of time there was a change in the assessment process with TSI assuming responsibility for conducting assessements on July 1, 2016. TSI inherited a sizeable backlog of individuals needing assessments and there was an understandable lull in completing assessments as TSI started and ramped up its operations. The State's contract with TSI also expected that the backlog of assessments would be eliminated within six months of assuming this responsibility.

Since March 10, 2017, considerable progress has been made in reducing the backlog of cases and time spent in the assessment process. As of March 16, 2018, 336 class members were in the assessment phase (a reduction of 59%); the median length of time they were there was 77 days, down from 269 days; and the percentage of cases in assessment for more than six months declined from 58.5% to 34.5%. (Table 5. *See also*, Figs. 2 & 3 above) As indicated in Figure 6, the pace of assessment completion has quickened over the past year. Despite these significant gains, further improvements are needed. Currently, approximately 47% of the 336 class members who are in the assessment phase  have been waiting more than three months for assessments to be completed.

51

|                                                  | 7/1/2015 | 3/11/2016 | 3/10/2017 | 3/16/2018 |
|--------------------------------------------------|----------|-----------|-----------|-----------|
| Cases in Assessment Process                      | 449      | 683       | 811       | 336       |
| Range of Days in Assessment from In-reach        | 0-470    | 0-695     | 1-969     | 0-1421    |
| Median # of Days in Assessment                   | 79       | 87        | 269       | 77        |
| % of Cases in Assessment more than Six Months    | 32.70%   | 27.70%    | 58.5%     | 34.50%    |

**Table 5. Delays in Completing Assessments**



**Figure 6. Rate of Completed Assessments by Month: January 2106 – February 2018**

## B. Changes in assessment recommendations/outcomes

Last year's annual report detailed changes in assessment recommendations and outcomes over time, which needed scrutiny and explanation. Recommendations for Level II housing as a percentage of all recommendations had increased while recommendations for supported housing had decreased. It was also noted that the percentage of cases resulting in assessments concluding that individuals did not have a SMI or declining assessment had increased. Some of these changes appeared to be particularly acute after TSI assumed assessment responsibilities on July 1, 2016. More recent data suggest these patterns of changes are continuing.

As of March 16, 2018, 2,667 class members had final AHRARs which listed housing and service recommendations and outcomes based on their assessment.[20] As illustrated in Table 6 below:

---

[20] Cumulative weekly data for the week ending March 16, 2018 indicate that 2,834 individuals have had at least one completed assessment over time, i.e. a completed Adult Home Resident Assessment Report (AHRAR). However, for a variety of reasons (e.g., change in clinical situation, such as a recent hospitalization; delays or a change in mind about transitioning; expired HRA approval; etc.), a number of these individuals may require reassessment. Information about the recommendations and outcomes of their initial assessment is not available in the State's weekly progress report which provides a snapshot of each individual's status in the transition process as of the date of the report. The following discussion is based upon the 2,667 class members for whom assessment data are available in the State's weekly progress report ending March 16, 2018.

- Recommendations for Level II or OMH licensed housing (Apartment Treatment, Congregate Treatment, CR-SRO and Family Care) as a percentage of all recommendations in a given year have grown from 0.6% in 2014 to 11.3% in the first quarter of 2018. It should be noted that the Settlement Agreement does not specifically require the State to create additional capacity in these types of housing options to accommodate class members. Also, few class members recommended for such housing have transitioned. As of March 16, 2018, of the 167 individuals approved by HRA for Level II housing, only 27 (16%) have transitioned; seven others have died and 18 were non-transitional discharges.

- Recommendations for supported housing as a percentage of all recommendations in a given year have steadily declined from 72.2% in 2014 to 36.3% in the first quarter of 2018. Based on Week 196 data, prior to TSI's assumption of assessment activities on July 1, 2016, recommendations for supported housing as a percentage of all recommendations stood at 63.6%. The rate of such recommendations has since steadily declined. Given the strong presumption in the Settlement Agreement about the qualification of class members for supported housing and the potential to provide a wide variety of Medicaid-funded support services to the class, this is a matter of significant concern.

| | All Years | | 2014 | | 2015 | | 2016 | | 2017 | | 2018 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | # | % | # | % | # | % | # | % | # | % | # | % |
| AHRAR Recs/Outcomes | 2,667 | 100% | 169 | 100% | 400 | 100% | 592 | 100% | 1,222 | 100% | 284 | 100% |
| Adult Home | 32 | 1.2% | | | 2 | 0.5% | 13 | 2.2% | 15 | 1.2% | 2 | 0.7% |
| Declined Assessment | 789 | 29.6% | 30 | 17.8% | 61 | 15.3% | 155 | 26.2% | 425 | 34.8% | 118 | 41.5% |
| Declined Transition | 47 | 1.8% | 6 | 3.6% | 20 | 5.0% | 21 | 3.5% | | | | |
| Discharged prior to Assessment | 7 | 0.3% | 4 | 2.4% | 1 | 0.3% | 2 | 0.3% | | | | |
| Housing other than SH (e.g., Senior Housing) | 7 | 0.3% | | | 1 | 0.3% | 1 | 0.2% | 5 | 0.4% | | |
| No SMI | 308 | 11.5% | 6 | 3.6% | 21 | 5.3% | 77 | 13.0% | 176 | 14.4% | 28 | 9.9% |
| OASAS | 13 | 0.5% | | | | | 6 | 1.0% | 7 | 0.6% | | |
| OPWDD | 8 | 0.3% | | | | | | | 7 | 0.6% | 1 | 0.4% |
| OMH Licensed Housing | 208 | 7.8% | 1 | 0.6% | 16 | 4.0% | 47 | 7.9% | 112 | 9.2% | 32 | 11.3% |
| Supported Housing | 1,247 | 46.8% | 122 | 72.2% | 278 | 69.5% | 269 | 45.4% | 475 | 38.9% | 103 | 36.3% |
| Undecided | 1 | 0.04% | | | | | 1 | 0.2% | | | | |

**Table 6. Number and Percentage Distribution of Final AHRAR Recommendations by Years**

Moreover, the yearly percentage of cases in which it was determined that the individual did not have an SMI – and thus was ineligible for the opportunities provided under the

Settlement Agreement – has grown from 0.6% in 2014 to 11% in 2018. There has also been a more than two-fold increase (from 17.8% to 41.5%) between 2014 and 2018 in people whose final AHRAR recorded them as declining assessment.

## C.  Settlement Agreement performance standard

The Settlement Agreement required that by July 23, 2017, at least 2,500 class members will have been assessed and, if appropriate, transitioned from adult homes. Based on the state's Weekly Report ending July 28, 2017, this milestone has not been met.

> The Settlement Agreement required that by July 23, 2017, at least 2,500 class members will have been assessed and, if appropriate, transitioned from adult homes. Based on the state's Weekly Report ending July 28, 2017, this milestone has not been met.

The state's weekly reports present two sets of data concerning transition activities. The first data set, the Impacted Adult Home (IAH) Weekly Progress Report, provides a snapshot of where class members who have been in-reached stand in the transition process as of the date of the Weekly Report. Among other things it would indicate whether or not the class member said Yes to transitioning when last in-reached, had a completed assessment, had an application submitted to HRA, etc.

The second data set, Cumulative Weekly Data, provides aggregate data as of the date of the report, such as the total number of in-reach sessions that have occurred, the number of class member who have had at least one completed assessment, etc. For a variety of reasons (a change in clinical condition, a change in mind about transitioning, etc.), class members may require additional in-reach or additional assessments. While these data are reflected in the Cumulative Weekly Data, they may not be captured in the IAH Weekly Progress Report. As a snapshot of where the individual stands as of the report's date, the IAH Weekly Progress Report may reflect that the person is in the assessment process, but not that he had a prior completed assessment.

Cumulative Weekly Data for the week ending July 28, 2017 indicate that 2,328 class members had had at least one completed assessment since the initiation of the Settlement Agreement. The IAH Weekly Progress Report, or snapshot of where class members stand on July 28, 2017, however, indicates that 2,095 had a complete assessment; evidently some of the 2,328 members with at least one assessment had been referred back for reassessment, while some others have died or been discharged outside of the Settlement Agreement's mechanisms. Of concern is the fact that the recorded outcome of the assessment in 587 of these 2,095 cases (28%) was that the individual refused to be assessed and therefore the assessment lacked specific

content relative to determining the most integrated setting desired and appropriate to the class members' needs. Although assessments were not completed, these cases are counted as completed assessments.[21]

Further, of the 1,187 class members assessed and recommended for supported housing (1,010) or other licensed OMH housing (177), 540 had transitioned by July 28, 2017.

## D. A new approach to assessments

During the past year, the parties have engaged in extensive discussions with a view to simplifying and streamlining the processes that affect timely completion of assessments and assessment outcomes. The goal is to eliminate the multiple handoffs that currently occur between different agencies and actors and to create a more cohesive process. It is anticipated that this new process will be implemented in stages beginning in early 2018.

The OMH has contracted with the housing providers in the Bronx and Staten Island, including Pibly, St. Joseph's, and SIBN, respectively, to begin the rollout of the new process. These agencies have been funded to hire and train qualified clinical staff who will assess those class members in the backlog, conduct new assessments, and complete a psychosocial, if needed, for all class members who are in-reached in the adult homes they serve, and indicate they would like to move to supported housing. In addition, the assessors will prepare the HRA application, and upon receipt of HRA approval will submit the referral to the housing division within their own agency.

It is hoped that consolidating the functions of in-reach, assessment and housing within the same agency will provide continuity to the process, making it more efficient and reduce many of the current delays. It is anticipated that after the initial rollout, the process will be expanded to include the remaining five Housing Contractors. The referral package will be the same as those used by all other entities making referrals for housing to HRA. The application will be comprised

---

[21] In the Third Annual Report, this issue was discussed as follows:

> In weekly data reports submitted by the State, people who have declined assessments have been reported as having completed assessments. . . . . One of the purposes of the clinical assessment was to identify whether the class member met one of the disqualifying conditions laid out in the Settlement Agreement. (§F (5)) If the assessment cannot be performed, that purpose is not being achieved and the "completed" assessment has no substantive content at all. At the same time, however, if the person does not participate in the assessment process, it would not be possible for the assessment to determine "the housing and service needs and preferences of the NYC Adult Home Resident for purposes of transitioning from the NYC Impacted Adult Home." (§F (2)) As of March 10, 2017, of the 1,667 individuals with completed AHRARs, the outcome/recommendation for 398 (23.9%) was declined assessment.

> The new Supplemental Agreement addresses this issue by distinguishing between assessments which have been completed and forwarded on to HRA for review, and assessments which are closed out because they could not be completed. (Supplemental Agreement, §B(3) and (4))

of the standard 2010e and supporting documentation, including the Comprehensive Psychiatric Evaluation and the Psychosocial. The first training of the new assessors occurred on January 17, 2018 and included staff from each of the named Housing Contractors.

### E. HRA review of housing recommendations

Of the 1251 applications approved by HRA as of March 16, 2018, 1084 (87%) were approved for Community Care (supported housing) and Level II and 167 (13%) for Level II-Only, or other than supported housing.

The number and percentage of cases in which HRA differed with the assessors' recommendations of supported housing, which decreased sharply from the first to the third annual reports (from 21% to 3%), has continued to remain low. In only one of the 351 cases that HRA approved from March 11, 2017 to March 16, 2018, the assessor had recommended supported housing, but HRA approved the resident for Level II-Only. HRA maintained that information it received during the application process, often in the psychiatric evaluation or the CMHA, led to a determination that the resident would not be safe in supported housing. The following example details the reason provided by HRA, extracted from the CMHA assessment, which countered the assessor's recommendation, and raised HRA's concerns about the class member's safety in supported housing.

- ***Reason in the case of JG***: *Class member reported command auditory hallucinations to hurt others, however no plan. The voices interfere with how member communicates and relates to others. Recently began to have suicidal ideation, reports no plan. Assessor recommends PROS to gain insight prior to transitioning and psychiatric workup to reassess class member's medication.*

Cases wherein the HRA disagrees with the assessor's recommendation for supported housing are reviewed and telephone conversations between the state and HRA representatives designed to reconcile the differences are conducted. The low number of disagreements between the assessor and HRA when supported housing is recommended is clearly a reflection of the ongoing communication between DOH and HRA when questions arise about specific applications, as well as the training provided by HRA to those completing the applications.

In two instances between March 11, 2017 and March 16, 2018, the assessor has recommended Level II placement, and HRA determined the individual was qualified for Community Care and Level II. The assessor's recommendation was based on the choice of the class member. In each of these cases, a box added to the most recent AHRAR under Community Housing Recommendations, was checked, which reads: "*Housing other than supported housing is the resident's personal preference.*" As noted in each AHRAR:

- ***RA*** *was referred to Supportive Housing, CR-SRO, which is her preference. She stated she*

*is requesting this level of care because she does not feel confident in her ability to take her medications 'on time' and also 'that sometimes I need help'...and feels comfortable in a communal setting.  Class member was provided with psychoeducation regarding the availability of wraparound services available in supported housing. Class member is not connected to a care coordination agency at this time. (AHRAR completed January 13, 2017; RA was enrolled in a HH and assigned an AH+ CM May 1, 2017; HRA application submitted July 10, 2017.)*

- ***MV** stated his preference is to reside in CR-SRO. Class member expressed fear of transitioning to supported housing and stated he will abuse his Ativan prescription if he self-administers, and becomes very anxious. Class member also reported never living independently and needing assistance with meal preparation and medication management. He was educated on wraparound services to assist with these things, It is recommended that class member be referred to a chemical dependency clinic to possibly consider alternatives to Ativan medication as well as care coordination services for more support. Class member is not enrolled in a HH. (AHRAR was completed January 13, 2017; MV was enrolled in a Health Home and assigned an AH+ CM on April 3, 2017. HRA application submitted on June 1, 2017. According to DOH, MV opted out of the Health Home and care management on July 24, 2017, stating he no longer wanted to move.)*

HRA has previously noted "clients who are approved for Community Care and Level II housing can be referred to Level II-Only housing programs at the discretion of the provider." In each of these cases Community Care was granted due to no clinical indication for a Level II-Only determination. It is also notable that in each of these cases, at the time of the assessment neither class member had been enrolled in a Health Home or assigned an AH+CM. It is thus understandable that they might have had a level of anxiety about the support they would receive once transitioned to supported housing.

In discussing these cases with DOH, they informed us that the delay in submitting the HRA application in the case of RA occurred despite multiple reminders sent by DOH to the Health Home. In the case of MV, the delay was reportedly due to the ambivalence of the class member regarding the prospective move, and his initial refusal to sign the consent to complete the HRA application. Although he signed the consent, after the HRA approval was received, he decided against moving and disenrolled from the Health Home, as noted above. DOH also reported that effective July 7, 2017, TSI was advised that the assessor must recommend the most integrated setting appropriate for the class member, based on clinical appropriateness. If a class member is appropriate for a supported apartment and requests housing other than a supported apartment, the class member should be provided with education on the supports available in a supported apartment, and the assessor is to document this on the AHRAR, which did occur in each of the cases above.

57

## VIII. HRA review and Unable to Complete (UTC) cases

In addition to the Settlement Agreement, the New York City HRA handles roughly 25,000 applications a year for housing arising out of mental health sectors and the NY/NY agreement. Major referral sources outside of this initiative, are psychiatric hospitals, shelters and correctional facilities. Many applicants are repeat HRA customers and their prior applications/histories are retained by HRA for up to five years, and are reviewed as part of the process of evaluating a current application. According to HRA representatives, applications are reviewed and generally turned around within 1-3 business days.

Effective July 1, 2016, DOH contracted with TSI-NY to be the sole assessment entity in the IAH initiative. In place of the UAS-NY nursing assessment, TSI-NY assessors use the CMHA, which was found to be more applicable to the adult home class members being assessed. HRA administration were very positive about the changes and noted the vastly improved consistency, quantity and quality of the information being provided in the assessments.

Applications are approved for Community Care (i.e., supported housing) and Level II, or Level II housing only. Level II Housing refers to other types of OMH housing, including Community Residence-Single Room Occupancy (CR/SRO); Congregate Treatment; and Apartment Treatment. According to a DOH FAQ, effective February 24, 2016, all new HRA approvals in the Impacted Adult Home Initiative are for a one year period, and all HRA approvals in effect at that time were extended to one year. While extensions are generally not granted, HRA representatives stated that if there is a move date or a placement in mind, exceptions can be made. Since then, HRA approvals they have been further extended to five years, which should reduce the need for extensions and re-assessments.

As mentioned in the Assessment section above, as a result of discussions between the parties, the State is implementing a new process for conducting assessments using the HRA 2010e application.  In speaking with the Director of Supportive Housing for HRA during January 2018, she explained that systems were put in place to distinguish these HRA 2010e applications from the other HRA applications that they receive. She also mentioned that as of September 5, 2017, anyone with approval to complete the HRA application will also have access to the Coordinated Assessment Survey. By accessing the survey, even if it is not completed, they will have access to prior applications for that class member for the last five years, as well as the psychiatric evaluations and other supporting documents which were submitted. In this way, the person completing the application will have access to information that may help them better understand HRA's questions, concerns, changes in recommendations, or designation of a case as UTC, pending further information and/or clarification. This can also be helpful in learning what other OMH housing has been applied for in the last five years, while also providing additional information on the individual's psychiatric history, risk factors, and background. In addition, identifying documents previously submitted to HRA, like a birth certificate or New York State

ID, that the class member may no longer have in their possession, can also be accessed from this site.

The Director stressed that access to this information is easily navigated from the newly revised application landing page, and is also included in all HRA training provided to those completing the HRA applications. During the training the Director of Supportive Housing for HRA speaks specifically about the Impacted Adult Home applications and provides context to the process, which differs from the information provided to other referral sources. Half-day trainings were regularly held on the last Thursday of the month from March through May 2017, and every other month thereafter, for all new staff designated to complete the HRA application. Since March 2017 through December there have been six training sessions, serving 63 trainees.

The median length of time from submission of an application to HRA approval is two days. It should be noted that in the initial stages of implementation, the median length of time for HRA approval was seven days.

At times, the HRA classifies applications as UTC due to insufficient or inconsistent information or other reasons, and the applying entity is informed of this so it can rectify the situation. According to HRA, if a case is determined to be UTC, and is not resubmitted within 30 days, a new HRA application is required. During this 30 day period, a resubmission would cause the application to be repopulated, with little additional work to be done. After 30 days, a new HRA is required and would have to be filled out completely. However, the Director pointed out if the person submitting the application clicks resubmission within 30 days, this resubmission can be held as pending for up to six months, thereby avoiding having to do the application from the beginning.

On December 18, 2017 a conference call was held with representatives from DOH (OCT), OMH, TSI, and the Independent Reviewer's office to discuss HRA applications that are UTC. HRA reported that UTCs are generally due to problems with the submission (things missing; information not included; missing documents, etc.) or problems with the assessment (need for more information; and conflicting information). They said that the discrepancy with the assessor's recommendation is often due to the treating physician saying that the individual is unable to live independently, which is often "tied to other issues." Safety, and the level of supports needed, given the safety risks, is of prime concern to HRA. Often a case is UTC because the recommendation of the assessor is not appropriate, given what the psychiatrist recommended and what is written in the application package, or there are many hospital admissions, that present additional risk factors. Frequently the treating physician has been seeing the person for some time, and "knows the patient (best)." HRA stressed their inability to go against a psychiatrist's recommendation, which is sometimes supported by other information including that from prior HRA applications to Supportive Housing. However, assessors have an opportunity to defend their opinion based on additional information, that may not have been

included in the application. In addition, in the new assessment process to be conducted by the Housing Contractors, the assessors will always have the option to submit the psychosocial that they complete, that will incorporate the individual's psychiatric history and risk factors, rather than the CPE completed by the psychiatrist.

As of March 16, 2018, 1295 applications had been submitted to HRA, of which 1251 (97%) were approved and 44 (3%) were classified as UTC. This is a marked decrease from the 6% reported in the Independent Reviewer's Third Annual Report (p. 61). Sixteen of these 44 will forever remain on the UTC list because the class members have died (5) or are non-transitional discharges (11) of people who left the adult home to live on their own or with family, went to an inpatient psychiatric or rehabilitation facility, or other disposition. Removing these class members from the count reduces UTC cases to 28 or 2%.

The current UTC list also includes class members who DOH has indicated were no longer interested in moving and the UTC would not be pursued. Four of the class members who had refused to be reassessed or otherwise indicated that they were no longer interested in transitioning (including one guardian on a class member's behalf), and are still noted as UTC as of March 16, 2018, were noted in our Third Annual Report. In addition, DOH has indicated that five additional class members designated as UTC as of March 16, 2018 are no longer interested in transitioning or refused reassessment and correcting their UTCs would no longer be pursued. The nine class member's applications were UTC a median of 77 days before they indicated they were no longer interested in moving from the adult home. As is the case with many class members who change their mind about wanting to transition, it is unclear what role, if any, the extensive delays in the application process played in their eventual decision.

This left 19 cases of class members who were still interested in transitioning but were UTC as of March 16, 2018. The median number of days that the 19 cases had been UTC was 102 days, a marked decrease from the median number of 198 days for 36 UTC cases reported in the Independent Reviewer's Third Annual Report (p. 62). Twelve of these 19 cases were submitted to HRA since November 15, 2017 and have been UTC for a median of 59 days. This is a clear indication that steps are being taken to address many of the most recent UTC cases in a more timely manner.

As noted in the Independent Reviewer's Third Annual Report (p. 62), 19 class members whose HRA applications had been designated UTC were waiting to be assessed by TSI as of March 10, 2017.  As of March 16, 2018, none of the 19 noted in the last annual report, were still waiting to be assessed. In addition, only four class members whose applications were designated UTC as of March 16, 2018 were waiting to be reassessed by TSI. They were UTC a median of 162 days.

In speaking with DOH during January 2018, we were informed that once a class member is referred for reassessment, the duration that they had been UTC does not factor in to the decision as to when they will be assessed. The current "backlog" of assessments includes people like the four class members noted above, currently waiting to be reassessed, as well as any new requests for assessment, with no priority given. Although improvements have been made in reducing the numbers of UTC cases, and even the duration of the UTC, it is imperative that steps be taken to ensure that cases that are UTC, do not get lost in the process, with a high likelihood that class members will lose interest in being reassessed and moving out of the adult home when they are eventually "found."

Below is a summary of the reason for the HRA determination of UTC for these 19 cases (and a definition of terms), as well as the number of cases and the median length of time cases have been in each category as of March 16, 2018.

| Determination Reason | Applications | Median # of Days |
|---|---|---|
| Missing/Incomplete Supporting Docs. | 8 | 94 |
| Assessment Discrepancy | 3 | 205 |
| Axis I Unsubstantiated | 1 | 157 |
| Requested Additional Information | 4 | 43 |
| Timeline of Assessments | 2 | 332 |
| Other | 1 | 102 |

Table7. Reasons for UTC status

**Determination Reasons Defined**

*Missing/Incomplete Supporting Documentation*:   Incomplete/missing sections of AHRAR, UAS and/or other clinical documents.   Missing required forms such as AHRAR, Psychosocial and/or UAS, or CMHA, for some assessments completed after July 1, 2016.

*Requested Additional Information*:  More information is needed in order to make a determination, such as fire setting/arson behavior, detailed description of violent behavior, or recent psychiatric hospitalization.

*Assessment Discrepancy*:   The level of housing recommended in the clinical documentation (i.e. psychiatric evaluation, UAS, AHRAR or psychosocial) is inconsistent.

*Axis I Unsubstantiated*: More information needed to substantiate the psychiatric diagnosis in the clinical assessment.

*Other: In the three cases above, which did not fall into any of the other categories, the reasons included: writing illegible; missing signature on CPE; and unable to open the documents.*

*Timeline of Assessments*: Date of completion for the AHRAR doesn't include the most recent significant clinical event to inform an appropriate recommendation for the level of Supportive Housing.

## IX. Person-centered care planning process

The Settlement Agreement requires that for each class member assessed, the Health Home or MLTCP shall develop a person-centered care plan with the informed and active involvement of the class member, and include consideration of the current and unique psychosocial and medical needs and history of the individual as well as the functional level and support systems developed by the Health Home or MLTCP care manager. (Settlement Agreement, ¶ F (1) (2))

Each person-centered plan must identify the housing that is the most integrated setting appropriate for the individual and the community services needed to support the individual in such housing, based on the individual's needs and personal preferences. If supported housing is part of the person-centered plan, the care coordinator must make a referral to the appropriate Housing Contractor. (*Id*. F (3))

In monitoring person-centered care planning activities, the Independent Reviewer team followed up on a sample of 35 individuals who had transitioned between September 1, 2016 and June 1, 2017, visiting with them in their homes if they consented; reviewing care plans, Support Plans and progress notes; and interviewing staff. The Independent Review team also participated in 63 transition calls and 48 post-transition calls and 46 "Level II" calls; and met with all Housing Contractors and scores of HH/MLTCP care manager/coordinators in the course of meetings, trainings and other activities.

### A. Improvements and ongoing problems in person-centered care planning

While there have been improvements made, these review activities suggested ongoing problems with care planning and delivery of needed services, as were reported in the Independent Reviewer's prior annual reports. (First Annual Report, pp. 47-53; Second Annual Report, pp. 70-73; Third Annual Report, pp. 64-68)

### 1. Delays in the delivery of services

As discussed earlier, a majority of the individuals who were included in the sample the Independent Reviewer followed up on experienced problems with the design and implementation of care plans and thus experienced delays in the receipt of benefits and services including SNAP benefits, government IDs necessary for a range of community services, and Health Home, MLTCP and/or CHHA services. Nineteen experienced problems with the timeliness and adequacy of SNAP benefits, sometime for several months after their transitions. Twelve had problems with the finances, in obtaining their SSI funds, dealing with changes in representative payee status, in continuing certification for SSI and Medicaid benfits and in managing their money. Seven experienced problems with timely provision of HHA, CHHA or PCW services.

### 2. Care management teams supporting class members

Notwithstanding these delays and problems in the delivery of services, virtually all of the class members who had transitioned expressed satisfaction with their new living arrangements, services and care support teams (i.e., HH/MLTCP care coordinators, Housing case managers, etc.). While many transitions went smoothly or with only minor bumps in the road, others did not. The Independent Reviewer's team saw many instances in which care support teams assisted the individuals in these trying situations, innovatively and with dignity and respect. Sometimes the assistance was in the form of helping the individual move to a new setting in the community; sometimes it was simply hand-holding. Several cases are illustrative.

> Notwithstanding these delays and problems in the delivery of services, virtually all of the class members who had transitioned expressed satisfaction with their new living arrangements, services and care support teams (i.e., HH/MLTCP care coordinators, Housing case managers, etc.).

- ***MM** was 44 years old when in late November 2016 she moved out of the adult home in which she had lived for nearly 20 years. She transitioned to live in supported housing with her boyfriend from the adult home. As described earlier in this report, (pp. 25, 28-29) many serious problems arose shortly after her transition. During MM.'s stay in supported housing, her Housing Contractor and AH+CM worked diligently and collaboratively to try to ensure her well-being and that of her boyfriend who showed signs of decompensation, possibly related to apartment conditions (neither heat nor hot water). He eventually agreed to move to another supported apartment. They did so while being extremely sensitive to and respecting her wishes and her right to refuse their efforts, but also endeavoring to try to ensure that she was in a safe and harm-free environment. They engaged the services of APS and a Mobile Crisis team, with which they consulted frequently about possible interventions. They also consulted with DOH and OMH about the situation. When MM. requested to return to her former adult home, with DOH's*

*approval, the support team approached the adult home which refused readmission. MM. then consented to living in a Level II OMH housing program operated by her Housing Contractor.*

- ***KR*** *was 53 when he transitioned to a single room supported apartment in October 2016 from the adult home where he had lived for more than 12 years. He had a long-standing history of mental illness with at least six previous psychiatric hospitalizations. He actively experienced auditory hallucinations, often of a commanding and sexual nature, but denied suicidal thoughts or intent. Following an episode of verbal aggression while in the adult home in 2016, he was hospitalized and then referred to an ACT team which continued to provide weekly case management and other services following and through his transition to supported housing. Less than two months after he transitioned to supported housing, KR. was hospitalized for about one week when it was suspected he was not taking his medications. Soon after his discharge, he displayed sexually inappropriate activity towards his housing case manager (exposing himself to her). He was promptly evaluated by the ACT team which resulted in a two week respite stay in the Housing Contractor's Level II Community Residence program. Following this, KR. returned to his supported apartment where he has done well and has been closely monitored by both the Housing Contractor and ACT team. ACT team notes reflect his ongoing struggle to not respond to voices that he called "the controllers," telling him to do sexually inappropriate things. In response, his medications have been adjusted several times, with good effect.*

- *During his discharge planning process, 63-year-old **JI**, expressed a fear about transitioning: getting lost in the community and not being able to remember his new address. JI had been living in his adult home for at least four years and had a history of living in a facility for individuals with developmental disabilities (Willowbrook) for 10 years, and had periods of incarceration and homelessness following such. This concerned his HH and MLTCP care managers. They began discussing Level II housing for him, but he said he wanted his own apartment. As the team's concerns continued, it was decided that his Housing Contractor and a peer would take him out and acquaint him with his prospective new neighborhood. Prior to his move date, they went out with him a couple of times to orient him and even "tested" him to see if he could get back to his apartment from the grocery store and check cashing place in his neighborhood. He did fine and, during the second pre-transition call, all agreed with the move. No issues were noted since his move, and he carries his address with him in his wallet.*

### 3. An advance towards more robust person-centered care planning

As reported in the Independent Reviewer's prior annual reports, HH/MLTCPs have a variety of templates for developing care plans.[22] Most of these, however, focus on health and safety issues, much like the State's Discharge Planning Tool which is completed by care

---

[22] First Annual Report p. 50; Second Annual Report pp. 71-73; Third Annual Report pp. 65-68.

coordinators and serves as the basis for pre-transition calls involving HH/MLTCP and Housing Contractor staff and representatives from DOH and OMH to ensure a safe and smooth transition. These issues, which included items such as food, shelter, medical/mental health services, emergency contacts, etc., are all vitally important issues, to be sure. But they do not address the totality of a person's life, their desires, life dreams, things they would like to accomplish upon transitioning from an adult home, or more fundamentally how they would like to spend their days once they leave an adult home.

This year, as in the past, few HH/MLTCP care plans reviewed by the Independent Reviewer's team addressed issues such as vocational, educational, spiritual, social, community/civic interests/needs which round out the total individual and complement his or her health and safety needs. Some individuals in the Independent Reviewer's sample were able to independently act on their interests in these regards or received help from care coordinators or care managers.

- **MR**, who is 58 years old and once served in the Air Force, contacted the VA about employment opportunities, and also expressed an interest in becoming a peer advocate.

- **IL**, who is 57 years old, has an interest in writing poetry and one of her life goals is to have a book of poetry published. With staff's assistance she has purchased and is learning to use a computer for her writing.

In other cases, though, interests that would tend to round out a person's life were not identified by the individuals (nor mentioned in care plans) until the Independent Reviewer's team interviewed the class members several months after the transition. They were asked whether they would like to get a job or do volunteer work, go to school or take classes, join a community group (church, gym, bowling league, etc.), learn or take up a hobby, or make more friends. They were also asked if they had discussed these interests with their care coordinators/care managers.

- During an interview with 43-year-old **SH**, when the Independent Reviewer's team discussed hobbies, he indicated that he used to collect comic books and liked to draw. He reported that he would like to take illustration classes and begin collecting comic books again. (Historical records indicate he once went to school for graphic design.) He reported that he has never mentioned these interests to his support team. Independent Reviewer staff encouraged him to do so; we also called his AH+CM and informed her of his interests.

- When asked about community involvement/groups, 63 year-old **CF**. said she would like assistance to join the local YMCA, but had never mentioned this to anyone. She also indicated that she would like to use the library, but didn't know where it was. Her care coordinator, who was present for the interview, told her that she would help her pursue these interests.

In September 2017, the State amended its Discharge Planning Tool (DPT), significantly advancing a more robust approach to person-centered planning and care plans. The DPT was expanded to include a "Community Integration Discussion" section.

The new section of the tool forthrightly states that the class member's care plan should consider how the individual envisions daily life in the community, including his or her interests and goals. It also states that the care plan should detail how the individual's vocational, educational, social or spiritual needs should be met. It requires that care coordinators facilitate a discussion with the class member around certain topics; help the class member identify specific services or programs that match their goals, desires and interests; and include the individual's vocational, educational, social or spiritual interests as part of the goals and interventions of their person-centered care plan, updating and revising them as appropriate.

> In September 2017, the State amended its Discharge Planning Tool (DPT), significantly advancing a more robust approach to person-centered planning and care plans. The DPT was expanded to include a "Community Integration Discussion" section.

Among the topics that should be probed during discussions between care coordinators and class members, summarized in the DPT, discussed in pre-transition calls and incorporated into care plans are:

- Prior to living in the adult home, where and in what types of places did you live? What types of activities did you enjoy doing there or wished you could have done there? Would you like to pursue these activities once you move?

- Have you ever been employed or volunteer before? Or are you now? What did you like/dislike about it? Would you like to work or volunteer in the future? What kind of paid or volunteer work can you see yourself doing? How can we help you achieve these goals?

- Prior to living in the adult home, did you attend school or participate in vocational training? What was it like? Are you interested in attending classes or participating in vocational training? What types of classes or training are you interested in?

- Do you participate in social activities in the adult home? Would you like to continue those types of activities? Would you like to meet new friends? Are you interested in community or cultural events? What types of events or programs interest you? Do you have any hobbies or other areas of interest that you are currently involved in or would like to pursue after you move (e.g., sports, music, art, photography, etc.)?

- Do you consider yourself religious? What importance does your faith or belief have in your life? Are you currently part of a spiritual or religious community? Would like to become part of one?

In monitoring pre-transition calls since these amendments to the Discharge Planning Tool have been made, the Independent Reviewer's team has been impressed with the degree to which the additions to the tool have resulted in a more holistic picture of the class members and their interests and needs above and beyond just living safely in the community. It remains to be seen how well these interests will be addressed over time.

As this approach to probing class members' interests more comprehensively prior to transition to ensure they are addressed in care plans was not in place prior to September 2017, when many individuals including those in our sample had been transitioned, it would be desirable to have similar community integration discussions with those individuals to see if they need assistance with achieving their life goals.

### 4. Adult Home Plus (AH+) care management program

In the fall of 2015, DOH established an intensive care management program for class members who were enrolled in Health Homes and desiring to transition. Under this program, Health Homes/Care Management Agencies must have a dedicated caseload ratio of one care manager (AH+CM) to 12 class members.

Among other things, the AH+CM must provide face-to-face contact with the class member four times a month or more frequently as needed; assist the individual in obtaining identification-related documents and in securing or renewing benefits (e.g., food stamps, SSI, Medicaid, etc.); maintain regular contact with the class member's other support providers (e.g., MLTCP, Housing Contractor, clinicians, etc.); and, with their input, prepare the State's required Discharge Planning Tool, lead the pre-transition conference call involving the various support providers and DOH and OMH, and develop and update the person-centered Plan of Care.

For at least six months following transition, AH+CMs are expected to continue working with the class member and the support team to provide support consistent with the care plan to foster ongoing skill-building and independence. By the sixth month, following consultation with the other team members, the AH+CM must assess the individual's need for the continued intensity of AH+CM services and determine whether he or she can be "stepped down" to a level of regular Health Home care management services. DOH has no policies concerning caseload size for regular Health Home care management services nor the frequency of face-to-face contacts.

The advent of the AH+CM program was instrumental in providing class members a single point of contact, and an individual with a reasonable caseload who could assist them through the transition process. Prior to the initiation of AH+CM program, the Independent Reviewer had received anecdotal reports of care managers having caseloads in excess of 75 individuals, with some up to more than 100 individuals.

A snapshot of the data as of December 15, 2017 shows that 1,949 class members were enrolled in Health Homes; 837 of whom were receiving AH+CM services. These 837 are a subset of the 2,492 class members who said Yes at in-reach. The status of the remaining 1,655 class members who were not assigned a AH+CM as of December 15, 2017 is shown on Table 7 below.

Of most concern are the 186 class members who said Yes, but have been waiting for more than 60 days for the assignment of an AH+CM. Given the heavy reliance upon these AH+CMs with low caseloads to remedy many of the problems that have emerged in the transition steps following in-reach, it is of vital importance that class members are assigned an AH+CM promptly. The primary reason for the delayed assignment appears to be a shortage of AH+CMs. The State recognizes this problem, and as this report is being drafted, is working on strategies to recruit additional AH+CMs to meet the anticipated demand for their services.

| Status | Number | Explanation |
|---|---|---|
| Said Yes | 2492 | |
| Assigned AH+CM | 837 | |
| Not Assigned AH+CM | 1655 | |
| | 186 | Not assigned within 60 days of saying Yes |
| | 89 | Not assigned, less than 60 days since saying Yes |
| | 10 | Enrolled in the PACE program |
| No current AH+CM | 1370 | |
| | 313 | Refused assessment |
| | 274 | Transitioned, no longer assigned AH+CM |
| | 266 | Not a class member |
| | 222 | Non-transitional discharge |
| | 115 | Deceased |
| | 101 | Assessed, declined to move |
| | 26 | Declined transition prior to assessment |
| | 16 | Assessed, transition not recommended |
| | 5 | Guardian declining transition |
| | 32 | Other, active cases |

**Table 8. Assignment of AH+CMs**

There are two other issues that warrant attention: a high rate of turnover among AH+CMs and the need for guidance concerning the frequency of contacts and types of monitoring class members receive following their step down from AH+CM to regular care management services.

### a. Turnover

In the course of review activities, the Independent Reviewer's team has received reports from care coordinators, supervisors and Housing Contractors about high turnover of AH+CMs. This undoubtedly has an impact on an individual's transition and their continuity of support. In pre-transition conference calls, for example, one sometimes hears an AH+CM explain that she has not yet applied for food stamps or engaged in another vital activity because she was just assigned to the case as the original AH+CM had left.

The Independent Reviewer requested data from DOH on turnover among AH+CMs and regular Health Home care coordinators by Health Home and Care Management Agency (CMA). DOH reported that it does not collect that type of information. However, the aggregate data provided by DOH suggests a fair degree of turnover which warrants closer scrutiny.

According to DOH, as of December 15, 2017, across the nine Health Homes and the 23 CMAs, there were 98 AH+CMs and 33 AH+CM supervisors. DOH also indicated that between March 2017 and December 2017, the Health Homes and CMAs reported 60 AH+CMs and 17 supervisors had left their agencies; and during that period they hired 25 AH+CMs and seven supervisors.

### b. Step downs

Through the AH+CM program, class members receive an intense level of monitoring and assistance by care coordinators prior to and for at least six months after they transition: among other things, at least four face-to-face contacts monthly. The decision to step an individual down from this level of monitoring and assistance is one to be made in consultation with members of the support team (e.g., Housing Contractor, MLTCP, etc.) and upon the AH+CM's assessment.

Although the State does not prescribe a tool or instrument to guide the assessment and decision, it has shared a tool developed by one CMA with the leadership of Health Homes to use or build upon. A number of Health Homes/CMAs are using the tool or one similar to it. The tool identifies areas in which class members should be assessed in formulating a decision as to whether or not they should be stepped down to regular Heath Home care management services. The items are:

- Daily Living skills (maintaining hygiene, doing laundry, using appliances safely, food preparation, etc.);
- Symptom and Medication Management (keeping appointments, taking medications as prescribed, managing symptoms, etc.);
- Medical health (responding appropriately to medical issues, keeping medical appointments, knowledge of first aid, etc.);

- Personal/Interpersonal (managing interpersonal conflicts or issues, interacting with peers, involvement in social activities, etc.);
- Community Integration (accessing and using community resources, ability to develop a natural support system, etc.);
- Vocational/Educational (participation in such programs);
- Assertiveness/Self Advocacy (ability to: respond to problems, assess needs and make changes accordingly, communicate needs, etc.); and
- Substance Abuse (abstains from using non-prescribed substances, identifies/avoids triggers, attends substance abuse treatment, etc.).

However, there are no standards concerning a minimal level of care coordinator's contacts with and monitoring of class members once they are stepped down from AH+CM. For some individuals, the step down from weekly visits to an unspecified level of monitoring might be a precipitous step.

> There are no standards concerning a minimal level of care coordinator's contacts with and monitoring of class members once they are stepped down from AH+CM. For some individuals, the step down from weekly visits to an unspecified level of monitoring might be a precipitous step.

As such, the Independent Reviewer suggests that in the process of assessing an individual for possible step down, the support team recommend a level or frequency of face-to-face contacts and monitoring by a care coordinators given the person's unique situation once he is stepped down, and also recommend when this level of monitoring should be revisited and, if appropriate, revised by the team. The step down plan should also require regular contact between the care manager and Housing Contractor staff who have monthly contact with the class member.

## X. Need for formal quality assurance mechanisms

In prior annual reports, the Independent Reviewer has discussed the need for formal quality assurance mechanisms by which events which jeopardize the well-being of class members or their continued stay in supported housing are reported and reviewed to remedy the immediate situation and identify underlying or root causes for further correction, if needed, to prevent a recurrence. (Second Annual Report, p. 100; Third Annual Report, pp. 68-70) The Third Annual Report addressed the issue as follows:

> The Independent Reviewer's Second Annual Report discussed the fact that individuals who transitioned from adult homes sometimes experience crises which jeopardize their continued stay in supported housing. As we noted there, such experiences in supported housing should not be regarded as failures. With the strong presumption in the Settlement Agreement that virtually all class members are qualified for supported housing, it is not

unexpected that the presumption proves incorrect in some cases. It is also foreseeable that persons who have a serious mental illness, like other serious illnesses, will experience periods when their illness requires hospitalization or a higher degree of support than can be provided in supported housing. These events are a source of further learning about how to best support class members with intensive needs in the community. For this reason, the Independent Reviewer has repeatedly recommended that such occurrences be seized and capitalized on as learning opportunities about how to support individuals with intensive needs.

At present, there continues to remain no such mechanisms.

Incident reporting standards and requirements that apply to OMH operated or licensed programs do not apply to supported housing programs. However, within OMH's New York City Field Office there is a High Risk/High Profile (HR/HP) Committee. More of a technical assistance than a quality assurance mechanism, the committee was created to promote coordination and better service planning for recipients who are brought to the committee's attention. Its mission is to provide mutual support to Field Office staff on complex cases; brainstorm about creative and thorough solutions to the highest priority needs of clients; and learn about resource, competency, service and policy gaps that need to be addressed. The interdisciplinary committee meets weekly and accepts referrals from hospitals, housing providers, clinic providers, and anyone serving someone in an OMH program.

Since the initiation of the Settlement Agreement, the HR/HP Committee has been consulted on the cases of five class members, including MM (discussed at pp. 25, 28-29 of this report). In MM's case, the committee recommended that the Housing Contractor continue to contact Adult Protective Services and, with proper consent, contact the family to obtain more information about her developmental years as well as school records to see if there is evidence of a developmental disability. If there is, the Housing Contractor could refer her to OPWDD. The committee also assigned staff to facilitate a psychiatric evaluation and secure other records.

Cases cited by the Independent Reviewer in prior annual reports as warranting quality assurance reviews were not brought to the HR/HP Committee's attention, nor was the case of JR, discussed hereafter.

DOH has incident reporting standards whereby Health Homes must report certain events to DOH. Until recently, Health Homes were also required to submit supplemental reports on these events to DOH: a five-day report outlining their preliminary findings and planned next steps; and a 30-day, final summary report which analyses the incident, identifies organizational or process deficiencies and steps taken to address deficiencies. In July 2017, however, DOH amended the standards and eliminated the requirement of supplemental reports; if needed, as of July 2017, DOH would request the additional information from Health Homes on a case-by-case basis.

DOH's definitions of reportable incidents by Health Homes, however, are largely predicated on the actions of a service provider. (See Appendix B.) They do not fit squarely with the experience of class members whose well-being or continued stay in supported housing might be jeopardized by their own actions/inaction (as a result of limited skills or an exacerbation of the symptoms of their mental illness) or that of others, such as a housemate, neighbors, landlord, etc. The case of JR is illustrative.

- *JR moved into a one bedroom supported housing unit in February 2015. Soon after, he began experiencing numerous problems with conditions of the apartment which persisted during his more than two-year tenure there. The living room floor was noted to be buckling as early as one week after his move. There were water leaks in the bathroom from an apartment above which persisted for months. His kitchen ceiling collapsed in June 2015, was repaired, but collapsed again in July. From 2015 through May 2017, he experienced numerous plumbing problems: his toilet and sink were frequently clogged; sometimes his toilet didn't work for weeks at a time; and for many months in 2017 water ran constantly in his bathtub. In May 2017, it was reported that the steam from the water leak was intolerable. The apartment was reported as being infested with roaches, dirty and malodorous. JR often would not take the garbage out or clean, but he refused home care services as he didn't want others whom he did not know in his apartment. He also did not have keys to the apartment's window gates which posed a safety hazard in the event of a fire.*

  *These conditions were not unknown to his support team. His Housing Contractor case manager visited him monthly in the apartment, noted the conditions in her record, brought them to the attention of the building's management, and sometimes they were repaired, only to recur. The AH+CM periodically visited the apartment, noted conditions and told JR. she would report them to the Housing Contractor. (Based on her notes, it does not appear that the AH+CM had conducted four visits monthly with JR.) JR was stepped down from AH+CM on September 23, 2015, a little more than six months after his transition. As of October 18, 2017, or a little more than two years since he was stepped down to regular care management, JR was visited a total of five times by four different regular Health Home care coordinators who also made monthly attempts to reach him by phone, or send him a letter if not contacted. These care coordinators were also aware of the conditions. In fact, on one occasion in July 2016, one care coordinator met with JR in the hallway of his building as the apartment was too hot and malodorous to enter. The care coordinators periodically reported the conditions to the Housing Contractor and inquired about the status of repairs; on other occasions they reported the problems to the building's management directly, to no avail. The conditions persisted and at some point JR even considered moving back to the adult home.*

The Independent Reviewer first learned of JR's situation in May, 2017 when contacted by an advocate who had visited JR on May 19, 2017. She reported that JR, with whom she had prior conversations, reported that his apartment was getting harder to live in, but his descriptions

over the phone left her completely unprepared for what she saw when she visited on May 19th. In her message to the Independent Reviewer she recounted:

> *There is mold growing everywhere, black and thick and snaking up the walls. The ceiling is bubbling and falling down in many places. The linoleum flooring is curling up at the seams. His bathtub faucet pours water 24 hours/day; the super sent in a plumber a few months ago to fix it but the problem began again and JR estimates he's asked both the super and rent office manager for help 15 to 20 times. Each defers to the other and no one has done anything. His housing case manager is aware of these problems and has documented them with photos… From the way JR describes it, his housing case manager isn't forcing the super/owner to do any of the repairs now, so it's just JR asking for himself. This situation, particularly the thick, black mold, is completely unsafe.*

On May 22nd, the Independent Reviewer alerted DOH and OMH to the situation, forwarded photographs taken by the advocate and requested that, beyond addressing the immediate problem, the State undertake a more searching inquiry into how this was allowed to happen and persist. (Prior to this, neither DOH nor OMH were aware of JR's situation, as neither the Housing Contractor nor the Health Home had reported the persistent problems with the apartment, nor were they required to.)

The State took immediate action and JR was moved to a studio apartment on May 24th.

The Independent Reviewer requested reports from DOH and OMH on their reviews of the handling of the problems with JR's apartment, and received them in November 2017. The OMH requested that the Housing Contractor conduct an investigation and submit a plan of correction which was reviewed by OMH. It found that there were numerous apartment issues that were related to the management company and were repaired. However, the management company stopped responding to unit issues in the latter part of September 2016. The case manager reported the issues to the building management and also reported bringing it up in supervision. But there was no effective action taken while the class member continued to endure myriad problems. In the end, the landlord's lack of response should have been elevated for the Housing Contractor to aggressively advocate for the apartment repairs to be fixed by the building management company. In addition, the client's care coordination team (care management and housing), had an almost nonexistent collaboration.

Among the corrective actions were the following:

- Implementation of an agency-wide apartment inspection conducted by facilities and program managers, which began in May 2017. Deficiencies with units will either be repaired by the Housing Contractor's maintenance staff, or be aggressively communicated to management companies.

- Ongoing regular unit inspections will be conducted by management team thereafter. For apartments identified with deficiencies, program staff will visit client's unit twice per month until deficiencies are corrected.
- Scatter site staff will also receive more intensive training on fieldwork, unit inspections, client linkages, follow up and documentation.

Upon its review of Health Home and related records and a meeting with Health Home staff, DOH concluded and recommended among other things that:

- The Care Manager should continue to maintain ongoing communication with the Housing Contractor and establish a measurable follow up time to resolve issues.
- If issues are not resolved, care manager should elevate the complaint to their supervisor who should also establish a reasonable follow up time.
- If the CMA supervisor is unable to resolve the issue, contact should be made with the lead Health Home for further review and resolution.
- When appropriate in compliance with the Health Homes' reportable incidents policies and procedures, the Care Manager will continue to identify, document and report incidents to supervisor and Health Home. If necessary the Health Home may contact the DOH team for discussion and resolution.
- Both the Care Manager and Housing Contractor were not successful in quickly resolving apartment issues. Although issues were clearly documented in the care record, problems were not resolved.

During a nearly two-year tenure in a supported housing unit, JR endured intolerable and unsafe living conditions. His situation was ultimately remedied, and many of the underlying causes in need of corrective action identified, only because a concerned advocate brought it to the attention of the Independent Reviewer who in turn relayed the situation to OMH and DOH. Notably, however, the failure of the AH+ CM to conduct the required number of visits with JR was not identified as a problem requiring attention or correction, although this care coordinator conducted only eight visits over an eight month period rather than the required four visits per month.

> During a nearly two-year tenure in a supported housing unit, JR endured intolerable and unsafe living conditions. His situation was ultimately remedied, and many of the underlying causes in need of corrective action identified, only because a concerned advocate brought it to the attention of the Independent Reviewer who in turn relayed the situation to OMH and DOH.

His case, like others discussed in the Third Annual Report (EE and JSC at pp. 30-32), exemplifies the need for a quality assurance mechanism for class members which, in addition to immediately correcting situations which jeopardize their well-being and continued stay in supported housing, addresses the root causes that led to the situation. A sound quality assurance mechanism also serves to provide teaching moments, opportunities from

74

which other Housing Contractors, Health Homes, MLTCPs, etc. can learn in order to better provide supports and services to class members. The Supplemental Agreement partially addresses this concern with a new provision requiring incident reporting and review for class members enrolled in the Adult Home Plus program for conditions which endanger their health or safety, or result in death, or jeopardize their ability to remain stably housed in supported housing. (D. 6) It also requires quarterly case reviews of samples of cases in several categories. (D.4)

## XI. Conclusion

The pace of transitions is still slower than what would be required to meet the Settlement Agreement goals. The Settlement Agreement required that by Year Four (July 23, 2017) the State would have assessed 2,500 class members and, if appropriate, transitioned them to supported housing or another appropriate least restrictive alternative. The Weekly Report submitted by the State for the week ending July 28, 2017, reports that 2,328 class members had at least one completed assessment since the start of the Settlement Agreement. Of these, in 587 cases, the individual was reported as refusing the assessment. Of the 1,187class members assessed and recommended for supported housing (1,010) or other licensed OMH housing (177), 540 had transitioned by July 28, 2017.

It is apparent that the implementation of the Settlement Agreement has not proceeded as originally anticipated and that the pace of transitions of class members who are interested in moving to supported housing or other community residential alternatives has been considerably slower than envisioned. The state regulations[23] that were intended to prevent new admissions of persons with serious mental illness into the impacted adult homes have been the subject of a Temporary Restraining Order issued in a State Court, with the consent of the State Defendants. (*Doe v. Zucker*, Index No. 07079/2016 (Albany County))[24] Consequently, new admissions to the impacted adult homes have continued, adding to the original class. As can be seen in Figure 1, despite all of the efforts over the past four years, the overall size of the class remains about the same.

---

[23] *See* 18 NYCRR §§ 487.4(c) provides:

> No operator of an adult home with a certified capacity of eighty or more and a mental health census. .. of 25 percent or more of the resident population shall admit any person whose admissions will increase the mental health census of the facility.

14 NYCRR § 580.6(c)(2), 582.6(c)(2) prohibit a hospital from discharging any person with serious mental illness to an adult home with a certified capacity of eighty or more and a mental health census of 25 percent or more unless the person was a resident of the home immediately prior to his or her current period of hospitalization.

[24] Subsequently removed to the United States District Court in the Northern District of New York (No. 17-1005, Suddaby, C.J.)

The parties have been engaged for most of the past calendar year in reviewing the entire implementation process, along with members of the Independent Reviewer team, with a view to streamlining the process in order to facilitate the achievement of the goals of the Settlement Agreement. These discussions culminated in a Supplement to the Second Amended Stipulation and Order of Settlement that has been filed with the Court (Doc. 196-1, filed March 12, 2018 in 1:13-cv-04166-NG-ST). The State has already begun implementing some of the changes. Among the significant changes are the following:

1. The assessment process will be changed by lodging responsibility for the assessments with the Housing Contractors. This is intended to simplify and streamline the process and reduce the number of people and agencies that class members have to interact with.

2. The State will implement a program of Peer Bridgers – persons with a lived experience of mental illness who live in the community – who will be present in the adult homes to work with current residents throughout the process of in-reach, assessment, planning and transition to the community. At least three full time peers will be assigned to each of the impacted adult homes and work closely with the Housing Contractor staff.

3. The agreement sets specific timelines for various tasks to be performed, and thresholds for compliance.

a. In-reach must occur within 30 days of placing a person's name on the Community Transition List;

b. Referrals for assessment will occur within five days of in-reach.

c. The backlog of assessments must be eliminated within four months of signing the agreement.

d. 85% of the new assessments will be completed within 60 days, and 98% within 120 days.

e. Cases that do not meet the deadlines in (d) will be subject to a Case Review Committee described below.

f. Completed referrals must be sent to HRA within five days.

g. Housing Contractors must offer to show suitable and available apartments within 45 days of HRA approval.

h. All efforts must be made to effect transitions within 60 days of HRA approval.

i. Pre-transition planning will be required to ensure that necessary services are available upon transition.

j. 85% of the class members shall be enrolled in Adult Home Plus case management (1:12 ratio) within 60 days of referral for assessment, and 98% within 90 days. Cases that do not meet these deadlines will be referred to the Case Review Committee.

k. The agreement specifically addresses the State's obligation to class members who either explicitly or implicitly by their behavior do not cooperate with the processes described above, and essentially eliminates them from compliance calculations.

4. The agreement sets forth specific transition metrics to be measured every six months, with the Independent Reviewer reviewing and reporting upon compliance to the parties and the Court.

5. The agreement creates a new Quality Assurance and Performance Improvement process which requires the collection, analysis and reporting from various data pertaining to compliance with the metrics described above. These will be included in the quarterly reports submitted to the parties and the Court.

a. It creates a Case Review Committee composed of representatives of the Plaintiffs, the State and the Independent Reviewer to review cases that do not meet the metrics described above, or about which there are disagreements among the parties.

b. It requires quarterly reviews of samples of class members in various categories to assess fidelity to the implementation processes agreed upon, with reports to the parties.

c. It creates a more specific incident reporting and review process for class members enrolled in the Adult Home Plus care management who are exposed to conditions which endanger their health or safety or jeopardize the stability of their housing.

6. There are new provisions addressing discouragement and interference by adult home providers, including a new complaint investigation and tracking system.

7. The parties agreed upon a cap on the class as of September 30, 2018. Individuals who are admitted to the impacted adult homes after that date will not be entitled to relief under the Settlement Agreement, but the State will continue to make efforts to transition those individuals into supported housing as desired and appropriate. No later than September 30, 2019, class members who wish to be assessed must make their decision known and the State will not be obligated to assess or transition class members who do not indicate their desire by this date. The agreement provides for notice to the class to be provided no later than March 31, 2019 of these provisions. It is important to note that class members

admitted prior to September 30, 2018 will be receiving in-reach to individually inform them of their rights and option to move to supported housing. The Supplemental Agreement provides that it does not and is not intended to prejudice the rights or claims of persons admitted to impacted adult homes after September 30, 2018.

8. The Court's jurisdiction to ensure compliance with the agreement will terminate on December 31, 2020 if, as of that date, the state has transitioned substantially all eligible class members who are appropriate to be transitioned and has substantially complied with its other obligations as set forth in the Settlement Agreement and the Supplemental Agreement. The parties may jointly ask the Court to terminate the agreement and supplement earlier than December 31, 2020.

The Governor's Executive Budget includes a request for five million dollars in new funds for the implementation of these initiatives in support of the Settlement Agreement implementation. As this case is halfway through its fifth and, what was anticipated to be, its final year, it is apparent that much work remains to be done to transition all interested and eligible class members to supported housing or other appropriate community living arrangements.

## XII. Recommendations

In prior annual reports, the Independent Reviewer has offered numerous recommendations to improve implementation of the Settlement Agreement.[25] Among the issues they addressed were the need to:

- Bolster in-reach efforts and better engage class members in the transition process through strengthened motivational interviewing, increased attention to Housing Contractor performance and staffing levels and, as an adjunct to in-reach staff, the involvement of Peer Ambassadors to assist class members in envisioning life outside adult homes and to guide them through the transition process;

- Create reasonable caseloads for care coordinators as well as performance expectations surrounding the completion of assessments, applications for benefits (e.g., SNAP) and other critical steps in the transition process;

- More closely scrutinize assessment outcomes, particularly with regard to those resulting in recommendations for Level II housing or in a finding that the individual does not have an SMI;

---

[25] First Annual Report, pp. 67-72; Second Annual Report, pp. 95-101; Third Annual Report, pp. 71-75.

- Develop more holistic person-centered plans of care which address class members' life dreams and goals and not simply their health and safety needs;

- Provide more placement opportunities for class members desiring one bedroom or studio supported housing units; and

- Establish quality assurance mechanisms whereby events that jeopardize a class member's continued stay in supported housing are reported and critically reviewed to identify and remedy underlying causes and to serve as learning opportunities for all involved in transition efforts.

At this juncture, many of the recommendations offered by the Independent Reviewer in the past, and which are still relevant, are under consideration by the parties as they seek to redesign the structure and implementation of the Settlement Agreement. As this annual report reflects, such a redesign is needed in order to provide class members the opportunity to transition to the community in a timely manner, if they are willing and it is appropriate -- a goal shared by the parties, but which has proven to be elusive to date.

While the parties continue the important work of redesigning the Settlement Agreement implementation process to afford class members the opportunity for timely transitions to community settings, the cases cited in this report indicate more attention needs to be paid to issues which arise upon transition.

- More than half the individuals (19) followed up in the Independent Reviewer's sample this year had problems with the timely receipt of SNAP benefits and 12 experienced difficulties with regard to SSI and Medicaid benefits (receipt of or renewal of certification for such). For class members, this results in financial instability or uncertainty, dependency on others or food pantries for basic necessities – not experienced while living in adult homes – and anxiety. As recommended in the First Annual Report, the Independent Reviewer recommends that DOH provide more targeted training for care coordinators on key tasks involved in transitioning individuals to the community related to their securing and continuing benefits to which they're entitled (e.g., obtaining IDs, applying for SNAP and other benefits). Given the reported high rate of turnover among these critically important frontline staff, we also again recommended that a "how-to" manual be created on these key tasks to serve as a resource for care managers.

- During visits to transitioned class members, the Independent Reviewer learned of or observed significant environmental problems in 14 of their apartments. Some of these pre-existed the planned move and had not been addressed for weeks or months; others

were identified after the move but were slow to be corrected. All diminished class members' comfort and enjoyment in having a place of their own; some threatened their safety or were cause for fear and anxiety. It is recommended that OMH work with Housing Contractors – whose staff have monthly contacts with clients and visit their apartments at least quarterly and often more frequently - to develop a protocol to guide inspections of environmental conditions and promptly remedy problems when observed or reported by class members.

- While the State has endorsed a series of issues support teams should consider in determining whether a person should be stepped down after their transition from intensive, weekly AH+CM contacts to regular Health Home care management services (for which there are currently no requirements for caseloads or care manager/coordinator visits), such decisions should be accompanied by a team recommendation, including input from the class member, on an appropriate level of care manager/coordinator visits, over a period of time, which can be revisited, and regular contacts with Housing Contractor staff to ensure a smooth step down.

- There also appears to be the need for the State to take the *Community Integration Discussion* section, recently added to its Discharge Planning Tool, one step further: to the more than 500 class members who transitioned before this section was added. The *Community Integration Discussion* section of the tool helps foster a holistic understanding of class members and their life goals. For people who transitioned before it became part of the discharge process, such a discussion may help identify needs of people now that they have transitioned and promote their success in the community.

- As discussed in prior annual reports and described herein, class members who have transitioned sometimes experience crises, events or conditions which jeopardize their continued stay in supported housing. The Independent Reviewer reiterates the recommendation that formal quality assurance mechanisms be put in place whereby these events are reported and reviewed to first immediately remedy the immediate situation and second to identify and correct underlying causes to prevent a recurrence. The provisions of the Supplemental Agreement discussed above are a positive step in that direction.

## Appendix A Table of Acronyms and Abbreviations

| Acronym or Abbreviation | Meaning |
|---|---|
| ACF | Adult Care Facility |
| ACT | Assertive Community Treatment |
| ADL | Activity of Daily Living |
| AH | Adult Home |
| AH+ CM | Adult Home Plus Care Manager |
| AHRAR | Adult Home Resident Assessment Report |
| ALP | Assisted Living Program |
| APS | Adult Protective Services |
| CAIRS | Child and Adult Integrated Reporting System |
| CBC | Coordinated Behavioral Care |
| CC | Care Coordinator |
| CDTP | Continuing Day Treatment Program |
| CHHA | Certified Home Health Aide |
| CIAD | Coalition of Institutionalized Aged and Disabled |
| CM | Care Manager |
| CMHA | Community Mental Health Assessment |
| COPD | Chronic Obstructive Pulmonary Disease |
| CPE | Comprehensive Psychiatric Evaluation |
| CPEP | Comprehensive Psychiatric Emergency Program |
| CR-SRO | Community Residence - Single Room Occupancy |
| CTC | Community Transition Coordinators |
| CTL | Community Transition List |
| CMA | Care Management Agency |
| CMHA | Community Mental Health Assessment |
| DAL | Dear Administrator Letter |
| DMV | Department of Motor Vehicles |
| DOH | New York State Department of Health |
| DSM-V | Diagnostic and Statistical Manual of Mental Disorders - 5th Edition |
| DPT | Discharge Planning Tool |
| FEGS | Federation Employment & Guidance Services |
| FIOS | Fiber Optic Service (Verizon) |
| FOO | Federation of Organizations |
| FTL | Fast Track List |
| GERD | Gastroesophageal Reflux Disease |
| HC | Housing Contractor |
| HCS | Health Commerce System |
| HH | Health Home |

| | |
|---|---|
| **HHA** | Home Health Aide |
| **HHC** | Health & Hospitals Corporation |
| **HIPAA** | Health Information Portability Act |
| **HRA** | Human Resources Administration |
| **IAH** | Impacted Adult Home |
| **ICL** | Institute for Community Living |
| **JBFCS** | Jewish Board of Family and Children's Services |
| **LHCSA** | Licensed Home Care Service Agency |
| **MFY** | Mobilization for Youth |
| **MH** | Mental Health |
| **MHANYS** | Mental Health Association in New York State |
| **MHC** | Mental Health Clinic |
| **MI** | Motivational Interviewing |
| **MLTCP** | Managed Long Term Care Plan |
| **NYAPRS** | New York Association of Psychiatric and Rehabilitation Services |
| **NYCRR** | New York Codes, Rules and Regulations |
| **NYPCC** | New York Psychotherapy and Counseling Center |
| **OMH** | New York State Office of Mental Health |
| **OPWDD** | New York State Office for Persons with Developmental Disabilities |
| **PCP** | Primary Care Physician |
| **PCS** | Personal Care Services |
| **PCW** | Personal Care Worker |
| **PERS** | Personal Emergency Response System |
| **PNA** | Personal Needs Allowance |
| **PNP** | Psychiatric Nurse Practioner |
| **PROS** | Personalized Recovery Oriented Services |
| **PSYCKES** | Psychiatric Services and Clinical Knowledge Enhancement System |
| **QA** | Quality Assurance |
| **RUMC** | Richmond University Medical Center |
| **SA** | Settlement Agreement |
| **SCAA** | Schuyler Center for Analysis and Advocacy |
| **SIBN** | Staten Island Behavioral Network |
| **SMI** | Serious Mental Illness |
| **SNAP** | Supplemental Nutrition Assistance Program (Food Stamps) |
| **SUS** | Services for the Underserved |
| **SSA** | Social Security Administration |
| **SSI** | Supplemental Security Income |
| **TSI** | Transitional Services for New York, Inc. |
| **TWC** | Time Warner Cable |
| **UAS-NY** | Uniform Assessment System for New York |

| **UTC** | Unable to Complete |
|---------|--------------------|

# Appendix B Definitions of Health Home Reportable Incidents

**Abuse:** Any of the following acts by an individual service provider:

(1) **Physical Abuse:** any non-accidental physical contact with a member which causes or has the potential to cause physical harm. Examples include, but are not limited to, hitting, kicking, biting, choking, smothering, shoving, dragging, throwing, punching, shaking, burning, cutting, or the use of corporal punishment.

(2) **Psychological Abuse:** includes any verbal or nonverbal conduct that is intended to cause a member emotional distress. Examples include, but are not limited to, teasing, taunting, name calling, threats, display of a weapon or other object that could reasonably be perceived by the patient as a means of infliction of pain or injury, insulting or coarse language or gestures directed toward a patient which subjects the patient to humiliation or degradation; violation of patient rights or misuse of authority.

(3) **Sexual Abuse/Sexual Contact:** includes any sexual contact involving a service provider (e.g., HH staff, CMA staff, other provider) and a member. Examples include, but are not limited to, rape, sexual assault, inappropriate touching and fondling, indecent exposure, penetration (or attempted penetration) of vagina, anus or mouth by penis, fingers, or other objects. For purposes of this Part, sexual abuse shall also include sexual activity involving a member and a service provider; or any sexual activity involving a member that is encouraged by a service provider, including but not limited to, sending sexually explicit materials through electronic means (including mobile phones, electronic mail, etc.), voyeurism, or sexual exploitation.

(4) **Neglect:** any action, inaction or lack of attention that breaches a service provider's duty and that results in or is likely to result in physical injury or serious or protracted impairment of the physical, mental or emotional condition of a member.

(5) **Misappropriation of Member Funds:** use, appropriation, or misappropriation by a service provider of a member's resources, including but not limited to funds, assets, or property, by deception, intimidation, or similar means, with the intent to deprive the patient of those resources. Examples include the deliberate misplacement, theft, or wrongful, temporary, or permanent use of a member's belongings or money.

**Crime Level 1:** An arrest of a member for a crime committed against persons (i.e. murder, rape, assault) or crimes against property (i.e. arson, robbery, burglary) AND is perceived to be a significant danger to the community or poses a significant concern to the community.

**Death:** The death of a member resulting from an apparent homicide, suicide, or unexplained or accidental cause; the death of a member which is unrelated to the natural course of illness or disease.

**Missing Person:** When a member 18 or older is considered missing AND the disappearance is possibly not voluntary or a Law Enforcement Agency has issued a Missing Person Entry, OR

when a child's (under the age of 18) whereabouts are unknown to the child's parent, guardian or legally authorized representative.

**Suicide Attempt:** An act committed by a member in an effort to cause his or her own death.

**Violation of Protected Health Information:** Any violation of a client's rights to confidentiality pursuant to State and Federal laws including, but not limited to, 42 CFR Part 2 or the Health Insurance Portability and Accountability Act (HIPAA), and Article 27F. The CMA has a responsibility to review to determine whether the incident is a breach of security vs. a breach of privacy.